1   KENNETH A. KUWAYTI (CA SBN 145384)
    BERKELEY FIFE (CA SBN 325293)
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California  94304-1018
    Telephone: 650.813.5600
4
    JOHN R. LANHAM (CA SBN 289382)
5   JANET S. KIM (CA SBN 313815)
    MORRISON & FOERSTER LLP
6   12531 High Bluff Drive
    San Diego, California  92130-2040
7   Telephone: 858.720.5100

8   Attorneys for Plaintiffs
    MITCHELL REPAIR INFORMATION
9   COMPANY, LLC and SNAP-ON
    INCORPORATED
10

11              **UNITED STATES DISTRICT COURT**

12            **SOUTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14   MITCHELL REPAIR INFORMATION COMPANY, LLC, a Delaware limited liability company, and SNAP-ON INCORPORATED, a Delaware corporation, | Case No. 3:21-cv-01339-CAB-BGS |
| 17            Plaintiffs, | **PLAINTIFFS MITCHELL REPAIR INFORMATION COMPANY, LLC'S AND SNAP-ON INCORPORATED'S *EX PARTE* MOTION FOR: (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 18   v. | |
| 19   AUTEL. US INC., a New York corporation, and AUTEL INTELLIGENT TECHNOLOGY CORP., LTD., a Chinese corporation, | |
| 21            Defendants. | Judge: Hon. Cathy Ann Bencivengo Courtroom: 15A |
| 22 | |
| 23 | PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |
| 24 | |
| 25 | **Jury Trial Demanded** |

26

27            **REDACTED VERSION OF
            DOCUMENT LODGED UNDER SEAL**

28

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiffs Mitchell Repair Information Company, LLC ("Mitchell 1") and Snap-on Incorporated ("Snap-on") (collectively, "Plaintiffs") hereby move, pursuant to U.S. District Court for the Southern District of California Civil Local Rule 83.3(g) and Federal Rules of Civil Procedure 26 and 65, and having provided notice to Defendant Autel. US Inc. ("Autel US") of this motion, for the following:

(1) a temporary restraining order enjoining Autel US, its officers, agents, independent contractors, employees, and all persons acting in concert with them, including Autel ITC, from:

(a) directly or indirectly accessing Plaintiffs' handheld diagnostic devices, TruckSeries, or ProDemand products, or any of Plaintiffs' other vehicle diagnostic and repair products ("Plaintiffs' Vehicle Diagnostic and Repair Products"), or any of Plaintiffs data servers or data services software associated with those products;

(b) disclosing, disseminating, or making use of any of the data or information obtained or derived from Plaintiffs' Vehicle Diagnostic and Repair Products, or any of Plaintiffs' data servers or data services software associated with those products;

(2) an order to show cause why a preliminary injunction should not issue, pursuant to Federal Rule of Civil Procedure 65, enjoining Autel US, its officers, agents, independent contractors, employees, and all persons acting in concert with them, including Autel ITC, from directly or indirectly committing the above-described acts; and

(3) an order requiring Autel US to provide a copy of the order to all persons acting in concert with it, including Autel ITC.

A temporary restraining order and preliminary injunction are appropriate in this case because Defendants have repeatedly accessed Plaintiffs' products and proprietary data and information without authorization in violation of the Digital Millennium Copyright Act ("DMCA"), the Computer Fraud and Abuse Act

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

("CFAA"), California's Comprehensive Computer Data Access and Fraud Act and/or Wisconsin Computer Crimes law, and in breach of Plaintiffs' end user license agreements. The requested relief is necessary to stop the violations and breaches and to prevent further irreparable injury to Plaintiffs from use and disclosure of the proprietary data and information that has been taken.

Pursuant to Civil Local Rule 83.3, Counsel for Plaintiffs informed Autel US that Plaintiffs were filing this *Ex Parte* Motion for: (1) Temporary Restraining Order and (2) Order To Show Cause Regarding Preliminary Injunction in this Court via a letter personally served on Autel US's California registered agent on July 27, 2021 and personally served on an authorized employee at Autel US's headquarters in New York on July 28, 2021. (Declaration of Janet S. Kim ("Kim Decl.") ¶¶ 3-4; Ex. 1.) In the letter, Plaintiffs' counsel offered to meet and confer about the *Ex Parte* Motion for: (1) Temporary Restraining Order and (2) Order To Show Cause Regarding Preliminary Injunction, but have not heard from Defendants as of the time of this filing. (*Id.* ¶ 3; Ex. 1.) Plaintiffs also sent the same letter to Defendants via the following means on July 27, 2021: certified mail to Autel US's headquarters, email to Autel US's public sales and support email addresses, facsimile to Autel US's public fax address, certified mail to Autel US's California registered agent, Priority Mail International to Autel US's parent corporation Autel Intelligent Technology Corp., Ltd. ("Autel ITC"), email to Autel ITC's public sales and support email addresses, and facsimile to Autel ITC's public fax address. (*Id.* ¶ 2; Ex. 1.)

Counsel for Plaintiffs are also providing Autel US and Autel ITC with a copy of this *Ex Parte* Motion for: (1) Temporary Restraining Order and (2) Order To Show Cause Regarding Preliminary Injunction, and all supporting documentation, via similar means as identified above, including process server hand delivery, overnight mail, email, and facsimile. (*Id.* ¶ 5.) Because outside counsel for Autel US has not yet appeared, and because these papers contain Plaintiffs' highly

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

confidential business information, Plaintiffs are providing the public, redacted versions of these papers.

This motion for relief is based on this notice and Memorandum of Points and Authorities, the concurrently-filed Declarations of Bradley Lewis, Jeff Grier, and Daniel Roffman, the concurrently lodged proposed Order Granting Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, all papers on file in this action, and any argument the Court may hear.

Dated: _July 28, 2021                    MORRISON & FOERSTER LLP

By: */s/ Kenneth A. Kuwayti*
    Kenneth A. Kuwayti
    KKuwayti@mofo.com

    Attorneys for Plaintiffs
    MITCHELL REPAIR INFORMATION
    COMPANY, LLC and SNAP-ON
    INCORPORATED

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1
II.   FACTUAL BACKGROUND ................................................. 2
    A.    Plaintiffs Snap-on and Mitchell 1 .................................. 2
    B.    Plaintiffs' Product Development ..................................... 3
    C.    Relevant Products ......................................................... 4
        1.    Snap-on Handheld Diagnostic Units .......................... 4
        2.    TruckSeries ............................................................. 6
        3.    ProDemand ............................................................. 6
    D.    Autel US and Autel ITC ................................................ 7
    E.    Intrusions into Plaintiffs' Systems ................................. 8
III.  LEGAL STANDARD ......................................................... 11
IV.   ARGUMENT ..................................................................... 12
    A.    Plaintiffs Will Likely Succeed on Their DMCA Claim .......... 12
        1.    Plaintiffs' Technological Measures............................ 12
        2.    Defendants Circumvented Plaintiffs' Measures ........... 13
        3.    Plaintiffs' Measures Control Access to Protected
            Works ..................................................................... 14
    B.    Plaintiffs Will Likely Succeed on Their CFAA Claim .......... 15
        1.    Plaintiffs Have a Protected Computer......................... 16
        2.    Defendants Accessed and Obtained Information
            without Authorization ............................................... 16
        3.    Defendants Acted with Knowledge and Intent .............. 17
        4.    Plaintiffs Suffered Damages...................................... 18
    C.    Plaintiffs Will Likely Succeed on Their California
        Computer Fraud Claim .................................................. 18
    D.    Plaintiffs Will Likely Succeed on Their Wisconsin
        Computer Crimes Claim ................................................ 19
    E.    Snap-on Will Likely Succeed on its Breach of EULA
        Claim ......................................................................... 20
    F.    Mitchell 1 Will Likely Succeed on its Breach of EULA
        Claim ......................................................................... 21
    G.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive
        Relief......................................................................... 22
    H.    The Balance of Equities Favors Injunctive Relief.................. 24
    I.    Injunctive Relief Serves the Public's Interest ..................... 24

**TABLE OF CONTENTS**
(continued)

Page

J. The Court Should Require Only a Minimal Bond ................... 25

V. CONCLUSION ...................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
307 F. Supp. 2d 1085 (N.D. Cal. 2004)................................................................14

*Actuate Corp. v. IBM Corp.*,
2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) ...............................................13, 14

*Al Otro Lado v. Gaynor*,
2021 WL 150987 (S.D. Cal. Jan. 18, 2021) .......................................................12

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)...............................................................................12

*B2B CFO Partners, LLC v. Kaufman*,
787 F. Supp. 2d 1002 (D. Ariz. 2011) ................................................................14

*Blizzard Ent. Inc. v. Ceiling Fan Software LLC*,
28 F. Supp. 3d 1006 (C.D. Cal. 2013).........................................................12, 25

*CDN Inc. v. Kapes*,
197 F.3d 1256 (9th Cir. 1999) ..............................................................................14

*Culligan, Inc. v. Rheaume*,
269 Wis. 242 (1955) .................................................................................................12

*Danaei v. Rostam*,
2016 WL 9138055 (C.D. Cal. Nov. 2, 2016) ......................................................15

*Design Ideas, Ltd. v. Meijer, Inc.*,
2018 WL 3545157 (C.D. Ill. July 23, 2018) ......................................................15

*Dish Network, L.L.C. v. SatFTA*,
2011 WL 856268 (N.D. Cal. Mar. 9, 2011) .......................................................24

*Dish Network L.L.C. v. Whitcomb*,
2011 WL 1559825 (S.D. Cal. Apr. 25, 2011) ....................................................25

*eBay Inc. v. Digital Point Sols., Inc.*,
608 F. Supp. 2d 1156 (N.D. Cal. 2009)...............................................................17

*Facebook, Inc. v. Power Ventures, Inc.*,
　　252 F. Supp. 3d 765 (N.D. Cal. 2017),
　　*aff'd,* 749 Fed. App'x 557 (9th Cir. 2019) ........................................................ 23

*Facebook, Inc. v. Sluchevsky*,
　　2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) .................................................... 19

*Fla. Atl. Univ. Bd. of Trustees v. Parsont*,
　　465 F. Supp. 3d 1279 (S.D. Fla. 2020) .............................................................. 23

*Ford Motor Co. v. Autel US Inc.*,
　　No. 14-13760, 2015 WL 5729067 (E.D. Mich. Sept. 30, 2015) .................... 8, 15

*General Motors L.L.C. v. Autel US Inc.*,
　　No. 14-14864 (E.D. Mich.) .................................................................................. 8

*Glynn v. Cigar Store, Inc.*,
　　2018 WL 3145683 (N.D. Cal. June 27, 2018) ................................................... 15

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
　　556 F. Supp. 2d 1122 (E.D. Cal. 2008) ............................................................. 17

*Jorgensen v. Cassiday*,
　　320 F.3d 906 (9th Cir. 2003) ............................................................................. 25

*Justin v. City of Los Angeles*,
　　2000 WL 1808426 (C.D. Cal. Dec. 5, 2000) ..................................................... 25

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
　　629 F.3d 928 (9th Cir. 2010) ........................................................................ 12, 13

*Microsoft Corp. v. EEE Bus. Inc.*,
　　555 F. Supp. 2d 1051 (N.D. Cal. 2008) ............................................................. 14

*Multiven, Inc. v. Cisco Sys., Inc.*,
　　725 F. Supp. 2d 887 (N.D. Cal. 2010) .......................................................... 16, 17

*Nexon Am., Inc. v. S.H.*,
　　2011 WL 13217951 (C.D. Cal. Dec. 13, 2011) ................................................. 13

*NNG, KFT. v. AVA Enters., Inc.*,
　　2015 WL 5442725 (C.D. Cal. July 8, 2015) ...................................................... 13

*Pixon Imaging, Inc. v. Empower Techs. Corp.*,
 2011 WL 3739529 (S.D. Cal. Aug. 24, 2011) .............................................. 22, 23

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
 793 F.2d 1132 (9th Cir. 1986) ............................................................................... 24

*San Diego Comic Convention v. Dan Farr Prods.*,
 336 F. Supp. 3d 1191 (S.D. Cal. 2018) ............................................................. 24

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
 739 F.2d 1415 (9th Cir. 1984) ............................................................................... 12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
 240 F.3d 832 (9th Cir. 2001) ............................................................................... 11

*SuccessFactors, Inc. v. Softscape, Inc.*,
 544 F. Supp. 2d 975 (N.D. Cal. 2008) ............................................................. 18

*Synopsys, Inc. v. AzurEngine Techs., Inc.*,
 401 F. Supp. 3d 1068 (S.D. Cal. 2019) ............................................................. 13

*TGG Mgmt. Co. v. Petraglia*,
 2020 WL 209103 (S.D. Cal. Jan 14, 2020) ....................................................... 23

*United States v. Christensen*,
 828 F.3d 763 (9th Cir. 2015) ......................................................................... 18, 19

*United States v. Nosal*,
 844 F.3d 1024 (9th Cir. 2016) ....................................................................... 16, 17

*Van Buren v. United States*,
 141 S. Ct. 1648 (2021) ....................................................................................... 16

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*,
 447 F.3d 769 (9th Cir. 2006) ............................................................................... 15

*Winter v. NRDC*,
 555 U.S. 7 (2008) ......................................................................................... 11, 12

sf-4515150

**Statutes**

Digital Millennium Copyright Act (DMCA) ........................................................*passim*

17 U.S.C.
   § 1201(a)(1)(A).............................................................................................. 12
   § 1201(a)(3)(A).............................................................................................. 13
   § 1203(b)(1).................................................................................................. 12

Computer Fraud and Abuse Act (CFAA)............................................................*passim*

18 U.S.C.
   § 1030(a)(2).................................................................................................. 15
   § 1030(a)(4)...................................................................................... 15, 16, 18
   § 1030(e)(2)(B).............................................................................................. 16
   § 1030(e)(8).................................................................................................. 18
   § 1030(e)(11)................................................................................................ 18
   § 1030(g)...................................................................................................... 12

Cal. Penal Code
   § 502(c)................................................................................................. 18, 19
   § 502(e)(1).................................................................................................... 12

Wis. Stat.
   § 943.70........................................................................................................ 12
   § 943.70(2).................................................................................................... 19
   § 943.70(2)(a)(3)........................................................................................... 19
   § 943.70(2)(a)(6)........................................................................................... 20
   § 943.70(5).................................................................................................... 12

**Other Authorities**

2 Nimmer on Copyright § 7.16(B)(1)(b)(i) (2021) ............................................... 15

sf-4515150

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    INTRODUCTION**

3          This motion is necessary to stop the blatant theft of Plaintiffs' proprietary

4    information and data by one of its largest competitors.

5          For over 25 years Snap-on, Incorporated ("Snap-on") and its majority-owned

6    affiliate Mitchell Repair Information Company, LLC ("Mitchell 1") have collected

7    information related to real-world vehicle repairs, including billions of repair records

8    and hundreds of billions of vehicle sensor data points.  To curate and analyze this

9    massive dataset, Plaintiffs co-developed proprietary artificial intelligence and

10   invested years of time and over $100 million.  As a result of this foresight and

11   massive development effort, Plaintiffs are the world's leading providers of

12   computerized automotive diagnostic and repair information.  Plaintiffs' products

13   uniquely allow automotive technicians to access information that industry experts

14   have precisely tailored to the exact symptoms and trouble codes exhibited for the

15   vehicle being repaired, at its given mileage level.  No competitor in the world offers

16   technicians such a comprehensive ability to focus their diagnostic process to

17   provide efficient and uniform repairs to their customers.

18         Like Plaintiffs, Defendant Autel US and its Chinese parent, Autel Intelligent

19   Technology Corp. ("Autel ITC") (collectively "Autel," or "Defendants") sell

20   vehicle diagnostic and repair products. But, unlike Plaintiffs, Autel has not been

21   developing a powerful database for 25 years.  Autel has no legitimate way to

22   develop nearly as comprehensive a product, so it attempted to do so illegitimately.

23         Plaintiffs recently discovered that Autel has been engaging in massive theft

24   from three of Plaintiffs' individual products: handheld diagnostic computers,

25   TruckSeries, and ProDemand.  Acting in concert, and hiding behind a web of over

26   300 different IP addresses, Autel US and Autel ITC circumvented Plaintiffs'

27   security measures and made *millions* of unauthorized requests for data by

28   "spoofing" the credentials of hundreds of Snap-on's handheld diagnostic

1

computers.  Concealed by third party user credentials, they obtained repair and diagnostic data for trucks from the TruckSeries product.  And Autel US has abused its user credentials to share its password with Autel ITC and make thousands of systematic vehicle data requests from ProDemand.

Autel's conduct violates numerous laws, including the Digital Millennium Copyright Act ("DMCA"), the Computer Fraud and Abuse Act ("CFAA"), and state anti-hacking statutes.  It also breaches Plaintiffs' license agreements.

Plaintiffs bring this motion against Autel US, on a subset of claims in the Complaint, asking that the Court enter an order temporarily and preliminarily restraining Autel US, and those acting in concert with it, from further attempts to access Plaintiffs' proprietary data, or use or disclosure of any data obtained to date.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs Snap-on and Mitchell 1

Snap-on was founded 101 years ago in Milwaukee, Wisconsin, originally as a professional tool company.  It began developing computer-based diagnostic equipment as vehicles adopted modern on-board diagnostics ("OBD-II") ports in the 1980s.  (Decl. of Bradley Lewis ("Lewis Decl.") ¶¶ 9-11.)[1]  Snap-on now develops and sells sophisticated handheld diagnostic computers that interface with vehicle OBD-II ports and display Plaintiffs' cloud-hosted proprietary diagnostic and repair information as well as Original Equipment Manufacturer ("OEM") repair information.  (*Id.* ¶¶ 11, 28-31.)  Snap-on employs about 12,000 people, including over 3,500 employees in its Repair Systems and Information Group.  (*Id.* ¶ 12.)

Mitchell 1 was founded 103 years ago as a vehicle service manual provider.  (*Id.* ¶ 13.)  It evolved into providing computer-based services and rolled out an On-Demand® repair information system in 1989.  (*Id.* ¶ 15.)  Mitchell 1 employs roughly 380 people in San Diego.  (*Id.* ¶ 16.)  The San Diego County Board of

---

[1] All exhibit citations are to Lewis Declaration exhibits.

Supervisors recognized it as a fixture of the San Diego business community, and declared Mitchell 1's 100th Anniversary to be "Mitchell 1 Day." (*Id.* ¶ 14; Ex. 1.) Snap-on acquired a majority stake in Mitchell 1 in 1996 and has closely integrated Mitchell 1's products into the Snap-on ecosystem. (Lewis Decl. ¶¶ 16, 18.)

Mitchell 1's products include Manager™, the software most widely used by repair shops for customer management. (*Id.* ¶ 23.) Plaintiffs collect anonymized repair data through Manager and have been collecting vehicle repair data for over 25 years. (*Id.* ¶ 25.) They have an incomparable database of repair information, with billions of unique repair records. (*Id.* ¶ 26.) In addition, Snap-on has collected over 200 billion data points from handheld diagnostic devices from Parameter ID ("PID") sensors, which are live readings from the vehicle's sensors. (*Id.* ¶¶ 36-38.) Again, no competitor has comparable data. (*Id.* ¶ 40.)

### B.    Plaintiffs' Product Development

Plaintiffs have leveraged their billions of repair records to create comprehensive, computer-assisted diagnostic and repair products. This has been an enormous undertaking, involving hundreds of person-years of work by hundreds of expert technicians, editors, and engineers, and well over $100 million in research, analysis, and product development (*See id.* ¶¶ 17, 43, 66, 115.)

Vehicle repair records are challenging to process and organize because, among other reasons, the underlying data is from service writers who often use different naming conventions, and who often use shorthand or introduce errors in the names of vehicle components. (*Id.* ¶ 60.) For example, a vehicle's oxygen sensor is referred to by over *thousand-plus* different names in Plaintiffs' records. (*Id.*) Further, some data extracted from repair orders is simply wrong, and the accurate data alone is not useful because it has no organizational framework to help repair technicians identify key symptoms, components, or fixes. (*See id.* ¶¶ 60-61.)

Organizing this data into a usable product was a huge challenge and took years. Around 2012, Plaintiffs formed a special team of developers, experts, and

sf-4515150

editors and began a comprehensive taxonomy and ontology project to categorize various terminologies, link related concepts, and decide on what language Plaintiffs will use across products. (*Id.* ¶ 61.) In tandem, Plaintiffs and an outside technology partner developed a proprietary artificial intelligence ("AI") to process and organize their data. (*Id.* ¶ 62.) This AI now processes billions of records, and still requires constant fine-tuning by Plaintiffs' expert teams. (*Id.*)

### C.     Relevant Products

#### 1.     Snap-on Handheld Diagnostic Units

Snap-on designs and sells sophisticated handheld computers adapted for use as vehicle diagnostic tools. Most relevant to this motion is the ZEUS™ system, a handheld computer with OBD-II and lab scope interfaces. (Lewis Decl. ¶ 28.) It costs $9,995 plus a $1,099 annual subscription for data services. (*Id.* ¶ 29.) When plugged into a vehicle, a ZEUS can read a vehicle's trouble codes and report those codes and vehicle identifying information to Plaintiffs' servers. (*Id.* ¶ 30.) The handheld unit displays an array of "cards" containing information to help the technician diagnose and repair the vehicle (*Id.* ¶¶ 31-42). These cards include:

Top Repairs (*id.* ¶¶ 32-33): The Top Repairs card identifies the most frequent repairs for the reported trouble codes, for that particular year, make, model, and engine type, at different mileages, based on Plaintiffs' extensive data analysis. It allows technicians to zero in on the most common repairs, and avoid unnecessarily testing or replacing components. Nobody else has such granular data.

Real Fixes (*id.* ¶ 34): The Real Fixes card provides code-specific recommendations on vehicle repairs, including millions of expert-created narratives. A "Fixed It" count shows how many times each Real Fix has successfully repaired the vehicle and is used to prioritize the Real Fix narratives.

Smart Data (*id.* ¶¶ 36-40): The Smart Data card displays a curated set of live vehicle PIDs, identified by Snap-on's experts as the ones most relevant to a particular trouble code for a given vehicle, from among the 100 to 200 PIDs

Mot. For TRO and OSC re PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

1   available.  Based on its 200 billion-plus PID data points, Snap-on has identified the
2   desired min/max values of particular PIDs to determine the "known good" range for
3   each sensor value.  Snap-on's diagnostic unit highlights in red any live PIDs that
4   exceed this known good range.  The min/max PID data points of the "known good
5   range" are not shared with the technician and are kept confidential.

6       Troubleshooter tips (id. ¶ 35):  Troubleshooter offers symptom and code-
7   specific tips from Snap-on's experts, such as tips to determine the components
8   likely causing a particular problem, or the most common faults that are observed.

9       Functional Tests and Guided Component Tests (id. ¶¶ 41-42):  These two
10  cards display the tests that Plaintiffs' experts have determined are the ones that are
11  best associated with the relevant trouble code(s) for the vehicle.  Functional tests
12  interact with on-board systems to perform functions such as resetting or
13  programming components.  Guided component tests provide step-by-step test
14  instructions prepared by Plaintiffs' editors, and also embed automation.

15      This diagnostic and repair information is highly proprietary to Plaintiffs and
16  has immense business value.  (Id. ¶¶ 43, 110-119.)  Its principal value comes from
17  Plaintiffs' compilation and analysis of a comprehensive set of data, and creation of
18  numerous expert narratives that took many years to create and that nobody else
19  possesses.  (See id. ¶¶ 26, 34, 40, 43, 113-119.)  To keep this data confidential,
20  Plaintiffs have implemented robust security measures.  These security measures are
21  based around physical possession of a Snap-on diagnostic unit with valid security
22  credentials.  (Lewis Decl. ¶ 73; Decl. of Jeff Grier ("Grier Decl.") ¶¶ 8-17; Decl. of
23  Daniel Roffman ("Roffman Decl.") ¶ 8.)  To obtain access to Plaintiffs' data
24  servers, which are located in San Diego and San Jose, California, the diagnostic
25  unit must ████████████████████████████████████████████████████████
26  ████████████████████████████████████████████████████████████████
27  ████████████████████████████████ the "Authentication Handshake").  (Lewis Decl.
28  ¶¶ 73-76, 93; Roffman Decl. ¶ 11.)  This security process is run by over 30,000

lines of custom software developed by Plaintiffs' engineers.  (Grier Decl. ¶ 11.)  A device that does not pass either step of the Authentication Handshake cannot access Plaintiffs' data.

Even devices that pass the Authentication Handshake obtain only limited access to Plaintiffs' data.  The device must submit a properly-formatted request, defined through Plaintiffs' custom code.  (Grier Decl. ¶¶ 12-13.)  Even then, the proprietary diagnostic information features work only when the device is physically connected to a vehicle with an active trouble code (or a non-commercially available vehicle emulator), and displays only the information for the trouble code(s) at issue. (Lewis Decl. ¶¶ 79-80.)

Use of Snap-on's handheld diagnostic units is also governed by a EULA that is presented when the user first buys the device, each time the device software is upgraded, and a link for which is displayed every time the user starts the device software.  (Lewis Decl. ¶¶ 81-85; Ex. 7.)  It prohibits, among other things, reverse engineering of the software, or running the software on multiple computers.  (*Id.*)

### 2.   TruckSeries

Mitchell 1's TruckSeries product provides diagnostic and repair information for commercial (medium and heavy duty) trucks.  (Lewis Decl. ¶¶ 51-52.)  On a vehicle- and component-specific basis, TruckSeries provides the user with proprietary data including testing narratives, high-resolution photos of components, interactive wiring diagrams, testing, and labor estimating features.  (*Id.* ¶¶ 56-58.) Nearly all of this content is authored by Mitchell 1, prepared by its editors or vendors.  (*Id.* ¶ 59.)  Access to TruckSeries is protected by a username/password, HTTPS encryption, and the Authentication Handshake.  (*Id.* ¶ 86; *see also* Grier Decl. ¶ 22.)  It is also subject to a EULA that accompanies every subscription order and, among other things, limits how the end-user may use the product.

### 3.   ProDemand

Mitchell 1 also offers proprietary diagnostic and repair information for light

sf-4515150

vehicles through its ProDemand web-based product, which provides Real Fixes, Top Repairs, and Troubleshooting features like those of the Snap-on diagnostic unit. (Lewis Decl. ¶ 44.) ProDemand also offers a unique listing of Top 10 Repairs for an individual vehicle, regardless of symptoms. (*Id.* ¶ 50.) ProDemand does not include features that require an OBD-II connection. (*Id.* ¶ 48.)

ProDemand also organizes and displays repair information from vehicle OEMs, such as Technical Service Bulletins and calibration information for advanced driver-assistance systems ("ADAS"). (*Id.* ¶ 45.) Mitchell 1 pays substantial license fees for much of this information and, even for OEM information, adds proprietary structure and organization to help technicians locate OEM information relevant to particular vehicle problems. (*Id.* ¶¶ 45-46.)

Like TruckSeries, ProDemand access is restricted through account-specific usernames and passwords, as well as HTTPS encryption of data traffic, the Authentication Handshake structure, and the Mitchell 1 product EULA. (*Id.* ¶¶ 86-87.) ProDemand and TruckSeries require separate subscriptions. (*Id.* ¶ 51.)

### D.   Autel US and Autel ITC

Autel US is the U.S. subsidiary of the Chinese company Autel ITC. Autel US represents that its headquarters are in New York. Autel makes automotive equipment, including handheld diagnostic tools, that are available nationwide.

Autel US received a user account to ProDemand in October 2015, based on a request from a large customer of Mitchell 1's to have Autel test one of its diagnostic tools to confirm it could display ProDemand. (Lewis Decl. ¶ 20.) Autel US has maintained a ProDemand account since then, and signed a ProDemand EULA in at least 2016. (*Id.* ¶ 20; Exs. 2-3.) In December 2020, Autel US reaffirmed the EULA when it signed an order form attaching Terms incorporating Mitchell 1's EULA. (*See id.* ¶ 21; Exs. 4-5.) Autel does not have a TruckSeries account, and Snap-on has no record of Autel ever purchasing a ZEUS device, or a subscription or update to any Snap-on diagnostics handheld device. (*Id.* at ¶ 22.)

sf-4515150

1    This case is not the first time Autel has been caught stealing from a

2  competitor.  Autel has been sued twice before—by Ford and by General Motors—

3  for stealing data and intellectual property relating to automotive vehicle repairs.

4  *See Ford Motor Co. v. Autel US Inc.,* No. 14-13760 (E.D. Mich.); *General Motors*

5  *L.L.C. v. Autel US Inc.*, No. 14-14864 (E.D. Mich.).  Those cases also involved

6  unauthorized use of proprietary vehicle servicing software.  Autel settled both.

7    **E.    Intrusions into Plaintiffs' Systems**

8    Handheld diagnostic devices:  Beginning in November 2020, Plaintiffs

9  noticed unusual traffic spikes on their California data servers.  (Lewis Decl. ¶¶ 94-

10  95.)  Plaintiffs blocked IP addresses associated with this suspicious activity, but the

11  intrusions continued to increase in severity.  (*Id.*)  The network logs indicated that

12  this traffic was being caused by a bad actor who had "spoofed" the ZEUS device

13  Authentication Handshake to obtain data server access.  (Lewis Decl. ¶ 96;

14  Roffman Decl. ¶¶ 26, 30-34, 35-65.)  Because of the nature of the spoof, Snap-on's

15  authentication server was blocking legitimate customers.  (Lewis Decl. ¶¶ 96, 98.)

16  Many of the IP addresses used in this spoofed access were geolocated in China,

17  where Plaintiffs do not sell a ZEUS product.  (*Id.* ¶ 102; Roffman Decl. ¶ 19.)

18    By Thanksgiving 2020, the intrusion attempts had become so severe that

19  Plaintiffs had to entirely shut down worldwide access to their diagnostic device

20  services to customers ██████████████████████████████████████████

21  ██████████████  over the holiday weekend, and then intermittently over the following

22  evenings and weekends.  (Lewis Decl. ¶¶ 98, 100.)  Over 15% of Snap-on's

23  legitimate customers ████████████████████  were blocked from Snap-on's services

24  as a result.  (*Id.* ¶ 98.)  Snap-on engaged an outside data security firm through

25  counsel to investigate these attacks on its network.  (*Id.* ¶ 99.)

26    Plaintiffs were unable to identify the bad actor at this time but introduced

27  multiple new security measures and enhanced network monitoring as a result.  (*Id.*)

28  The bad actor's intrusions continued into 2021.  In May 2021, a member of their

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

1    anti-piracy team observed unusual activity connected to the ProDemand product.

2    (*Id.* ¶ 106.)  Shortly thereafter, Daniel Roffman, an independent computer forensic

3    expert, was retained through Plaintiffs' outside counsel to perform an investigation

4    into malicious traffic on Plaintiffs' servers.  (*See id.*; Roffman Decl. ¶¶ 1-4.)

5          Mr. Roffman has determined that Autel US and Autel ITC are the actors

6    responsible for this data theft.  Autel has repeatedly circumvented Plaintiffs'

7    security systems and "spoofed" the credentials of over 400 handheld devices to

8    obtain Plaintiffs' data, attacking Plaintiffs from over 300 different IP addresses.

9    (Roffman Decl. ¶¶ 26, 30-65.)  During just the period of time for which Plaintiffs

10   still have web server logs, Autel submitted over *5 million* requests for Plaintiffs'

11   diagnostic and repair information.  (*See id.* ¶¶ 25, 26.)[2]  These requests came in at a

12   frequency that could only have been achieved through use of a bot, and have many

13   other tell-tale signs that they were not legitimate requests relating to repairing an

14   automobile.  (*Id.* ¶¶ 26.b-c, 44-46, 49-51, 55-63.)  At times, Autel was submitting

15   more than 600,000 data requests in a single hour.  (Lewis Decl. ¶ 97; Ex. 10 at 1.)

16         There are many indications that Autel ITC and Autel US have been carrying

17   out the attacks on Plaintiffs' data together.  The main static IP address that Autel

18   US has used to sign into its ProDemand account was also used with a previously-

19   spoofed diagnostic device.  (Roffman Decl. ¶ 66.)  Plaintiffs' authentication logs

20   show that eight different spoofed devices connected to Plaintiffs' authentication

21   software used this same Autel US IP address, and that seven of these eight devices

22   were also used by *86* other IP addresses that are associated with the data theft,

23   including IP addresses originating from China.  (*Id.* ¶ 67.)  At one point, on March

24   8, 2021, a spoofed device using the Autel US IP address was used to make the exact

25   _____

26   [2]    ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

1   same request for PID data for a specific vehicle as a spoofed device in China.  (*Id.* ¶

2   68.)  The requests were made within one minute of each other, at a time when

3   Plaintiffs had begun sending randomized data to Chinese IP addresses, strongly

4   suggesting Autel US and Autel ITC were comparing results.  (*Id.*) In addition,

5   Defendants' coordination is shown by the fact that six Chinese IP addresses have

6   been used to access the Autel US ProDemand account, at least one of which has

7   also made anomalous requests from multiple spoofed devices.  (*Id.* ¶ 71.)

8     As staggering as the numbers above are, they only represent a fraction of

9   Autel's data theft.  Plaintiffs do not have web server logs for much of the early time

10  period when a massive amount of theft took place.  During November 11-13 alone,

11  contemporaneous documents show that Autel made *5.6 million* requests for

12  Plaintiff's proprietary information.  (*See* Lewis Decl. ¶ 97; Roffman Decl. ¶ 17;

13  Exs. 9-10.)  And for multiple days in mid-December, Autel was attacking Plaintiffs

14  with numerous IP addresses, each of which was simulating dozens of devices at a

15  time.  (*See* Lewis Decl. ¶ 101; Roffman Decl. ¶¶ 49-52; Ex. 11.)  This bad activity

16  is not factored into Mr. Roffman's request total.  Plaintiffs will need discovery from

17  Autel to determine the full extent of the information that was taken.

18    Although the activity that Plaintiffs have been able to observe has diminished

19  since January 2021, Autel still regularly tries to penetrate Plaintiffs' systems with

20  multiple spoofed devices, continuing through at least July 15, 2021, the last day for

21  which Mr. Roffman reviewed logs.  (*See* Roffman Decl. ¶¶ 26.f-g, 65.)

22    <u>TruckSeries</u>:  Autel has used the TruckSeries credentials of a different

23  company—Tom Machine and Equipment Repair ("Tom Machine")—to make over

24  800 search actions and over 725 print actions from Mitchell 1's proprietary

25  database since October 2020, systematically obtaining data for multiple trucks in a

26  manner inconsistent with normal, licensed usage for vehicle repair.  (*See* Roffman

27  Decl. ¶¶ 82-88.)  The activity has been escalating.  Between July 7 and July 12,

28  2021 alone, Autel printed over 470 entries from TruckSeries, at times printing as

Mot. For TRO and OSC re PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

1    fast as every 90 seconds.  (*Id.* ¶ 89.)  The Tom Machine account has accessed

2    Plaintiffs' information from three IP addresses that are also used by Autel US.  (*Id.*

3    ¶ 82.)  In addition, the billing email provided by Tom Machine is identical to an

4    email address provided by Autel for one of its technicians.  (*Id.* ¶ 83; Lewis Decl. ¶

5    107; Exs. 12-14.)  The individual listed as the billing contact for Tom Machine

6    appears as an Autel consultant on the International Automotive Technicians

7    Network and shares a nearly-identical moniker as the Internet username of an Autel

8    technician.  (Exs. 14-16.)  Mitchell 1 terminated the Tom Machine account on July

9    14, which cut off access by the next day.  (Lewis Decl. ¶ 108.)

10       ProDemand:  Plaintiffs' investigation has also revealed that Autel has been

11   systematically scraping data from ProDemand since at least October 1, 2020.

12   Together, Autel US and Autel ITC have taken over 9,600 search actions and nearly

13   2,000 print actions.  (Roffman Decl. ¶¶ 26.h; 74.)  These systematic searches again

14   do not fit the normal pattern of licensed usage for vehicle repair.  (*Id.* ¶¶ 74-81.)

15   Over 4,000 of these requests have targeted ADAS features.  (*Id.* ¶ 74.)  During this

16   time period Autel made the second-highest number of requests for ADAS data of

17   any of Plaintiffs' customers—nearly as much as a national chain specializing in

18   ADAS calibration that is licensed for *50* users.  (*Id.* ¶ 80.)  Again, the activity has

19   been escalating.  Between July 1 and July 14, 2021 (when Mitchell 1 terminated

20   Autel US's account), Autel printed over 300 items.  (*Id.* ¶ 81.)

21   **III.   LEGAL STANDARD**

22       The legal standards for a temporary restraining order and preliminary

23   injunction are the same.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

24   F.3d 832, 839 n.7 (9th Cir. 2001).  In both instances, a plaintiff must demonstrate:

25   (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent

26   a preliminary injunction; (3) that the balance of equities tips in favor of issuing an

27   injunction; and (4) that an injunction is in the public's interest.  *Winter v. NRDC*,

28   555 U.S. 7, 20 (2008).  Under the Ninth Circuit law, "'serious questions going to

the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011); *Al Otro Lado v. Gaynor*, 2021 WL 150987, at *4 (S.D. Cal. Jan. 18, 2021) (issuing TRO under "serious questions" standard). A "serious question" is one on which the movant has a "fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

The DMCA specifically authorizes the granting of "temporary and permanent injunctions." 17 U.S.C. § 1203(b)(1). The CFAA, California's Comprehensive Computer Data Access and Fraud Act, and Wis. Stat. § 943.70 also authorize injunctive relief. 18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1); Wis. Stat. § 943.70(5). Likewise, breach of contract claims under both Wisconsin and California law permit injunctive relief. *See Blizzard Ent. Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1018-19 (C.D. Cal. 2013) (granting injunction for breach of EULA); *Culligan, Inc. v. Rheaume*, 269 Wis. 242, 248 (1955) (upholding injunction for breach of license agreement).

## IV.   ARGUMENT

### A.   Plaintiffs Will Likely Succeed on Their DMCA Claim

Autel US violated the DMCA by "circumvent[ing] a technological measure that effectively controls access to a work protected under this title," when it spoofed legitimate devices to circumvent Plaintiffs' security measures, and when it wrongfully used a third party's TruckSeries credentials. 17 U.S.C. § 1201(a)(1)(A). Section 1201 prohibits circumvention of access controls regardless of whether the access constitutes copyright infringement. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 952 (9th Cir. 2010) (§ 1201(a)(1)(A) "created a distinct anti-circumvention right . . . without an infringement nexus requirement").

#### 1.   Plaintiffs' Technological Measures

As described above, Plaintiffs "effectively control[]" access to their

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150

proprietary information from Snap-on's handheld devices by requiring both physical possession of the device and passing the Authentication Handshake (Lewis Decl. ¶¶ 73-76; Grier Decl. ¶¶ 8-11; Roffman Decl. ¶ 11.)  This is an "effective control" under the DMCA.  *See, e.g., Synopsys, Inc. v. AzurEngine Techs., Inc.*, 401 F. Supp. 3d 1068, 1072 (S.D. Cal. 2019) ("checking out" license key from server "effectively controls"); *NNG, KFT. v. AVA Enters., Inc.*, 2015 WL 5442725, at *4 (C.D. Cal. July 8, 2015) (software authentication code "effectively controls"); *Nexon Am., Inc. v. S.H.*, 2011 WL 13217951, at *6 (C.D. Cal. Dec. 13, 2011) (authentication mechanism limiting server access "effectively controls").

Additionally, the TruckSeries and ProDemand username/password requirement "effectively controls" access to those products, along with the authorization requirements that must be met.  *See MDY Indus.*, 629 F.3d at 947 (discussing legislative history on use of password as an effective control); *Actuate Corp. v. IBM Corp.*, 2010 WL 1340519, at *9 (N.D. Cal. Apr. 5, 2010) (finding DMCA violation based on unauthorized password use).

### 2.   Defendants Circumvented Plaintiffs' Measures

"[T]o 'circumvent a technological measure' means to . . . avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(A).  Autel reverse engineered Snap-on's authentication process to create hundreds of "spoofed" device credentials, which it could then use to pass the Authentication Handshake.  (*See* Roffman Decl. ¶¶ 63, 66-72; Lewis Decl. ¶ 96.)  Doing so circumvented a technological measure.  *See, e.g., Synopsys, Inc.*, 401 F. Supp. 3d at 1072 (finding likelihood of circumvention based on use of "counterfeit keys [that] work by effectively tricking the company's license-control systems into thinking [defendant] is a licensed user").

Autel US also circumvented Mitchell 1's TruckSeries access controls by using Tom Machine's user credentials.  (Roffman Decl. ¶¶ 82-89.)  The Mitchell 1 EULA prohibits allowing access to Mitchell 1 products by people other than the

sf-4515150

authorized end user.  (Ex. 3 § 6.3(ii)-(iii).)  Unauthorized use of a password

constitutes DMCA circumvention.  *See Actuate*, 2010 WL 1340519, at *9; *321*

*Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085 1098 (N.D.

Cal. 2004) (unauthorized use of software key "avoids and bypasses" technological

measure); *Microsoft Corp. v. EEE Bus. Inc*., 555 F. Supp. 2d 1051, 1059 (N.D. Cal.

2008) (unauthorized distribution of license key was circumvention).  In addition,

TruckSeries is protected by the Authentication Handshake.  (Grier Decl. ¶¶ 21-22,

24; Roffman Decl. ¶ 15.)

### 3.   Plaintiffs' Measures Control Access to Protected Works

Plaintiffs' measures control access to, at the least, the copyright-protected

works of Plaintiffs' vehicle and truck diagnostic and repair information databases

and Plaintiffs' data services software.

Both the vehicle and truck repair databases are the product of years of work

by Plaintiffs' editors and engineers and contain narratives written from scratch by

Plaintiffs.  (Lewis Decl. ¶¶ 34-35, 41-42, 49, 53-59, 60-66, 115.)  Both databases

also reflect extensive, creative work by Plaintiffs in identifying the ideal

terminologies for various components and symptoms as well as in developing

complex taxonomy and ontology systems for organizing and searching the

databases.  (*Id.* ¶¶ 60-62.)  These original works and the databases themselves are

protected under the Copyright Act.  *See, e.g.*, *CDN Inc. v. Kapes*, 197 F.3d 1256,

1260 (9th Cir. 1999) (holding "compilations of data chosen and weighed with

creativity and judgment" entitled to copyright protection); *B2B CFO Partners, LLC*

*v. Kaufman*, 787 F. Supp. 2d 1002, 1007 (D. Ariz. 2011) (manuals were protected

by copyright because author "made choices regarding which concepts and ideas to

include in the Manuals and how to express those concepts").

Additionally, Plaintiffs' Authentication Handshake measure controls access

to Plaintiffs' data services software, which is used for both products.  Only once a

sf-4515150

user passes the authentication check can the user submit requests to Plaintiffs' data servers, which sets into motion software created to gather the appropriate pieces of information, combine them, and send them to the user.  This software, which consists of tens of thousands of lines of code, was written entirely by Plaintiffs with approximately eight to ten person-years of effort.  (Grier Decl. ¶¶ 13-16; Lewis Decl. ¶ 67.)  Copyright law unambiguously protects software, *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006), and Plaintiffs' data services software reflects creative choices within the core of copyright protection.  (*See* Grier Decl. ¶¶ 15-16; Lewis Decl. ¶ 67.)

The vast majority of courts around the country, including the courts in this Circuit, have found that content need only be protected by copyright—not registered—in order to form the basis for a DMCA claim.  *See, e.g., Danaei v. Rostam*, 2016 WL 9138055, at *5 (C.D. Cal. Nov. 2, 2016) (registration not a prerequisite to DMCA misrepresentation claim); *Glynn v. Cigar Store, Inc.*, 2018 WL 3145683, at *4-5 (N.D. Cal. June 27, 2018) (awarding statutory DMCA damages despite violation before registration); *Design Ideas, Ltd. v. Meijer, Inc.*, 2018 WL 3545157, at *10 (C.D. Ill. July 23, 2018) (same); 2 Nimmer on Copyright § 7.16(B)(1)(b)(i) (2021) ("[B]ecause a suit under the [DMCA] is not an 'action for copyright infringement,' it would seem that there is no registration pre-requisite to bringing a claim thereunder.")  One of the few decisions that appears to hold to the contrary is *Ford Motor Co. v. Autel US, Inc.*, but in that case the court noted that Ford "did not offer any response in opposition" to Autel's argument.  2015 WL 5729067, at *6-7, 6 n.7 (E.D. Mich. Sept. 30, 2015).

## B.    Plaintiffs Will Likely Succeed on Their CFAA Claim

To bring an action under section 1030(a)(2) of the CFAA, a plaintiff must show that the defendant: (1) "accessed" and "obtain[ed]" "information from any protected computer"; (2) did so "without authorization" or by "exceed[ing] authorized access"; and (3) did so "intentionally."  18 U.S.C. § 1030(a)(2).  Under

sf-4515150

section 1030(a)(4), a plaintiff must show that the defendant: (1) accessed a "protected computer"; (2) without authorization or exceeding authorization; (3) "knowingly" and with "intent to defraud"; and thereby (4) "further[ed] the intended fraud and obtain[ed] anything of value"; causing (5) a loss during any one-year period aggregating at least $5,000 in value.  18 U.S.C. § 1030(a)(4).

Autel US violated both sections when it maliciously spoofed Snap-on's handheld diagnostic devices and when it wrongfully used Tom Machine's TruckSeries credentials to access Plaintiffs' proprietary information.

### 1.    Plaintiffs Have a Protected Computer

The CFAA defines a "protected computer" as one "which is used in … interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2)(B). The CFAA applies "to all information from all computers that connect to the Internet."  *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021).  Here, Plaintiffs' data and authentication servers are connected to the Internet (Lewis Decl. ¶ 93), and thus are protected.  *See id.*; *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010) (finding plaintiff's computers "protected" under the meaning of § 1030(e)(2)(B) because they were connected to the Internet).

### 2.    Defendants Accessed and Obtained Information without Authorization

Circumventing a technological barrier designed to gate access to a computer clearly satisfies the "without authorization" element of a CFAA violation.  *See United States v. Nosal*, 844 F.3d 1024, 1039 (9th Cir. 2016) (password system is "unquestionably" a gating technological barrier.)  "Whether a user's credentials allow him to proceed past a computer's access gate" is a specific type of authorization.  *Van Buren*, 141 S. Ct. at 1659 n.9 (internal citation omitted).

Plaintiffs' Authentication Handshake was designed to prevent users without authorization from initiating communications with Plaintiffs' data servers.  (*See* Lewis Decl. ¶¶ 73-76; Grier Decl. ¶¶ 9-10, 17, 24.)  Autel accessed Plaintiffs'

sf-4515150

diagnostic device data servers without authorization, and by exceeding authorization, when it spoofed hundreds of sets of credentials to circumvent the Authentication Handshake and send millions of requests to Plaintiffs' data servers. (*See* Roffman Decl. ¶¶ 26, 30-65, 66-72.)

Similarly, Mitchell 1's requirement for a valid username/password combination was designed to control access to TruckSeries data servers, in conjunction with Authentication Handshake restrictions. (*See* Lewis Decl. ¶ 86; Grier Decl. ¶¶ 11, 21-24.) Autel is not a licensed user of TruckSeries. (Lewis Decl. ¶ 22.) Autel nonetheless used Tom Machine's credentials to access and print hundreds of pieces of TruckSeries repair information—including over four hundred records between July 7 and July 12, 2021, alone. (Roffman Decl. ¶ 89.) Autel's conduct was without authorization under the CFAA. *Nosal*, 844 F.3d at 1039 ("Had a thief stolen an employee's password and then used it to rifle through Searcher, without doubt, access would have been without authorization.").

### 3. Defendants Acted with Knowledge and Intent

For purposes of the CFAA, "[t]he term 'defraud' . . . simply means wrongdoing and does not require proof of common law fraud." *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008) (citation omitted); *eBay Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (accord).

Autel's intrusions into Plaintiffs' systems involved sophisticated credential spoofing from scores of IP addresses over many months. (Roffman Decl. ¶¶ 26, 30-34, 35-65.) And when Plaintiffs enhanced their security measures, Autel tried to find workarounds. (Lewis Decl. ¶¶ 96-98, 101, 105; Roffman Decl. ¶¶ 17, 26.) As to TruckSeries, Autel knew it was using another user's credentials. Its conduct was clearly knowing and intentional. *See Multiven, Inc.*, 725 F. Supp. 2d at 894 ("Given the number of times that [defendant] accessed the secure areas of the Cisco network, the Court finds that no reasonable juror could conclude that [defendant]

sf-4515150

actually believed that he had Cisco's authorization to do so.").

### 4.  Plaintiffs Suffered Damages

The CFAA requires only damage or loss greater than $5,000 in one year.  18 U.S.C. § 1030(a)(4).  The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system or information." and "loss" as "any reasonable cost to any victim" including costs of responding, assessing damage, and any consequential damages.  18 U.S.C. §§ 1030(e)(8), (11).  Costs associated with investigating intrusions into a computer network satisfy the statute.  *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980-81 (N.D. Cal. 2008).  Since November 2020, Plaintiffs have spent far more than $5,000 tracking down and preventing Autel's bad actor activity, including retaining a cybersecurity firm and outside counsel.  (*See* Lewis Decl. ¶¶ 94-109.)

### C.  Plaintiffs Will Likely Succeed on Their California Computer Fraud Claim

California Penal Code ("CPC") § 502(c) holds liable one who:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services. . . .

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

Cal. Penal Code §§ 502(c)(1)-(3), (7).

Unlike the CFAA, CPC §§ 502(c)(1) and (2) do not require *unauthorized* access, merely knowing access.  *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015).  Thus, a user can violate these provisions even when they use their

validly-issued credentials to access a computer, and then use the computer improperly.  *Id.*  Autel violated CPC §§ 502(c)(1) and (2) when it, without permission: (i) accessed Plaintiffs' vehicle repair data, authentication servers, and data servers via spoofed diagnostic device credentials; (ii) engaged in mass downloads of data from Plaintiffs' servers through its ProDemand account, and (iii) used Tom Machine login information to download proprietary data from Plaintiffs' TruckSeries servers.  In each instance, the only reasonable explanation for these concerted intrusions is that Autel wanted to obtain Plaintiffs' proprietary data.

Autel additionally violated CPC §§ 502(c)(3), and (7) when it used spoofed device credentials to access Plaintiffs' authentication and data servers, and when it used Tom Machine's credentials to access TruckSeries servers.  *See Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *7 (N.D. Cal. Aug. 28, 2020) (finding claims for violation of §§ 502(c)(3) and (7) based on use of computer services by malicious extensions and data scraping tools).

### D.    Plaintiffs Will Likely Succeed on Their Wisconsin Computer Crimes Claim

Should the Court find that Wisconsin law applies to Autel's misuse of Snap-on diagnostic devices (by virtue of the Snap-on EULA, discussed below), Autel has violated Wis. Stat. § 943.70(2), the Wisconsin computer crimes statute.  Wis. Stat. § 943.70(2)(a)(3) prohibits "[a]ccess[ing] computer programs or supporting documentation" willfully, knowingly, and without authorization, while subparts (4) and (5) prohibit taking possession or copying of data, computer programs, or supporting documentation.  Autel violated subpart (3), at a minimum, by spoofing device credentials to gain unauthorized access to Plaintiffs' authentication and data servers and by using Tom Machine's login credentials to access TruckSeries without authorization.  Autel violated subparts (4) and (5) by obtaining substantial amounts of diagnostic and repair information from Plaintiffs' device data servers, through ProDemand, and from TruckSeries, without authorization.

sf-4515150

1     Finally, Plaintiffs are likely to prove that Autel violated Wis. Stat. §

2   943.70(2)(a)(6) when it disclosed "restricted access information to unauthorized

3   persons" by providing Autel ITC with its ProDemand login credentials, as

4   evidenced by the extensive Chinese IP address activity associated with Autel's

5   ProDemand account.  (*See* Roffman Decl. ¶¶ 75, 78.)

6      **E.     Snap-on Will Likely Succeed on its Breach of EULA Claim**

7     Plaintiffs will prove that Autel US has agreed to Snap-on's diagnostic device

8   EULA.  The owner of a diagnostic device will typically agree to the EULA via a

9   Snap-on franchisee in connection with the initial device purchase, and each

10  software update also requires acceptance of the EULA.  (Lewis Decl. ¶ 81.) ███

11  ████████████████████████████████████████████████████████████████

12  ██████████████     (Lewis Decl. ¶ 75; Grier Decl. ¶ 9.)  Plaintiffs' log files indicate

13  that Autel updated the software bundle at least twice.  (Roffman Decl. ¶ 73.)

14     Snap-on's EULA provides that the device software may be installed only on

15  the single diagnostic computer for which it was intended and prohibits (for

16  example) otherwise copying the software; reverse engineering or modifying the

17  software; or permitting use of the software by a third party.  (Ex. 7 at 1.)

18     Autel US breached this agreement.  Autel US breached the Permitted Uses

19  provisions when it spoofed multiple sessions of Snap-on's software, with access

20  patterns consistent with running that software (or scripts derived from that

21  software) on multiple computers or virtual machines.  (Roffman Decl. ¶¶ 26, 30-65,

22  66-72.)  Autel US also breached the Prohibited Uses provisions when (1) it

23  translated, decompiled, reverse engineered, or otherwise altered Snap-on's software

24  to determine how to circumvent Snap-on's security measures and submit scripted

25  queries; (2) it ran sessions of the software (or scripted versions thereof) on multiple

26  machines; and (3) it provided, disclosed, divulged, made available, and/or permitted

27  use of the software by Autel ITC without Snap-on's prior written consent.  (*See id*.)

28

sf-4515150

### F.     Mitchell 1 Will Likely Succeed on its Breach of EULA Claim

Mitchell 1's ProDemand product is governed by its EULA.  (Lewis Decl. ¶ 90.)  Autel US signed the EULA in 2016 when it created its current account (Lewis Decl. ¶ 20; Exs. 2, 3), and reaffirmed it in December 2020.  (Lewis Decl. ¶ 21; Ex. 5 at § 1.)  The EULA includes a California choice of law clause.  (Ex. 3 § 15.6.)

Autel US breached the Mitchell 1 EULA in at least three respects.  First, Autel US exceeded the permitted uses granted by the license, which are solely for "(i) providing vehicle mechanical services; (ii) estimating vehicle mechanical parts and labor cost estimates; and (iii) conducting vehicle shop management."  (Ex. 3 § 6.1.)  Autel US's requests from the account were inconsistent with that of an actual user.  (Roffman Decl. ¶¶ 26, 30-65.)  A mechanic fixing a car would typically look up a particular problem code or symptom and would linger on the material relating to that code for at least a few minutes (Lewis Decl. ¶ 95).  Usage data shows Autel US systematically ran through all of the problem codes for a particular make and model of a vehicle and looked through vehicle after vehicle for information relating to a particular problem code.  (*See, e.g.,* Roffman Decl. ¶¶ 60-63.)[3]

Second, Autel US engaged in conduct prohibited by section 6.3, which prohibits a user from making the Product or its data available to others or passing along the Product data or access to the Product.  (Ex. 3. § 6.3(ii), (iii), (v).)  Autel US breached these provisions by permitting Autel ITC to access, view, and obtain data through its ProDemand account.  (Roffman Decl. ¶¶ 75, 81.)

Third, Autel US breached its confidentiality obligations under section 9 of the EULA.  Autel acknowledged that ProDemand is a confidential and proprietary product that contains Mitchell 1's "substantial trade secrets."  (Ex. 3 § 12.)  Autel breached its confidentiality obligations by permitting Autel ITC to access Mitchell 1's proprietary materials and by using the proprietary materials for unauthorized

---

[3] This conduct also violated the 2020 Terms and Conditions, which contains the same license restrictions.  (Ex. 5 § 4.)

purposes. (*Id.*)  Autel US acknowledged that breach of its EULA obligations with respect to the proprietary rights or confidential information of Mitchell 1 or its third party providers would cause Mitchell 1 irreparable harm.  (Ex. 3 §§ 12, 21.)

### G.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Autel US's extensive and ongoing malicious activity has caused, and is likely to continue to cause, irreparable harm to Plaintiffs absent a restraining order and injunction.  The diagnostic and repair space is a critical part of Snap-on's business and has been featured in its public financial reports.  (Lewis Decl. ¶ 111.)  In 2020, Snap-on's Repair Systems and Information Group generated more than $1.24 billion—over a quarter of Snap-on's entire revenue.  (*Id.* ¶ 112.)  Plaintiffs' success in this field has been based largely on the unique competitive advantage derived from its expert analysis of its proprietary repair data.  (*See id.* ¶¶ 113-116, 120.)  This is the result of hundreds of person-years of work and over $100 million in investment.  (*Id.* ¶¶ 17, 115.)  It is among Plaintiffs' most important IP.

It would be impossible for another company to release a comparable competitive diagnostic product through legitimate means.  Because the bulk of repairs are for cars with model years between 2005 and 2012, Plaintiffs have at least a sixteen-year head start in collecting data using their shop management products.  (*Id.* ¶¶ 26, 114.)  And many potential competitors, like Autel, have no shop management product at all.  (*Id.* ¶ 24.)  No competitor can match the accuracy, usability, and comprehensiveness of Plaintiffs' products, which are based on decades of development, substantial investments, and years of parsing through and analyzing the data.  (*See Id.* ¶¶ 60-66, 115-116.)

Autel, one of Plaintiffs' main competitors, has now wrongfully obtained substantial amounts of proprietary, highly valuable diagnostic and repair information.  (*See* Roffman Decl. ¶ 26.)  Autel's illicit use of such hardearned and product-distinguishing information will cause irreparable harm to Plaintiffs.

sf-4515150

Allowing Autel to use the information it has stolen from Plaintiffs would be devastating to Plaintiffs' business.  (Lewis Decl. ¶¶ 110-121.)  *See Pixon Imaging, Inc. v. Empower Techs. Corp.,* 2011 WL 3739529, at *6 (S.D. Cal. Aug. 24, 2011) (competitor's access to proprietary and valuable algorithms established likelihood of irreparable harm); *TGG Mgmt. Co. v. Petraglia*, 2020 WL 209103, at *8 (S.D. Cal. Jan 14, 2020) ("intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm") (citation and internal quotation marks omitted).

Moreover, Autel's persistent attempts to circumvent Plaintiffs' security measures are themselves causing Plaintiffs irreparable harm.  Plaintiffs have invested countless hours into additional anti-piracy and data security measures in efforts to block Autel's access.  Courts have routinely found irreparable injury from similar conduct.  *See, e.g., Facebook, Inc. v. Power Ventures, Inc*., 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd,* 749 Fed. App'x 557 (9th Cir. 2019) ("Defendants have interfered with Facebook's right to control access to its own computers and have acquired data to which Defendants have no lawful right . . .  Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm."); *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1296 (S.D. Fla. 2020) ("federal courts around the country agree that the interference with an entity's control of its computer systems constitutes irreparable injury") (collecting authority).

Significantly, when Plaintiffs attempted to stop Autel's intrusions, for example by blocking IP addresses, Autel repeatedly responded with new attempts at circumvention from new IP addresses.  (See Roffman Decl. ¶¶ 27, 66; Lewis Decl ¶¶ 94-105; Ex. 11.)  Autel continues to try to access Plaintiffs' data through spoofed devices even today (*see* Roffman Decl. ¶¶ 27, 66), and their improper use of ProDemand and TruckSeries increased during the first two weeks of July right before the Autel US and Tom Machine accounts were terminated.  (*See* Roffman

sf-4515150

Decl. ¶¶ 81, 89.)  Given this persistent and prolonged pattern, it is evident that Autel will continue its intrusions absent injunctive relief.  *See Facebook*, 252 F. Supp. 3d at 782 ("[U]nless the Court issues a permanent injunction, it is very likely that Facebook will suffer irreparable harm again because Defendants will again attempt to access Facebook's servers without authorization.").  Moreover, despite Plaintiffs' best efforts, they cannot rule out that Autel is current using other, unknown methods to steal their proprietary data.  (*See* Roffman Decl. ¶ 65.)

### H.    The Balance of Equities Favors Injunctive Relief

The balance of equities strongly favors injunctive relief.  In contrast to the enormous harm to Plaintiffs, if an injunction is issued, Autel will merely have to cease its illegal activity and stop using the data it stole.  *San Diego Comic Convention v. Dan Farr Prods.*, 336 F. Supp. 3d 1191, 1197 (S.D. Cal. 2018) ("[B]alance of hardships tips in [plaintiff's] favor as there will be no harm to [defendant] as an 'injunction would merely require [defendant] to comply with the law'") (citation omitted); *Dish Network, L.L.C. v. SatFTA*, 2011 WL 856268, at *8 (N.D. Cal. Mar. 9, 2011) ("an injunction would do no more than require Defendant to comply with federal . . . anti-piracy laws").

Autel will suffer no harm from the temporary restraining order, because it has no legitimate claim to the data it has taken from Plaintiffs, or that it should be allowed to continue intruding into Plaintiffs' servers.  *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) ("If the defendants sincerely intend not to infringe, then the injunction harms them little; if they do, it gives [plaintiff] substantial protections of its [intellectual property].").  Autel continues to try to access Plaintiffs' diagnostic device servers and, unless an injunction is put in place, it is likely that Autel will continue its unlawful use.

### I.    Injunctive Relief Serves the Public's Interest

The public interest strongly favors granting Plaintiffs' requested relief as public policy favors a swift end to violations of anti-hacking laws, and EULA

24

Mot. For TRO and OSC re PI
Case No. 3:21-cv-01339-CAB-BGS

breaches as they are detected.  *See Dish Network, L.L.C.*, 2011 WL 856268, at *8 ("the public has an interest in the enforcement of . . . statutes") (citation omitted); *Dish Network L.L.C. v. Whitcomb*, 2011 WL 1559825, at *4 (S.D. Cal. Apr. 25, 2011) ("The public has a strong interest in enforcing anti-piracy legislation, such as the DMCA"); *Blizzard Ent. Inc.*, 28 F. Supp. 3d at 1018-19 (granting injunction for breach of EULA).

Allowing ongoing circumvention and crawling of Plaintiffs' software at the expense of increasing and expanding irreparable harm to Plaintiffs will only reward piracy.  This will harm the public as true innovators will be deterred from investing the effort and resources needed to create new products and technologies.

### J.     The Court Should Require Only a Minimal Bond

"Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*.'"  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation omitted) (emphasis in original).  A district court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (citation omitted); *see also Justin v. City of Los Angeles*, 2000 WL 1808426, at *2 (C.D. Cal. Dec. 5, 2000) (exempting plaintiffs from TRO bond where no pecuniary risk).

Here, given that the temporary restraining order merely asks Autel to stop trying to steal Plaintiffs' proprietary information and to refrain from using or disclosing that information, there is no realistic probability of harm.  To the extent any bond is necessary under these circumstances, Plaintiffs respectfully request the bond not exceed $5,000.00.

## V.     CONCLUSION

Autel has blatantly violated the law in a prolonged and massive effort to steal Plaintiffs' proprietary information.  Plaintiffs request that the Court enter the proposed temporary restraining order and order to show cause to stop this conduct and to prevent any further use of their proprietary information.

sf-4515150

Dated:  July 28, 2021                    Respectfully submitted,

MORRISON & FOERSTER LLP


By:  */s/ Kenneth A. Kuwayti*
     Kenneth A. Kuwayti
     KKuwayti@mofo.com

Attorneys for Plaintiffs
MITCHELL REPAIR INFORMATION
COMPANY, LLC and SNAP-ON
INCORPORATED

MOT. FOR TRO AND OSC RE PI
Case No. 3:21-cv-01339-CAB-BGS

sf-4515150