# EXHIBIT 1

EXHIBIT 1

5

**MORRISON | FOERSTER**

12531 HIGH BLUFF DRIVE
SAN DIEGO, CALIFORNIA
92130-2040

TELEPHONE: 858.720.5100
FACSIMILE: 858.720.5125

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BOSTON, BRUSSELS,
DENVER, HONG KONG, LONDON,
LOS ANGELES, NEW YORK, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI,
SINGAPORE, TOKYO, WASHINGTON, D.C.

July 27, 2021

Writer's Direct Contact
+1 (858) 314.7601
JLanham@mofo.com

*Via hand delivery, email,
certified mail, and facsimile*

Autel. US, Inc.
175 Central Ave, Ste. 200
Farmingdale, NY 11735
Fax: (631) 357-3304
ussupport@autel.com
sales@autel.com

*Via hand delivery and certified mail*

Shuping Wang
Registered Agent for Autel US, Inc.
5282 Palazzo Dr.
Dublin, CA 94568

*Via email, Priority Mail International, and
facsimile*

Autel Intelligent Technology Corp., Ltd.
7th, 8th and 10th Floor, Building B1,
Zhiyuan, Xueyuan Road, Xili, Nanshan,
Shenzhen, 518055, China
Fax: 0086-755-8614-7758
support@autel.com
sales@auteltech.net

Re:     *Mitchell Repair Information Co., LLC and Snap-on, Incorporated v.
        Autel. US, Inc. and Autel Intelligent Technology Corp., Ltd.* (S.D. Cal.)

Dear Sir or Madam:

I write regarding litigation being filed today in United Stated District Court for the Southern
District of California against Autel. US, Inc. and Autel Intelligent Technology Corp., Ltd.
The Complaint in this litigation is attached.  This matter requires your immediate attention
and this letter should be provided to your attorneys immediately.

Plaintiffs Mitchell Repair Information Co., LLC ("Mitchell 1") and Snap-on, Incorporated
("Snap-on") intend to file *ex parte* motions with United States District Court for the Southern
District of California on July 28, seeking:  (1) a temporary restraining order and order to
show cause regarding preliminary injunction against Autel. US, Inc., relating to its
unauthorized intrusions into Plaintiffs' diagnostic and repair data; (2) an order permitting
expedited discovery and requiring the preservation of documents and information; and (3) an
interim protective order governing the exchange of confidential business information.

sf-4529710

EXHIBIT 1
6

MORRISON | FOERSTER

July 27, 2021
Page Two

You are additionally notified regarding your duty to preserve documents or other information relevant to the allegations in the attached Complaint, including but not limited to by suspending any existing policies related to deleting or destroying files. *See Al Otro Lado, Inc. v. Nielsen*, 328 F.R.D. 408, 416 (S.D. Cal. 2018); *Lewis v. Ryan*, 261 F.R.D. 513, 518 (S.D. Cal. 2009).

We would like to schedule a call to discuss the forthcoming motions as soon as possible and are available to discuss the motions or the litigation with your attorneys at any time.

Sincerely,

John R. Lanham

encl.

sf-4529710

EXHIBIT 1
7

KENNETH A. KUWAYTI (CA SBN 145384)
KKuwayti@mofo.com
BERKELEY G. FIFE (CA SBN 325293)
BFife@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600

JOHN R. LANHAM (CA SBN 289382)
JLanham@mofo.com
JANET S. KIM (CA SBN 313815)
JKim@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100

Attorneys for Plaintiffs
MITCHELL REPAIR INFORMATION
COMPANY, LLC and SNAP-ON INCORPORATED

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCHELL REPAIR INFORMATION COMPANY, LLC, a Delaware limited liability company, and SNAP-ON INCORPORATED, a Delaware corporation, | Case No. **'21 CV 1339 CAB BGS** |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AUTEL. US INC., a New York corporation, and AUTEL INTELLIGENT TECHNOLOGY CORP., LTD., a Chinese corporation, | |
| Defendants. | |

COMPLAINT

EXHIBIT 1
8

1   Mitchell Repair Information Company, LLC ("Mitchell 1") and Snap-on

2   Incorporated ("Snap-on") (collectively, "Plaintiffs") bring this action against

3   Defendants Autel. US Inc. ("Autel US") and Autel Intelligent Technology Corp.,

4   Ltd. ("Autel ITC") (collectively, "Defendants" or "Autel") and allege as follows:

5   <u>**NATURE AND SUBSTANCE OF THE ACTION**</u>

6   1.   This case arises out of the blatant theft of Plaintiffs' proprietary

7   information and data by Defendant Autel US and its Chinese parent company,

8   Defendant Autel ITC.

9   2.   Plaintiffs Snap-on and Mitchell 1 provide proprietary diagnostic and

10   repair information that automotive technicians use to facilitate the efficient repair of

11   automobiles and trucks.  This information is based on expert and artificial

12   intelligence analysis of literally billions of data points that Plaintiffs have gathered

13   from real world repair information accumulated over a period of more than 25

14   years.  Plaintiffs have spent over $100 million dollars on research, analysis, and

15   product development relating to this proprietary information over many years.  No

16   other company in the world has access to even a small fraction of this volume of

17   real world repair data, and, as a result, no other company offers a product that

18   provides as comprehensive and detailed diagnostic and repair information.

19   3.   Snap-on and Mitchell 1 offer a variety of products that allow end users

20   to access some of this information when conducting their repairs, in exchange for a

21   monthly subscription fee.  As discussed in more detail below, these products range

22   from a custom handheld diagnostic computer that connects directly to the vehicle

23   and sells for an MSRP of just under $10,000, to separate web-based services for

24   vehicles and for medium and heavy trucks that allow users to access some of this

25   proprietary information online.  Plaintiffs' products combine access to their

26   proprietary information with comprehensive Original Equipment Manufacturer

27   ("OEM") information, much of which requires Mitchell 1 to pay substantial annual

28   licensing fees.

2                                   COMPLAINT

EXHIBIT 1
9

4.      Autel competes with Snap-on and Mitchell 1, and has its own handheld diagnostic computer tool.  But it does not have access to anywhere near the same level of real world repair information.  Further, Autel has not invested the years of time and money that would be required to analyze and usefully categorize this repair information.  Instead, Autel decided to steal the information from Snap-on and Mitchell 1.

5.      Autel US and Autel ITC have done so by improperly syphoning data from three separate products, in at least three different ways: (1) circumventing the security measures on Plaintiffs' handheld diagnostic computers to "spoof" those devices and engage in mass, automated downloads of Plaintiffs' proprietary information; (2) stealing the user name and password of a different company to surreptitiously and systematically pull Plaintiffs' proprietary data from its online TruckSeries product, which provides diagnostic and repair information for medium and heavy trucks; and (3) improperly pulling large quantities of Plaintiffs' proprietary information through Mitchell 1's ProDemand product in violation of the terms of that product's End User License Agreement.

6.      This theft of vehicle repair data is part of a familiar pattern for Autel. It has been sued twice before by Ford and by GM for stealing their repair-related information.

7.      Autel has concealed its conduct by, among other things, masking its attacks on Plaintiffs' data by using more than 300 different IP addresses, copying the authentication information from Snap-on's handheld diagnostic devices, pretending to be making requests for data through over four hundred devices, and secretly operating behind the username and password of a different registered user. Plaintiffs have taken countermeasures to stop this conduct, but Autel has morphed its behavior in return and, undeterred, continues to try to steal Plaintiffs' data.

8.      Snap-on and Mitchell 1 accordingly bring this action for temporary, preliminary, and permanent injunctive relief to stop Autel from making use of the

<div align="center">3</div>

<div align="right">COMPLAINT</div>

EXHIBIT 1
10

1   information it has taken and from taking any further data, and for damages for

2   Autel's flagrant violations of law.

3                                    **PARTIES**

4        9.      Plaintiff Mitchell 1 is a Delaware limited liability company with its

5   principal place of business at 16067 Babcock Street, San Diego, California 92127.

6        10.     Plaintiff Snap-on is a Delaware corporation with its principal place of

7   business at 2801 80th Street, Kenosha, Wisconsin 53143.

8        11.     Defendant Autel US is a New York corporation with its principal place

9   of business located at 175 Central Ave., Suite 200, Farmingdale, New York 11735.

10  Upon information and belief, Autel US is a wholly-owned subsidiary of Autel ITC.

11       12.     Defendant Autel ITC is a Chinese corporation having a principal place

12  of business at 7th, 8th, and 10th Floor, Building B1, Zhiyuan Xueyuan Road, Xili,

13  Nanshan, Shenzhen 518055, China and having an office in the United States at 175

14  Central Ave., Farmingdale, New York 11735.

15                        **JURISDICTION AND VENUE**

16       13.     This Court has subject matter jurisdiction over the claims arising under

17  the Digital Millennium Copyright Act ("DMCA") (17 U.S.C. §§ 1201, 1203)

18  pursuant to 28 U.S.C. §§ 1331 and 1338.

19       14.     This Court has subject matter jurisdiction over the claims arising under

20  the Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030) pursuant to 18

21  U.S.C. § 1030(g) and 28 U.S.C. § 1331.

22       15.     This Court has subject matter jurisdiction over the claims arising under

23  the Defend Trade Secrets Act ("DTSA") (18 U.S.C § 1836) pursuant to 18 U.S.C.

24  §§ 1836(b) and 1837, and 28 U.S.C. § 1331.

25       16.      This Court has supplemental subject matter jurisdiction over the

26  related state law claims pursuant to 28 U.S.C. § 1367 because these claims are so

27  related to the federal claims that they form part of the same case or controversy

28

1  under Article III of the United States Constitution and derive from a common

2  nucleus of operative facts.

3      17.    This Court has an independent basis for jurisdiction over all the claims

4  herein in accordance with 28 U.S.C. § 1332 because there is diversity of citizenship

5  between the parties, and the amount in controversy exceeds $75,000.

6      18.    Defendants are subject to personal jurisdiction in this District because

7  this action arises out of Autel's illegal conduct that intentionally targets and causes

8  injury to Plaintiffs in this District.  For example, as further detailed in the

9  allegations in this Complaint, Autel has circumvented Plaintiffs' security measures

10  to illegally obtain access to, and make unlawful use of, Plaintiffs' proprietary

11  diagnostic and repair information hosted by, and stored in, servers located in this

12  District.  Autel has also illegally obtained access to, and made unlawful use of,

13  Plaintiffs' products and services developed and sold in this District.  Via these and

14  other actions, Autel has made unauthorized use of Plaintiffs' intellectual property,

15  personal property, and proprietary data that was created in and is located in this

16  District.

17      19.    In addition, Autel US has violated the End User License Agreement

18  that it entered into with Plaintiff Mitchell 1 ("Mitchell 1 EULA") with respect to

19  opening and maintaining an account relating to the ProDemand product.  Autel

20  entered into a Mitchell 1 EULA by at least 2016, and reaffirmed its acceptance of

21  Mitchell 1's EULA at least as recently as December 2020.  A copy of Autel's 2016

22  Mitchell 1 order form with the EULA signature page, and a copy of the 2016

23  Mitchell 1 EULA are attached as Exhibits 1-2.  The Mitchell 1 EULA requires that

24  parties to the agreement "agree that jurisdiction of any claim or suit hereunder shall

25  be exclusively the courts located within the County of San Diego, California" and

26  specifically states that, for such claims, both parties to the agreement "hereby

27  submit to the personal jurisdiction of such courts."  Exhibit 2 at 76 (¶ 17).  Autel

28  US has signed this agreement.  *See* Exhibit 1 at 70-71.

20.    A copy of Autel's 2020 Mitchell 1 order form with the signature page, and a copy of the 2020 Mitchell 1 "Order Terms and Conditions" are attached as Exhibits 3-4.  The Mitchell 1 Order Terms and Conditions state that "[t]he agreement between you ("Customer") and Mitchell Repair Information Company LLC ("Mitchell 1") includes: (i) these Mitchell 1 Order Terms and Conditions; (ii) the Order Form; and (iii) the End User License Agreement as may be updated from time to time ("EULA")[.]"  Exhibit 4 at 82 (¶ 1).  Autel US has signed this agreement as well, reaffirming its agreement to the Mitchell 1 EULA.  *See* Exhibit 3 at 78-79.

21.    Accordingly, this Court has exclusive jurisdiction over Mitchell 1's claim against Autel US for breaching the Mitchell 1 EULA by improperly using the ProDemand account for the purposes of determining Plaintiff Mitchell 1's entitlement to preliminary injunctive relief for that claim.

22.    In addition, Autel markets, sells, furnishes, and supports its competing diagnostic products and services throughout the United States (a fact which has already been established against Autel in multiple written opinions, *see Service Solutions U.S., LLC, v. Autel. US, Inc., et al*., 2013 U.S. Dist. LEXIS 150036, *11-16 (E.D. Mich. Oct. 18, 2013), *Ford Motor Co. v. Autel. US Inc. et al.*, 2015 U.S. Dist. LEXIS 133201, *32-35 (E.D. Mich. Sept. 30, 2015), *General Motors L.L.C. et al. v. Autel. US Inc. et al*., 2016 U.S. Dist. LEXIS 40902, *10-12 (E.D. Mich. Mar. 29, 2016)) including in the State of California to California residents.  Upon information and belief, Autel ITC's competing products are sold and distributed by Autel US in the United States.  Autel ITC is aware of where these products are to be sold and distributed by Autel US, and therefore intends that these products be sold and delivered to those locations.  Such products are purposefully sold and promoted for sale to customers in California, including customers residing in the Southern District of California.

23.    At the public website https://www.auteltech.com, which has a notice identifying Autel ITC as the owner of the site, users in California can access and download software, user manuals, and other materials for Autel's diagnostic tools. Users in California can also purchase Autel's diagnostic tools at this site.

24.    Venue is proper in this judicial district under 28 U.S.C. § 1391, at least because a substantial part of the events or omissions giving rise to the claims of this complaint occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

## FACTUAL BACKGROUND

### A.    Snap-on and Mitchell 1

25.    Snap-on has been a leading designer and manufacturer of tools essential to automotive and truck repair since its founding over 100 years ago.

26.    Snap-on's industry-leading automotive and truck repair equipment includes both traditional hand tools and cutting-edge portable diagnostic computers. In tandem with the automotive industry's advent of vehicular on-board diagnostic ports in the 1980s, Snap-on developed handheld diagnostic computers capable of interfacing with these ports.  These sophisticated devices are able to understand "trouble codes" output by vehicles' diagnostic ("OBD-II") ports, initiate testing within the vehicle relating to these codes, and offer diagnostic and repair solutions to problems causing these codes.

27.    For more than 30 years, Snap-on has designed and developed varieties of these handheld diagnostic computers.  As discussed more below, these tools' features and capabilities have become increasing sophisticated over the years.  For example, Snap-on's diagnostic tools now can display for users a wealth of cloud-hosted proprietary expert diagnostic and repair information and OEM sourced repair information.  These and other advances are made possible, in part, by Snap-on's roughly 12,000 employees worldwide, almost a third of whom are part of Snap-on's Repair Systems and Information Group.

28.     These advances were also made possible, in part, by Snap-on's acquisition of Mitchell 1 in 1996.  Mitchell 1 has been a fixture in the San Diego community for over 100 years, and has established itself as an industry-leading provider of resources to automotive and truck technicians and repair shops.

29.     Like Snap-on, Mitchell 1 has long recognized the importance of technological resources for vehicle technicians.  In the 1980s, Mitchell 1 began releasing electronic repair information and estimator systems.  In 1995, Mitchell 1 released its Manager™ shop management and service writing software to automotive repair shops across the country.  This software functions to facilitate customer vehicle repairs and contains features such as cost-estimating tools, integration with electronic parts catalogs, and customer and marketing management functions.  This software has gathered repair data for vehicles logged in the system since the mid-1990s.

30.     Snap-on recognized the importance of Mitchell 1's offerings and the potential impact Mitchell 1's software and repair data could have on the capabilities of Snap-on's diagnostic devices.  As such, since acquiring Mitchell 1 over 25 years ago, Snap-on has closely integrated Mitchell 1's software and repair data into the Snap-on ecosystem.  For example, Mitchell 1's Manager software is now sold as a component of the Snap-on product ShopKey®.  Mitchell 1's software is used in over 32,000 repair shops nationwide and has become by far the most popular shop management software.  As a result of this software's widespread use, Snap-on and Mitchell 1 have gathered billions of vehicle repair records.  These records contain information such as descriptions of symptoms, diagnosis, and replacement/repair techniques for all logged vehicle repairs.  None of Snap-on or Mitchell 1's competitors appear to have even a fraction of this repair data.

31.     Snap-on and Mitchell 1 have used this repair data to develop proprietary diagnostic and repair information.  This proprietary information is the result of over 100 million dollars of research, analysis, and product development

1   based on both expert and artificial intelligence analysis of billions of repair records.

2   As discussed more below, this proprietary information is offered through Snap-on's

3   diagnostic device services, and some of the information is also offered as part of

4   Mitchell 1's standalone paid subscription service, ProDemand.

5       **B.   Autel**

6       32.   Autel US is the U.S. subsidiary of a Chinese company, Autel ITC.

7   Autel is one of Plaintiffs' main competitors in the automotive diagnostic and repair

8   space.  It offers products directed to automotive repair shops, including its own

9   handheld devices.  Autel products are available nationwide through AutoZone

10  stores and other distributors.  On information and belief, Autel has a U.S.

11  headquarters in New York, where Autel US is located.

12      33.   Autel has been sued twice before for stealing data and intellectual

13  property relating to automotive vehicle repairs.  *See General Motors LLC v. Autel.*

14  *US Inc. et al.*, 4:14-cv-14864 (E.D. Mich.), ECF No. 1 (Complaint) (Dec. 22,

15  2014), *Ford Motor Co. v. Autel US Inc. et al.*, 4:14-cv-13760 (E.D. Mich.), ECF

16  No. 28 (Second Amended Complaint) (Nov. 11, 2015).

17      34.   In *Ford*, Autel was accused of unauthorized access to and use of

18  Ford's Integrated Diagnostic System ("IDS system"), which includes hardware and

19  software components Ford developed to diagnose problems with Ford vehicles.  *See*

20  *generally*, *Ford*, 4:14-cv-13760, ECF No. 28 (Second Am. Compl.) at 8-37.  Ford

21  alleged Autel created a program that circumvented Ford's security measures and

22  provided Autel access to Ford's data.  *Id.* at 36-37.  Ford alleged Autel then stole

23  this data, which included copyrighted and trade secret material (*id.* at 8-9), and used

24  it in its own products (*id.* at 9-33).  Autel's motion to dismiss challenging Ford's

25  claims for copyright infringement, counterfeiting, breach of contract, and trademark

26  dilution was denied.  *See Ford Motor Co. v. Autel US Inc. et al.*, 2016 U.S. Dist.

27  LEXIS 85875, *6-8, 10-16 (E.D. Mich. July 1, 2016).  But, the parties settled

28

COMPLAINT

EXHIBIT 1
16

1  before final adjudication of Ford's claims.  *See Ford*, 4:14-cv-13760, ECF No. 109
2  (Dismissal Order).

3       35.    In *General Motors*, Autel was accused of unauthorized access to and
4  use of GM's proprietary vehicle servicing software and unauthorized use of GM's
5  trademarks, copyrights, and trade secrets.  *See generally*, *General Motors*, 4:14-cv-
6  14864, ECF No. 1 (Complaint) at 12-26.  Although the parties settled before GM's
7  claims were decided on the merits, *see id.,* ECF. No. 42 (Dismissal Order), Autel's
8  Rule 12(b)(6) motion to dismiss GM's DMCA, CFAA, trade secret, and unjust
9  enrichment claims was denied.  *See General Motors LLC v. Autel. US Inc. et al*.,
10  2016 U.S. Dist. LEXIS 40902, *17-33 (E.D. Mich. Mar. 29, 2016).

**C.      Snap-on and Mitchell 1 Offer Sophisticated Diagnostic and Repair Products Powered by Proprietary Information and Databases**

12       36.    Snap-on and Mitchell 1 offer three different products for diagnostic
13  and repair that are at issue in this lawsuit: diagnostic handheld computers,
14  ProDemand, and TruckSeries.

15       ***Diagnostic Handheld Computers***

16       37.    Snap-on currently offers various types of handheld diagnostic
17  computers.  One example is the ZEUS™ device, pictured below, which will serve
18  as an example to illustrate some of the features offered in Snap-on diagnostic
19  systems:

20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14    38.    This device contains hardware and software allowing it to
15  communicate with a connected vehicle.  When connected, ZEUS's scanner function
16  identifies the year, make, model, and engine of the vehicle.  The technician may
17  then use ZEUS to scan the vehicle for trouble codes, which are communicated via
18  the vehicle's OBD-II port.  After scanning, ZEUS allows the technician to view
19  trouble codes resulting from the scan.  The technician can then select to "diagnose"
20  any of those active trouble codes.

21    39.    In response to a technician choosing to "diagnose" an active trouble
22  code, ZEUS provides the technician various types of proprietary diagnostic and
23  repair information relevant to the trouble codes detected on the connected vehicle.
24  As discussed above, this information has been (and continues to be) developed
25  from billions of repair records collected in Mitchell 1's Manager software, and is
26  the result of enormous amounts of Plaintiffs' labor and expenditure.  The following
27  represent categories of tailored information that may be displayed to a technician
28  (via "cards" on the ZEUS display) relevant to a vehicle's specific trouble code:

40.  Top Repairs:  Top Repairs lets a technician quickly understand what the most likely repairs will be for the vehicle at issue.  The Top Repair card presents a graph depicting the most common repairs performed for a certain vehicle with certain trouble codes, at particular mileages, along with the frequency of those repairs.  An exemplary Top Repairs graph for a P0441 (evaporative emissions) trouble code on a 2015 Toyota Camry appears below:



41.  This Top Repairs graph is based on a real-world understanding of the most common fixes for a specific vehicle's trouble codes, which is based on Plaintiffs' sophisticated analysis of billions of repair records.  Top Repairs therefore can save both the technician and the vehicle owner significant time and money.  No other company offers such a comprehensive and specific data set.

42.  Real Fixes:  Real Fixes provides trouble code-specific recommendations on performing the most common vehicle repairs.  These recommendations include information on the behavior associated with the code, the

<p align="center">12</p>

COMPLAINT

EXHIBIT 1
19

1    likely cause (including recommended troubleshooting steps), and the desired results

2    of troubleshooting.  Real Fixes includes procedures and tests gathered from real-

3    world repair orders.  The narratives for these entries are written by Snap-on expert

4    technicians, who have created millions of unique Real Fix entries.  Real Fix data is

5    continually updated and revised to reflect new repair data and new vehicle model

6    years.  Each Real Fix card includes a Fixed It count derived from the real-world

7    data.  The Fixed It count shows how many times the vehicle problem was solved

8    with the solution described in the Real Fix.  Real Fixes are prioritized based on the

9    Fixed It count to help the technician choose the course of action with the highest

10   probability of success.

11        43.    Troubleshooter tips:  This card provides tips written by Snap-on expert

12   technicians and other industry experts relevant to the vehicle in question.  For

13   example, these tips may include time-saving suggestions for repairs, such as how to

14   determine the most likely components causing a particular problem.  Some tips

15   include links to related Functional Tests that further help to diagnose the problem.

16        44.    Smart Data:  This card enables technicians to view relevant vehicle

17   Parameter IDs ("PIDs").  PIDs are live readings of a vehicle's systems, which are

18   communicated to ZEUS via a vehicle's OBD-II port from the vehicle's numerous

19   system controllers, which are connected to hundreds of sensors, solenoids,

20   actuators, and switches with associated PIDs.  On average, a vehicle may present

21   approximately 100-200 PIDs when connected to a diagnostic scanner, which is too

22   much data to be particularly useful to a technician trying to diagnose a specific

23   issue.  But, as a result of years of collecting PID data associated with vehicle repairs

24   and expert analysis of this data, Snap-on has developed lists of PID data points

25   relevant to each trouble code.  The Smart Data card presents the technician those

26   PIDS that are relevant to the trouble code at issue.

27

28



45.     Further, Snap-on has created a "known good" range of values for specific PIDs based on its over 200 billion data points and the views of its experts. The Smart Data card flags specific PIDs that fall outside of Snap-on's "known good range," as shown above.  This immediately informs the technician that there is a likely problem with that portion of the system.  However, the minimum and maximum values of the "good" ranges for each parameter are not shared with the end user.  Snap-on deliberately keeps this information confidential.  No competitor has a comprehensive product comparable to Snap-on's PID functionality.

46.     <u>Functional tests</u>:  ZEUS further displays functional tests associated with a particular trouble code, such as system controls, resets of component operations, and programming new vehicle components.  Snap-on's experts, aided by their billions of repair records, have determined which functional tests to associate with particular trouble codes, and have consolidated those relevant tests into a single easy-to-use card.

47.  Guided Component tests:  This card displays component tests associated with a vehicle's trouble code(s) and guides for how to perform these tests.  These component tests are used to determine whether a particular component is good or bad, and are derived from Snap-on's expert analysis of its repair record databases.  The narrative step-by-step instructions associated with these test are also prepared by Snap-on expert technicians.

48.  Snap-on and Mitchell 1 spend millions of dollars annually to keep the proprietary diagnostic and repair information provided through these cards up-to-date.  This proprietary information allows technicians to use Snap-on diagnostic devices to efficiently resolve a vehicle's problem.  No competitor has the same volume of repair and diagnostic records, or analysis of these records.  Consequently, no competitor is capable of providing technicians a comprehensive catalog of the exact information needed to quickly resolve a particular vehicle's problem.

**ProDemand**

49.  Mitchell 1 offers a web-based subscription service that provides diagnostic and repair information for vehicles.  ProDemand is available to users only on a subscription basis.  Most subscribers must have a valid username and password for access.  For some large customer accounts, Mitchell 1 allows the customer to authenticate through a designated specific company IP address, where all of the traffic is routed through their corporate firewalls or routers.  Owners of a Snap-on handheld diagnostic device still need to pay an additional subscription fee and open a ProDemand account to make use of the ProDemand features.

50.  ProDemand offers its subscribers access to some of the proprietary information described above.  In addition, ProDemand organizes and displays comprehensive repair information from vehicle OEMs, including Technical Service Bulletins issued by the OEMs, repair instructions, and calibration information for advanced driver-assistance systems ("ADAS").  Mitchell 1 has to pay significant

1  fees to license this OEM data.  And Mitchell 1 incurs substantial additional labor

2  and expense via its effort to both organize OEM data in a user-friendly manner and

3  to map the OEM information to its own proprietary data services.

4      51.    Mitchell 1's organization and transformation of the OEM data

5  provides significant benefit to users of ProDemand attempting to efficiently access

6  this information.  For example, if a user wants to learn about all of the ADAS

7  information for a vehicle, that user would normally have to search for individual

8  items, such as the front view camera, adaptive cruise control, or other sensors on

9  the car.  Each manufacturer organizes its information differently, and the

10  information is normally found spread among different component categories, so

11  this is no easy task.  With ProDemand, Mitchell 1 avoids this user headache by

12  providing all of a vehicle's ADAS information organized into one place.   Mitchell

13  1 makes this organization consistent for each vehicle manufacturer so that the

14  information is easy to locate.  Mitchell 1 also ensures that the same taxonomy can

15  be used across manufacturers, regardless of whether OEMs use different terms for

16  the same component.  Mitchell 1 has a team of over 50 people responsible for

17  sorting through all of the OEM data and continually updating and organizing it.

18      52.    In terms of proprietary information, ProDemand allows its users to

19  access Top Repairs, Real Fixes, and Component Tests (described above).

20  ProDemand also offers an additional "Top 10 Repairs" feature (pictured below),

21  which reports the most common symptoms, diagnostic trouble codes ("DTCs"), and

22  most commonly replaced components for a particular year, make, model, engine,

23  and trim for a particular vehicle.  This information streamlines a technician's

24  troubleshooting and also allows shops to provide customers with proactive

25  maintenance suggestions to avoid future part failures.  The Top 10 Repairs feature

26  is only possible thanks to Plaintiffs' collection of the billions of repair records

27  described above, and the analysis and review of these records by Plaintiffs' industry

28  experts.  An example screenshot of the Top 10 Repairs feature is provided below.



***TruckSeries***

53.     Mitchell 1 offers another web-based subscription service, called TruckSeries, which is directed to repair of medium and heavy commercial trucks. It requires a separate paid subscription from ProDemand.  To access this service, most subscribers must have a valid username and password.  Certain large customers are permitted to authenticate through a specific, designated IP address, as described above.

54.     Unlike ProDemand, where most repair information comes from OEMs and is licensed to Mitchell 1, nearly all of the diagnostic and repair information on TruckSeries is authored by Mitchell 1.  Mitchell 1 has invested enormous time and effort into TruckSeries.

55.     Mitchell 1's efforts, and the resulting proprietary information provided by TruckSeries, saves technicians substantial time and effort when trying to diagnose and repair medium and heavy trucks.  Rather than having to go find diagnostic and repair information in lengthy repair manuals from OEMs,

Mitchell 1's system allows technicians to quickly access relevant and applicable diagnostic and repair information and to return specific information to facilitate repairs.

56.     For example, a technician who wants to quickly identify the problem that a truck may be experiencing can use the TruckSeries "Top Search Lookups" feature.  This feature displays the top ten searches that other technicians have performed for problems they are experiencing on a truck with a particular configuration, giving the technician insight into the most common problems the truck has experienced.  The Top Search Lookups is regularly updated as technicians make continued use of TruckSeries.

57.     TruckSeries also offers features tailored to a particular trouble code or particular symptoms that a technician has observed with the truck.  Some of these features include the following:

58.     Testing: This provides a step-by-step narrative on how to diagnose and test a problem.

59.     Photos: The Component Connector and Component Location features provide high resolution photographs and CAD drawings that have been created by Mitchell 1 and have been highlighted, color-coded, and labeled where appropriate to display the component and where it fits within the car.  These pictures are made by Mitchell 1.

60.     Interactive Wiring Diagrams: The original diagrams that contain links to other relevant portions of TruckSeries data to make troubleshooting and repairs easier.

61.     Labor Time: This shows estimates of how much time Mitchell 1's experts believe that a repair should take.  Unlike automotive manufacturers, heavy truck manufacturers generally do not publish a time for how long they believe a particular repair should take.

1    62.    <u>RepairConnect</u>: This code diagnostic feature allows technicians to

2  enter a vehicle and a trouble code and receive specific repair procedures for the

3  vehicle's problem.  The content in TruckSeries is proprietary to Mitchell 1, as

4  Mitchell 1 prepares the diagnostic and repair information itself.

5    63.    TruckSeries also includes ADAS reference tables, torque

6  specifications, step-by-step guidance on how to remove and replace parts, and after

7  repair information describing steps that need to be taken once the repair is

8  completed.

9    **D.    Snap-on and Mitchell 1 Spent Years Developing Their Proprietary
10          Data**

11    64.    Transforming the billions of repair records collected by Mitchell 1's

12  Manager software into useable, searchable databases has required an enormous

13  undertaking by both Snap-on and Mitchell 1.  For this data to be useful, Plaintiffs

14  knew they had to create a set of databases able to associate specific symptoms or

15  trouble codes with specific repairs and component failures, and to associate those

16  pieces of information with the repair, diagnostic, and test information to display to

17  the technician.

18    65.    This task was an immense challenge in part due to the difficulty

19  inherent in organizing and analyzing such a massive volume of data.  But the task

20  was made even harder because the underlying repair records were prepared by

21  technicians lacking a common vernacular.  For example, technicians across the

22  country often use different naming conventions for vehicle components, use

23  shorthand, or introduce typographical errors or phonetic spellings of vehicle

24  components.  There are over *three thousand* variations or misspellings for the term

25  "oxygen sensor" in Plaintiffs' dataset.  And some repair records are simply

26  incorrect.  To address this, in 2012 Snap-on formed a team of special developers,

27  experts, and editors to solve the problems presented by these service records.  The

28  team worked to categorize various terminologies and link related concepts across

<div align="center">19</div>

COMPLAINT

EXHIBIT 1
26

1  the products.  Ultimately, the team built a comprehensive taxonomy and ontology

2  to organize repair terminologies across all vehicle makes, models, and engine

3  systems in the databases.

4      66.    Further, reviewing, analyzing, and organizing Plaintiffs' proprietary

5  data so that it can be displayed in a user-friendly form has taken years, and still

6  requires constant human review alongside review by a proprietary artificial

7  intelligence ("AI") algorithm, which employs machine learning and natural

8  language processing to further analyze the processing repair records.  This

9  proprietary AI has taken a lead role in data processing and now processes billions

10  of repair records, with constant fine-tuning by human reviewers.

11      67.    As one specific example, Snap-on has expended enormous effort to

12  create and maintain its filtered PID data.  Properly-filtered PID data is valuable to

13  technicians because it provides real-time, objective information for various aspects

14  of the vehicle's operation.  But a vehicle may display roughly 100 to 200 PID

15  sensors, most of which are not relevant to any given problem.  Moreover,

16  technicians typically have no effective way of knowing whether each of the PID

17  values being reported by the car is within the acceptable range.  This results in data

18  pollution, making it difficult to use sensor data to diagnose a vehicle.

19      68.    To overcome PID data pollution, Snap-on's experts spent years

20  organizing data for use by repair technicians.  This involved creating a proprietary

21  code-to-component metadata structure, with the assistance of proprietary AI

22  technology that associates vehicle problems with probable components, and those

23  components with the relevant PIDs.  By utilizing this metadata structure the Smart

24  Data function is able to provide curated PID sensor data for only the most relevant

25  components.

26      69.    Snap-on has also analyzed PIDs and over 200 billion data frames

27  through a combination of human expert analysis and machine learning to determine

28  the normal distributions of PID data, in order to identify minimum and maximum

accepted values, and a "known good" range. This initial process involved millions of dollars in resources. And Snap-on's data continues to be constantly tuned by its subject matter experts. Snap-on's min/max PID data, and the metadata needed to present that PID data in response to particular vehicles and symptoms, is highly proprietary and is of immeasurable competitive value to Snap-on. Plaintiffs do not share the "known good range" for the PID data with their subscribers, even on an individual vehicle basis.

70.    Snap-on's and Mitchell 1's software engineers have also spent years developing custom code to manage their data and to organize data requests from products to their data servers. Invisible to the user, this software formats a user's request for certain proprietary diagnostic and repair information into a "call" or "query string" that will be recognized by the application programing interface ("API") for Plaintiffs' data servers. The query contains identifying information for the particular vehicle at issue, as well as data on the problem with the vehicle. These query strings are created by, and unique to, Snap-on and Mitchell 1 and are based on their software engineers' decisions for naming and categorization of the underlying vehicle characteristics.

71.    Underlying these queries are tens of thousands of lines of code that are used to manage Plaintiffs' proprietary data and to retrieve the appropriate data to provide to end users. This code is used to organize, manage, and search over 430 million individual artifacts of data, so that a response to a query can be presented to an automotive technician almost instantaneously.

### E.    Snap-on's and Mitchell 1's Security Measures

72.    Because the proprietary diagnostic and repair information is so important to Snap-on and Mitchell 1, they have put in place many measures to make sure it remains confidential.

73.    The core commercial value of Plaintiffs' products lies in the uniquely comprehensive coverage and the broad scope of their combined data, covering

1    diagnostic and repair information for vehicles going back over 20 years.  Thus,

2    while end users can make individual queries in the system (subject to certain

3    restrictions and agreements), this combined data as a whole is not accessible to

4    them.  Snap-on products do not allow users to comprehensively pull batches of

5    information about, for example, all of the different repairs for multiple cars or

6    multiple trouble codes.

7    **Internal Security Measures**

8    74.    Snap-on and Mitchell 1 employees who work with their proprietary

9    diagnostic and repair information must agree to confidentiality policies with

10    restrictions on the use and disclosure of confidential business information and

11    comply with confidentiality provisions expressed in various documents outlining

12    the companies' standards.  Among other things, these employees must sign a

13    confidentiality agreement governing treatment of the proprietary and diagnostic

14    information, technical data, trade secrets, and other confidential information.

15    75.    Snap-on and Mitchell 1 also train their employees in the proper

16    handling of confidential information, including the proprietary diagnostic and repair

17    data.  Each year, employees are required to complete various training modules

18    relating to information security, cyber security, and the protection of data and

19    intellectual property.

20    76.    The proprietary diagnostic and repair information is stored on

21    password-protected servers, which are accessible only by those with a need to use

22    them.  Even internal users need special access permissions to access these servers.

23    Visitors must sign in and be escorted when they go through company facilities.

24    77.    Snap-on and Mitchell 1 do not license their comprehensive data set to

25    anyone.

26    **Snap-on Handheld Diagnostic Units**

27    78.    Snap-on implements data protection measures to authenticate

28    legitimate device usage and prevent unauthorized actors from retrieving data from

its servers.  Snap-on's security process is designed to require physical possession of a Snap-on handheld diagnostic unit and the purchase of a current version bundle of software.

79.    Prior to obtaining any diagnostic data from Plaintiffs' servers, each device must pass authorization and authentication challenges.  Upon initiation, each diagnostic device must first authenticate by exchanging a particular set of credentials with a security server located in San Diego, California, and then it must again obtain new temporary authorization every five minutes.  A device that does not pass either of these two steps cannot access Plaintiffs' data.  This authentication and authorization process is implemented through over 30,000 lines of custom code written by Plaintiffs' in-house software engineers.[1]

80.    In addition, the proprietary diagnostic and repair information features work only when the handheld diagnostic unit is connected to an OBD-II port and reading trouble codes.  As a result, the user must either be physically connected to each vehicle subject to an information request or have built a vehicle simulator device for each vehicle, with active trouble code(s).  Such simulators are not commercially available but would need to be custom built by vehicle communication engineering groups who have had access to the individual vehicles or the vehicles' controllers.  As a result, it is difficult to build simulators that comprehensively address all the potential trouble codes and conditions that a specific vehicle could present.

81.    Even with these layers of security in place, Snap-on still does not provide users with access to more data than is necessary to perform the repair(s) at issue.  The diagnostic unit only displays information relevant to the particular trouble code(s) detected on the vehicle.  Moreover, Snap-on does not display its highly proprietary PID min/max data to the user at all.  Rather, the handheld

---

[1] This authentication and authorization process is not described in more detail here to avoid filing the Complaint under seal.

COMPLAINT

EXHIBIT 1
30

1    diagnostic unit identifies specific PID values that exceed the known good range
2    turning a flag red without showing the user what that range is, as depicted in
3    paragraph 44 above.

4          82.    Use of Snap-on's handheld diagnostic units is also governed by a
5    EULA that must be agreed to by the user or by a Snap-on franchisee on the user's
6    behalf when the device is first purchased and then accepted each time the device
7    software is upgraded.  In addition, every time the user starts the diagnostic device
8    software, a URL for the Snap-on EULA is displayed, along with a reference to the
9    terms and conditions for use of the device.  This screen states "Use of Software is
10   governed by the terms and conditions of the End User License Agreement."  A true
11   and correct copy of this screen is attached as Exhibit 5.  As described in more detail
12   below, the Snap-on EULA prohibits, among other things, reverse engineering of the
13   device software, running the software on multiple computers, or providing the
14   software to a third party.

15         **ProDemand and TruckSeries**

16         83.    All users of Mitchell 1's web-based ProDemand and TruckSeries
17   repair information products must have an active subscription, along with user
18   credentials tied to that subscription.  To access ProDemand or TruckSeries, the user
19   typically must have a valid username and password.  For some of Mitchell 1's
20   largest customer accounts, technicians may authenticate without a username and
21   password by using a designated company IP address through which the customer
22   routes their technician network traffic.  The data that are transferred between the
23   user and ProDemand or TruckSeries (and vice versa) during use of these services is
24   encrypted through HTTPS encryption.

25         84.    Both ProDemand and TruckSeries use an authorization process similar
26   to the one described above for Snap-on's diagnostic units, utilizing much of the
27   same custom-built code, which requires a new temporary authorization every five
28   minutes in order to make a valid request for data.

85.     Mitchell 1 has an anti-piracy team responsible for monitoring account access and usage and preventing misuse of its services.  This team monitors server traffic for, among other things, suspicious or inconsistent IP addresses using an account, or unusual account access patterns that are indicative of unauthorized use.

86.     The anti-piracy team will investigate suspicious account traffic and, if it is unable to confirm that the account is being used consistently with the EULA, will reset the account's credentials, block suspect IP addresses, or otherwise escalate the issue as appropriate.

87.     Mitchell 1 account holders for both ProDemand and TruckSeries must also agree to a EULA when placing an order for an account subscription.  As described in more detail below, among other things, this EULA permits usage of data only to provide vehicle repairs and estimates and conduct vehicle shop management.  Further, the EULA expressly prohibits allowing the Product or data from the Product to be made available to any other person; transferring or passing along the data, the Product or access to the Product; and translating, reverse engineering, decompiling, or otherwise accessing the source codes.

**F.     Recent Intrusion into Snap-on's and Mitchell 1's Data Servers**

88.     In mid-November 2020, Snap-on began detecting unusual spikes in traffic that impacted the performance of its diagnostic device network.

89.     Snap-on suspected this unusual activity was associated with illicit automated use of its diagnostic devices because legitimate users' access to Snap-on's data servers do not typically cause spikes in server traffic of this nature and because the speed at which requests were being made was faster than a human could make them.  These requests were inconsistent with how Snap-on's product is normally used for repair.  For example, a technician fixing a vehicle will typically look up specific service information related to the finite problems exhibited on that vehicle and the technician will linger on the material relating to that code for at least a few minutes as it is being reviewed.  A technician attempting to resolve a

specific problem on a real vehicle will not systematically run through the catalog of information available for a particular make and model of a vehicle. Nor will the technician quickly look through the same information across many vehicles. This is particularly impossible for Snap-on diagnostic devices because the devices are designed to display information for only the trouble codes on the vehicle that is connected to the device. To quickly move from the trouble codes from one vehicle to those from another vehicle and then to those from another, or to a large number of trouble codes, the device would need to be rapidly connected to various vehicles.

90.     Over a three-day period from November 11 to 13, 2020, Snap-on observed over *5.6 million* of such search queries seeking Plaintiffs' proprietary data. The intensity and speed of these requests is exemplified by the fact that on November 12, between the hours of 2:00 and 3:00 a.m. Pacific Time, Snap-on's IT group observed over *200,000* individual requests for data in the span of a single hour—and at a time when automotive technicians would not normally even be working in the United States. On November 13, between the same one-hour time period of 2:00 and 3:00 a.m. Pacific Time, the IT team observed over *600,000* requests.

91.     As a result of this activity, legitimate customers began to complain that they were being locked out of their devices and could not access the appropriate proprietary diagnostic and repair information. This appeared to be an effect of the bad actor "spoofing" these customers' device credentials.

92.     After discovering this bad actor activity, Snap-on blacklisted a set of approximately 40 IP addresses associated with the traffic and continued monitoring network traffic to block additional IP addresses engaged in suspicious activity. But, notwithstanding this blocking, the intrusions continued.

93.     During the four-day period between November 21 and 25, more than *5 million additional* anomalous requests for Plaintiffs' proprietary data were made from new IP addresses that had not yet been blocked. The activity was so bad that,

1   to protect its data, Snap-on had to shut down access to its diagnostic servers

2   worldwide to users of an older version of its software that was associated with the

3   bad actor activity, cutting off access to over 15% of its legitimate customers.

4   Periodically, over the next several weeks, during the evenings Pacific Time and on

5   weekends, Snap-on was forced to continue shutting down access to devices using

6   the older version of the software.

7       94.    On or around December 7, 2020, Snap-on began generating daily

8   reports designed to show instances where multiple devices appeared to be making

9   requests for proprietary repair and diagnostic information through a single IP

10  address.  The daily reports reflect a significant amount of additional bad actor

11  activity during the month of December.  For example, the report for the night of

12  December 10 through the morning of December 11 shows that at one time four

13  different IP addresses were each making data requests, purportedly on behalf of *45*

14  different devices *each*.  This is very abnormal traffic, particularly for IP addresses

15  coming from China, where Snap-on does not sell the ZEUS device.  A report from

16  December 12 shows that nine IP addresses in China were each making requests,

17  purportedly on behalf of 44 devices each.  A report from December 18 shows four

18  IP addresses in China requesting data, purportedly on behalf of between 18 to 41

19  devices each.  And a report from December 19 showed one IP address in China was

20  purportedly making requests on behalf of 72 devices at one time, and a second IP

21  address was purportedly making requests on behalf of another 40 devices.

22      95.    In response to these observations, Snap-on began adding additional

23  security mechanisms on its ZEUS devices and network, as well as additional

24  monitoring functions to allow more detailed tracking of network activity.  First,

25  Snap-on blocked all suspected IP addresses at the firewall level.  Then, on

26  December 28, 2020, Snap-on unblocked these addresses and began sending

27  "confused," randomized data associated with different makes and models of

28  vehicles, rather than the actual repair and diagnostic information requested by those

<div align="center">27</div>                                          COMPLAINT

EXHIBIT 1
34

IPs, and blocking unknown IP addresses from China, which was the source of much of the bad actor traffic.

96.    The illicit activity still continued.  Most notably, during three days in January 2021, the bad actor made over 240,000 requests for Plaintiffs' proprietary PID data.  However, Plaintiffs were unable to identify the bad actor behind these activities at the time.

97.    These are just examples of the illicit activity of which Plaintiffs are currently aware.  Plaintiffs' investigation into the wrongful conduct is continuing.

## G.    Autel Gets Caught

98.    The improper efforts to continue to access Plaintiffs' proprietary diagnostic and repair information continued after this time, though in lower volumes.  It was these continued efforts that would eventually tip off Snap-on and Mitchell 1 that the activity was coming from Autel.  In the middle of May 2021, after noticing additional suspicious activity, Plaintiffs hired outside counsel, who retained an independent forensic expert.

### Snap-on Handheld Diagnostic Units

99.    The expert has prepared a declaration that is being filed in support of Plaintiffs' motion for a temporary restraining order and order to show cause.  That declaration reports that there are numerous links between Autel and the attack on Plaintiffs' proprietary data.

100.   For example, between December 29, 2020 and July 3, 2021, at least eight different ZEUS device serial numbers were used to connect to the Plaintiffs' Authentication API from the main static IP address associated with Autel US's ProDemand account (discussed below).  Seven of these devices have been used with a total of 86 IP addresses to obtain Plaintiffs' proprietary data, including IP addresses from China that were associated with the bad actor activity.

101.   Plaintiffs' logs show that Autel US and Autel ITC were working in parallel to steal Plaintiffs' data, making many requests during the same time

periods, and that they were coordinated.  On one notable occasion, Autel US and Autel ITC made identical requests for the same car and problem code within one minute of each other from Autel US's IP address and from an IP address in China. At that time, the Chinese IP address was being sent confused data, while the Autel US IP address was not, and Defendants were likely comparing the data that each one was receiving.

102.   Autel has continued requesting Plaintiffs' proprietary data by spoofing devices throughout this time period, including as late as July 15, 2021.

103.   Plaintiffs have no record of Autel ever purchasing even one of Snap-on's handheld diagnostic units, or purchasing or paying for a software upgrade to one of those units.

104.   Autel has "spoofed" over 400 devices to request data from Plaintiffs' data servers, presenting the requests as coming from legitimate devices by using their serial numbers.  Many of these serial numbers were authenticated and activated on the days of November 9 and 14, 2020.  On November 9—right before the mass attack on Plaintiffs' servers that took place from November 11 to 13—a bad actor sequentially activated over 400 device serial numbers.  These activation requests were extremely unusual both because of their high volume and their speed.

105.   Then, on November 14, the day after Plaintiffs had blocked traffic to the bad actor IP addresses associated with the barrage of requests that took place from November 11 to 13, the same pattern was repeated, and over 600 device serial numbers were authenticated and activated on November 14, again in a highly abnormal, rapid-fire sequential order.

106.   Of these over 1,000 devices that were activated due to these November requests, at least 276 devices were associated with high-volume anomalous data requests.

COMPLAINT

EXHIBIT 1
36

**ProDemand**

107.  Autel US has maintained a ProDemand account since a large national customer of Mitchell 1 requested that Autel be provided with an account.  The account was to be used by Autel to confirm whether its customer could access its ProDemand subscription with Mitchell 1 on the Autel devices purchased by the customer.  Autel ITC has never had an account to ProDemand.

108.  Plaintiffs' logs show that Autel US has been using the account in breach of the license terms of the Mitchell 1 EULA and has evidently shared its password with Autel ITC.  Since at least October 1, 2020, both Autel US and Autel ITC have been systematically obtaining data from ProDemand relating to different features.  Together they have made at least 9,600 search actions.  Over 4,000 of those search actions have targeted ADAS features.  These requests have been so extensive that Autel has made the second-highest number of requests for ADAS data of any of Plaintiffs' customers during this time period—far exceeding the number of requests even by national automobile chains with dozens of ProDemand users in multiple locations throughout the country.

109.  Defendants' efforts escalated during the first two weeks of July 2021, and they continued to request this data until Mitchell 1 shut down Defendants' account on July 14, 2021, which took effect July 15, 2021.

**TruckSeries**

110.  Neither Autel US nor Autel ITC has an account to TruckSeries, which requires a separate account and subscription from ProDemand.  Nonetheless, it appears that they have been obtaining Plaintiffs' proprietary data from TruckSeries as well, through an account issued to another company, Tom Machine Equipment & Repair ("Tom Machine").

111.  Autel's US IP address has been used to sign into the Tom Machine account to make requests for data.  In addition, two other IP addresses have been used by both the Autel US IP account and the Tom Machine account.  These were

the only three IP addresses that have been used to sign into the Tom Machine account since October 1, 2020.

112.    Other factors point to Autel using the Tom Machine account as a front to obtain Plaintiffs' proprietary medium and heavy truck data.  Every TruckSeries and ProDemand account has a "ship to," "bill to," and "tech account(s)" associated with it, which contain information that Plaintiffs use to communicate with and bill their customers.  The customer-provided email address for the technician account associated with Autel's ProDemand account is the same as the billing email address provided by the Tom Machine TruckSeries account.  The individual listed as the billing contact for the Tom Machine account is identified as an Autel consultant on the International Automotive Technicians Network website and in his blog online.

113.    Since October 1, 2020, at least 800 search actions for Plaintiffs' proprietary diagnostic and repair truck information have been made through the Tom Machine account.  And just between July 7 and July 12, 2021, over 470 print requests were made for that account.

### H.    Autel's Competing Diagnostic Devices Recently Introduced an "Intelligent Diagnostics" Feature

114.    Autel sells diagnostic device products that compete directly with Plaintiffs' products, including its recently released MaxiSys Ultra device, which Autel describes as its "most ambitious diagnostics tablet designed to maximize technician intelligence."  *See* https://www.autel.com/c/www/mk3/3525.jhtml.

115.    The MaxiSys Ultra device purportedly includes an "intelligent diagnostics" feature.  This feature is explained in an Autel Global video released on January 22, 2021 titled "Autel MaxiSys Ultra: How to use intelligent diagnostics" and available at https://www.youtube.com/watch?v=9LKtVq5Kwlg.

116.    The Autel intelligent diagnostics feature purports to provide many of the same categories of diagnostic and repair information as Snap-on and Mitchell 1's products.  The Autel tutorial video linked above explains that

intelligence diagnostics "provides diagnostic solutions to help you fix vehicles with its step-by-step guidance."  Upon accessing the intelligent diagnostics interface, a user is shown different cards titled "Technical service bulletin," "DTC analysis," "Repair assist," "Repair tips," and "Component measurement."  The video describes the types of information each of these cards should display.  For example, the "Repair assist" card is intended to "integrate diagnostic devices, wiring diagrams, and measurement tools into one, guiding you to find reasons and solutions step by step."

117.   However, while it purports to provide similar diagnostic and repair information, Autel does not have the depth of proprietary data that Snap-on and Mitchell 1 have obtained from their analysis of the billions of repair records that they uniquely possess.  Even in the demonstration video that Autel has prepared, it is apparent that its device is missing data.  For example, in the intelligent diagnostics interface shown in this tutorial video, there is no data underlying the "Repair tips" card for the car being demonstrated:

32

COMPLAINT

EXHIBIT 1
39



118.   Similarly, in another tutorial released by Autel for the MaxiSys Ultra device, there is no data for the "Technical Service Bulletin" card, the "Repair assist" card, or the "Repair tips" card on the intelligent diagnostics interface:

1
2
3
4
5
6
7
8
9
10
11
12



13  119.  As shown above, the MaxiSys Ultra already has the structure to make

14  use of Plaintiffs' proprietary diagnostic and repair information, and the

15  comprehensive set of data that Plaintiffs pay significant fees to license from OEMs.

16  That data is of great value to Autel, because this data could allow Autel to both fill

17  in the many data points it is missing and determine the accuracy of the data it has

18  provided.  Autel simply cannot obtain the same level of comprehensive data as

19  Snap-on and Mitchell 1 because it does not have access to the billions of repair

20  orders that Snap-on and Mitchell 1 do, and even if it did, it would have to spend

21  years organizing and analyzing the data as Snap-on and Mitchell 1 have done.  This

22  provides Snap-on and Mitchell 1 with a unique competitive advantage in the market

23  and years of lead time over Autel.  Snap-on and Mitchell 1 will be irreparably

24  harmed if Autel is permitted to use their data to compete against them or if Autel

25  discloses their data to third parties.

26  120.  Further, while the MaxiSys Ultra provides information relating to

27  automobiles, Autel has recently expanded its products in the truck market as well.

28

In addition, on May 17, 2021, Autel announced that it has "introduced a diagnostic tablet for commercial vehicles, which is compatible with more than 80 models of light- medium- and heavy-duty vehicles," the MaxiSys MS909CV.  *See* https://www.truckinginfo.com/10143412/autel-adds-commercial-vehicle-diagnostics-tablet.  Snap-on and Mitchell 1 have spent years compiling and developing the repair and diagnostic information contained in TruckSeries, which has been authored by them to provide a uniquely detailed and comprehensive set of data for medium and heavy truck repair.  Snap-on and Mitchell 1 will be irreparably harmed if Autel were to disclose this data or use it in its own diagnostic truck product.

## FIRST CAUSE OF ACTION

### DMCA - Circumvention of Security Measures under 17 U.S.C. § 1201
**(Against Both Defendants)**

121.   Plaintiffs restate and incorporate by reference Paragraphs 1 through 120 as if fully set forth herein.

122.   Autel US and Autel ITC have each violated the DMCA, 17 U.S.C. § 1201(a)(1)(A), by unauthorized circumvention of technological measures for Plaintiffs' handheld diagnostic computers that control access to Plaintiffs' databases of proprietary diagnostic and repair information and associated software protected by the Copyright Act.

123.   As described in more detail above, Plaintiffs have implemented numerous technological measures which control access to their diagnostic and repair information and the associated data services software used to manage it.  For example, Snap-on implements an authentication and authorization process that is designed to require possession of a Snap-on handheld diagnostic device and the appropriate version of associated software in order to access Snap-on's proprietary diagnostic and repair information, and the software that manages that data.  Snap-on made extensive efforts to create this security software, which consists of more

than 30,000 lines of code and took two to three software developers three years to implement, working nearly full time.  Among other things, this process requires two pieces of unique device identifying information that must be authenticated.  A device that passes the authentication process must then obtain new temporary authorization every five minutes.  A device that does not pass these authentication and authorization steps cannot access either Snap-on's proprietary diagnostic and repair information or the data server software that manages it and returns the data.  Therefore, this process is a technological measure that controls access to Snap-on's proprietary diagnostic and repair information and associated software.

124.   Additionally, to gain access to Snap-on's proprietary diagnostic and repair information, the diagnostic device must be connected to a vehicle's OBD-II port and reading trouble codes.  This means that a user must physically connect their device to a vehicle or have built a vehicle emulator for the device, which would have to be custom made.  And, even when a device is connected to a vehicle, the diagnostic and repair information presented via the device's software is limited to information that corresponds to the year/make/model/engine of the vehicle and the particular repair at issue.  Therefore, these technological measures also control access to aspects of Snap-on's proprietary data.

125.   As described above, Autel US and Autel ITC have each engaged in unauthorized circumvention of Snap-on's above-described technological processes to "spoof" multiple devices, presenting the wrongfully obtained credentials of hundreds of devices to authenticate those devices, and then obtaining the required authorization for each device and regularly refreshing that authorization, thereby obtaining access to Snap-on's proprietary diagnostic and repair data contained on Plaintiffs' servers and the software used to manage it and to search for and return the data in response to requests.  Further, rather than obtaining data only for vehicles that were connected to the diagnostic device, Autel US and Autel ITC made use of an automated process to systematically make requests directly for

1   vehicle makes and models that it never connected to the devices, thereby

2   circumventing Plaintiffs' technological measures to protect its compilation of

3   proprietary data.

4        126.   This proprietary diagnostic and repair data and its associated software

5   comprise "works" subject to copyright protection under 17 U.S.C. § 102.  The

6   proprietary diagnostic and repair information provided by this software (e.g., Real

7   Fixes, Smart Data) was created, compiled, and organized by Plaintiffs based on a

8   combination of many years of compiling real world data, expert analysis of that

9   data, and artificial intelligence software.  In addition to all of the unique data points

10  that were determined based on this analysis, the proprietary diagnostic and repair

11  information includes literally millions of original narrative descriptions, all of

12  which are uniquely created, arranged, and organized by Plaintiffs.  Moreover,

13  Plaintiffs built a comprehensive taxonomy and ontology to organize diagnostic and

14  repair terminologies across all vehicle makes, models, and engine systems in the

15  databases.  Thus, Plaintiffs' proprietary diagnostic and repair data comprises

16  "works" subject to copyright protection due to both (1) the original content

17  included in this data and (2) the original data compilation as a whole.  Further, the

18  data services software created for managing and returning data from Plaintiffs'

19  massive databases of information is original source code that was created in-house

20  over a period of years, that easily amounts to tens of thousands of lines of code or

21  more, and that took eight to ten person-years to create.  Many original design

22  choices were made in the course of creating this code, and it is thus protected as an

23  original literary work.

24       127.   Autel US and Autel ITC have each further violated section

25  1201(a)(1)(A) of the DMCA via their unauthorized circumvention of technological

26  measures that control access to Mitchell 1's TruckSeries product and the data

27  services software that manages it.

28

COMPLAINT

EXHIBIT 1
44

128.    Mitchell 1 has implemented technological measures which control access to its web-based proprietary TruckSeries product.  As described above, access to the TruckSeries product requires users to purchase a monthly subscription, and to create a user name, and password (or in the case of certain larger customers, authentication through use of a specific, designated IP address). A user who does not meet these requirements and possess an active subscription cannot access TruckSeries.  Further, TruckSeries uses an authorization process similar to the one described above for Snap-on's diagnostic units, utilizing much of the same custom-built code, which requires a new temporary authorization every five minutes in order to make a valid request for data.  A request that is unauthorized cannot access the TruckSeries data or data services software.

129.    The TruckSeries product provides diagnostic and troubleshooting information for medium and heavy duty trucks.  It is an original work of authorship comprising a unique compilation of proprietary content.  The TruckSeries web program and the proprietary content within are "works" subject to copyright protection under 17 U.S.C. § 102.  The content is authored by Plaintiffs and is copyright protected.  It includes, among other things, high resolution photographs and CAD drawings created by Mitchell 1 that have been highlighted, color-coded, and labeled, interactive original wiring diagrams, labor estimates for how much time Snap-on's experts believe a repair should take, ADAS reference tables, written narratives, and more, all uniquely arranged and organized.  In addition to the copyright protection afforded to these original works, the proprietary content provided by this software was compiled and organized by Mitchell 1 and is therefore protected at least as an original data compilation. The TruckSeries product utilizes the same data services software described above, that was created in-house over a period of several years and is thus protected as an original literary work.

130.    Neither Autel US nor Autel ITC has a registered account to TruckSeries.  Neither Autel US nor Autel ITC has a legitimate username or

1    password.  They have circumvented the technological measures that control access

2    to Plaintiffs' TruckSeries product by accessing TruckSeries and its proprietary

3    content using an account registered to another company, Tom Machine, and

4    presenting their data queries as though they were authorized queries coming from a

5    legitimate authenticated account.

6         131.   The Mitchell 1 EULA that applies to TruckSeries (as well as

7    ProDemand) provides that "Customer may not . . . allow the Product or data from

8    the Product to be made available to any person other than Customer" or "assign,

9    sell, transfer or pass along the data, the Product or access to the Product."  Exhibit 2

10   at 75 (¶ 4(b)).

11        132.   In addition to their individual violations, Autel US and Autel ITC

12   conspired with one another to breach 17 U.S.C. § 1201(a)(1)(A) with respect to

13   Snap-on's handheld diagnostic devices and the TruckSeries account through the

14   conduct described above.  Autel US and Autel ITC agreed to work together to

15   circumvent the technological measures designed to control access to Plaintiffs'

16   databases of proprietary diagnostic and repair information and associated software

17   for these two products that are protected by the Copyright Act, and gained improper

18   access to this information and software from IP addresses associated with Autel US

19   as well as from Chinese IP addresses associated with Autel ITC.  At least seven

20   different "spoofed" ZEUS devices were observed attempting to improperly access

21   Snap-on's data servers from both an Autel US IP address and various IP addresses

22   from China associated with this scraping activity.  As just one example of this

23   concerted behavior, on March 8, 2021, parallel requests for the same PID data from

24   a 2015 Chevy Cruze were made from the main, static Autel US IP address and a

25   Chinese IP address within one minute of each other.  Autel US and Autel ITC

26   carried out the conspiracy by engaging in the wrongful acts described above.

27

28

1    133.   In addition, Autel ITC has violated section 1201(a)(1)(A) of the
2    DMCA via its unauthorized circumvention of technological measures that control
3    access to Mitchell 1's ProDemand product.

4    134.   Access to the ProDemand product is protected by the same
5    technological measures which control access to Mitchell 1's web-based proprietary
6    TruckSeries product, including the authentication and authorization processes
7    described above and the requirement for a subscription account with a user name
8    and password.  Autel ITC does not have a subscription to ProDemand and does not
9    have a legitimate user name or password to an account.  Autel ITC circumvented
10   the technological measures designed to protect access to ProDemand accounts by
11   using the account, user name, and password of Autel US, and presenting its data
12   queries as though they were authorized queries coming from the Autel US account.

13   135.   ProDemand is an original work of authorship comprising a unique
14   compilation of proprietary content and OEM content, much of which is licensed at
15   a substantial fee.  The ProDemand web program and the proprietary content within
16   are "works" subject to copyright protection under 17 U.S.C. § 102.  The proprietary
17   content included in ProDemand that is authored by Plaintiffs includes the millions
18   of Real Fix narratives, the TroubleShooter narratives, Top Repairs, and Top 10
19   Repairs, as described above; this proprietary content comprises protected original
20   works.  In addition to the copyright protection afforded to these original works, the
21   proprietary content provided by this software was compiled and organized by
22   Mitchell 1 in a unique fashion and is therefore protected at least as an original data
23   compilation.  The ProDemand product utilizes the same data services software
24   described above, that was created in-house over a period of several years, includes
25   tens of thousands of lines of code, and is protected as an original literary work.

26   136.   Plaintiffs have been damaged by Autel's above-described
27   circumvention of various technological measures that control access to their various
28   copyrighted works in an amount to be proven at trial.

137.   Autel's above-described conduct has caused and, unless enjoined, will continue to cause, irreparable harm to Plaintiffs.

138.   As a result of Autel's unlawful circumvention, Plaintiffs are entitled to an injunction, actual damages and any additional profits of Defendants pursuant to 17 U.S.C. § 1203(c)(2) or statutory damages pursuant to 17 U.S.C. § 1203(c)(3). Plaintiffs are further entitled to costs, including reasonable attorney's fees pursuant to 17 U.S.C. § 1203(b).

## SECOND CAUSE OF ACTION

### Violation of CFAA under 18 U.S.C. § 1030(a)
(Against Both Defendants)

139.   Plaintiffs restate and incorporate by reference Paragraphs 1 through 120 as if fully set forth herein.

140.   Defendants have acted individually and conspired with one another to violate various provisions of the CFAA.

141.   Snap-on's handheld diagnostic computers are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).  Plaintiffs' servers, computers, computer systems, and computer networks that support the functionality of their diagnostic systems and related subscription services (e.g., ProDemand and TruckSeries) are also "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2).

142.   Defendants have each individually violated the CFAA, 18 U.S.C. § 1030(a)(5)(C), by intentionally accessing a protected computer without authorization, and as a result of such conduct, causing damage and loss to Plaintiffs.

143.   As set forth in more detail above, Autel US and Autel ITC each circumvented the technical measures designed to protect Plaintiffs' protected computers, and then "spoofed" those devices to present authorization credentials in order to access the proprietary vehicle diagnostic and repair data that are stored on

1   Plaintiffs' servers.  Autel had no authorization to access these protected computers

2   and obtain this data.

3        144.   In addition, Autel had no authorization to access and use the

4   TruckSeries product.  Neither Autel US nor Autel ITC have a paid subscription,

5   user name, or password to TruckSeries, but each has used the user name and

6   password issued to Tom Machine to access the TruckSeries product and the

7   proprietary diagnostic and repair information for medium and heavy trucks that are

8   stored on Plaintiffs' servers.  Autel US and Autel ITC had no authorization to

9   access these protected computers and obtain this data.

10       145.   These same facts evidence a violation of 18 U.S.C. section 1030(a)(4)

11  of the CFAA.  Autel US and Autel ITC each knowingly, and with the intent to

12  defraud Plaintiffs, accessed a protected computer, without authorization or by

13  exceeding authorized access to such a computer, and by means of such conduct

14  furthered the intended fraud and obtained one or more things of value, including but

15  not limited to Plaintiffs' proprietary data.

16       146.   As described above, Autel US and Autel ITC both fraudulently

17  spoofed Snap-on's handheld diagnostic computers to access proprietary vehicle

18  diagnostic and repair information stored on Plaintiffs' servers, when they had no

19  authorization to do so, disguising the requests so that they appeared to be coming

20  from legitimate devices when in fact they were not and were coming from

21  Defendants.

22       147.   Similarly, Autel US and Autel ITC fraudulently presented the user

23  name and password assigned to Tom Machine to obtain access to TruckSeries and

24  proprietary diagnostic and repair information relating to medium and heavy trucks

25  from Plaintiffs' servers.

26       148.   In addition to their individual violations, Autel US and Autel ITC

27  conspired with one another to breach 18 U.S.C. sections 1030(a)(4) and

28  1030(a)(5)(C) with respect to Snap-on's handheld diagnostic devices and the

TruckSeries account through the conduct described above.  Autel US and Autel ITC agreed to work together to siphon the proprietary data from the data servers associated with these two products, and gained improper access to these data servers from IP addresses associated with Autel US as well as from Chinese IP addresses associated with Autel ITC.  At least seven different "spoofed" ZEUS devices were observed attempting to improperly access Snap-on's data servers from both an Autel US IP address and various IP addresses from China associated with this scraping activity.  As just one example of this concerted behavior, on March 8, 2021, parallel requests for the same PID data from a 2015 Chevy Cruze were made from the main, static Autel US IP address and a Chinese IP address within one minute of each other.  Autel US and Autel ITC carried out the conspiracy by engaging in the wrongful acts described above.

149.   In addition, Autel ITC violated sections 1030(a)(4) and 1030(a)(5)(C) of the CFAA, by knowingly and with the intent to defraud Plaintiffs, utilized the user name and password assigned to Autel US for Mitchell 1's ProDemand service to obtain access to at least the OEM licensed data stored on Plaintiffs' protected data servers.  Autel ITC does not have a ProDemand account, and was not authorized by Plaintiffs to use ProDemand.  Via its use of ProDemand, knowingly and with the intend to defraud Plaintiffs, Autel ITC accessed a protected computer, without authorization, and by means of such conduct furthered the intended fraud and obtained one or more things of value, violating section 1030(a)(4) of the CFAA.  This conduct also violated section 1030(a)(5)(C) of the CFAA because Autel ITC intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss to Plaintiffs.

150.   As a result of Autel's conduct, Plaintiffs have suffered damage and loss in an amount to be proven at trial but, in any event, in an amount far in excess of $5,000 aggregated over a one-year period as provided for in 18 U.S.C. § 1030(a)(4).  Among other things, Plaintiffs have been forced to spend a substantial

1   amount of money to respond to Autel's conduct, and their service to customers was

2   interrupted and impaired multiple times, as set forth in more detail above.

3       151.   Autel's unlawful access to and theft from Plaintiffs' computers has

4   caused Plaintiffs irreparable injury.  Unless restrained and enjoined, Defendants

5   will continue to commit such acts.  Remedies at law are not adequate to fully

6   compensate Plaintiffs for these injuries, entitling Plaintiffs to injunctive relief as

7   provided by 18 U.S.C. § 1030(g).

8                    **THIRD CAUSE OF ACTION**

9   **Violation of California's Computer Data Access and Fraud Act under Cal.**
    **Penal Code § 502(c))**

10                    **(Against Both Defendants)**

11      152.   Plaintiffs restate and incorporate by reference all foregoing Paragraphs

12  1 through 120 and 139 through 151 as if fully set forth herein.

13      153.   Defendants have acted individually and conspired with one another to

14  violate various provisions of California's Computer Data Access and Fraud Act

15  (Cal. Penal Code § 502(c)).

16      154.   Defendants have each individually violated California Penal Code

17  section 502(c)(7) by knowingly and without permission accessing Plaintiffs'

18  computer, computer system, or computer network.

19      155.   As described in detail above, Autel US and Autel ITC, each knowingly

20  and without permission accessed the proprietary diagnostic and repair information

21  located on Plaintiffs' data servers by spoofing Snap-on's handheld diagnostic

22  computers, disguising the requests as having come from legitimate devices to pass

23  the authentication protocol and gain access to the data servers.  Autel US and Autel

24  ITC were fully aware that they had not purchased these spoofed devices and that

25  they had never purchased subscriptions for the devices, and that they had no

26  permission to use the identifying information for the devices to request information.

27      156.   In addition, Autel US and Autel ITC, each knowingly and without

28  permission, made use of the user name and password issued to Tom Machine to

                                    44                          COMPLAINT

EXHIBIT 1
51

1   gain access to the TruckSeries product and to Plaintiffs' computer network to

2   access the proprietary diagnostic and repair information relating to medium and

3   heavy trucks on Plaintiffs' data servers.  Again, Autel US and Autel ITC were fully

4   aware that they were not the registered users of the account and had no right to

5   make use of the user name and password to obtain this data.

6      157.   Further, defendant Autel ITC, knowingly and without permission,

7   made use of the user name and password issued to Autel US to gain access to the

8   ProDemand product and to Plaintiffs' computer network to access the repair

9   information contained on Plaintiffs' data servers associated with that product. Autel

10  ITC was fully aware that it did not possess an account for the ProDemand product,

11  but made use of the Autel US account anyway.  Further, although Autel US did

12  have a user name and password for ProDemand, it violated California Penal Code

13  section 502(c)(7) by knowingly logging into ProDemand and accessing and taking

14  and using information from ProDemand and Plaintiffs data servers improperly.

15  Autel US's actions in siphoning Plaintiffs' data to compete against Plaintiffs

16  exceeded the permitted uses under the terms of the ProDemand EULA to which it

17  agreed, which were: (i) providing vehicle mechanical services; (ii) estimating

18  vehicle mechanical parts and labor cost estimates; and (iii) conducting vehicle shop

19  management.  Exhibit 2 at 75 (¶ 4(a)); Exhibit 4 at 82 (¶ 4).  Autel US's actions

20  were also prohibited by the ProDemand EULA, which among other things,

21  provides that an End User may not (i) copy or reproduce the Product except as

22  permitted in this Agreement; or (ii) allow the Product or data from the Product to be

23  made available to any person other than End User.  Exhibit 2 at 75 (¶ 4(b)).  By

24  providing its password to Autel ITC, Autel US made the data from ProDemand

25  available to Autel ITC, fully aware that it was violating the permitted uses of its

26  account, which were set forth in the EULA to which it had agreed.

27      158.   These facts above also constitute a violation of California Penal Code

28  section 502(c)(1), by both Autel US and Autel ITC with respect to Snap-on's

1 handheld diagnostic tools, the TruckSeries product, and the ProDemand product

2 because Autel knowingly accessed, and without permission used Plaintiffs' data,

3 computer, computer system, or computer network in order to wrongfully control or

4 obtain Plaintiffs' data.

5      159.  In addition Autel US and Autel ITC have each violated California.

6 Penal Code section 502(c)(5) by knowingly and without permission causing the

7 disruption of computer services and causing the denial of computer services to

8 authorized users of Plaintiffs' computers, computer system, or computer network.

9 Autel US and Autel ITC knew that they did not have permission to access the

10 proprietary data accessible through Snap-on's diagnostic devices as they were not

11 paying a subscription fee for the devices and were making use of the credentials of

12 devices that they had never purchased or registered.  Autel US and Autel ITC knew

13 that this would severely impact Plaintiffs' network.  They deliberately bombarded

14 Plaintiffs' network and data servers with hundreds of thousands or millions of

15 requests over compressed time periods, at times spoofing dozens of devices from a

16 single IP address to carry out their raid on Plaintiffs' data.  Autel US and Autel ITC

17 knew that their use of these spoofed credentials and the extreme amount of traffic

18 that they were sending to Plaintiffs' network from multiple IP addresses and

19 devices would interfere with Plaintiffs' network and its ability to provide services

20 to legitimate customers and other authorized users of this network.

21      160.  As described in more detail above, as a result of Autel US and Autel

22 ITC each knowingly and without permission spoofing multiple handheld diagnostic

23 computers, and extensively attacking Plaintiffs' data servers, service to Plaintiffs'

24 customers was cut off or interrupted, and Plaintiffs were forced to shut down

25 worldwide access to customers on their data servers on multiple occasions.

26      161.  In addition to their individual violations, Autel US and Autel ITC

27 conspired to violate California Penal Code sections 502(c)(1), and 502(c)(7) with

28 respect to Snap-on's handheld diagnostic devices and the TruckSeries account

<div align="center">46</div>

<div align="right">COMPLAINT</div>

EXHIBIT 1
53

through the conduct described above.  Autel US and Autel ITC conspired, agreed, and had a common plan and design to work together to siphon the proprietary data from the data servers associated with these two products, and gained improper access to these data servers from IP addresses associated with Autel US as well as from Chinese IP addresses associated with Autel ITC.  At least seven different "spoofed" ZEUS devices were observed attempting to improperly access Snap-on's data servers from both an Autel US IP address and various IP addresses from China associated with this scraping activity.  As just one example of this concerted activity, on March 8, 2021, parallel requests for the same PID data from a 2015 Chevy Cruze were made from the main Autel US IP address and a Chinese IP address within one minute of each other.  Autel US and Autel ITC carried out the conspiracy by engaging in the wrongful acts described above.

162.    Further, Autel US conspired and agreed, and had a common plan and design, to enable Autel ITC to clandestinely obtain access to ProDemand and to take ProDemand data from Plaintiffs' servers.  They agreed to share Autel US's user name and password, so that this information could be obtained by Autel ITC without Plaintiffs' knowledge—even though they knew that Autel ITC had no permission to access this information—to coordinate to systematically take data from ProDemand in violation of the uses permitted by the EULA.  This agreement is further evidenced by the parallel taking of ProDemand data from Plaintiffs' servers by Autel US and Autel ITC.  Autel US and Autel ITC carried out the conspiracy by engaging in the wrongful acts described above.

163.    As a result of Autel's violations of this Act, Plaintiffs are entitled to compensatory damages for the harm caused by their actions, and to injunctive relief.  Autel's violations of this Act have caused Plaintiffs irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Remedies at law are not adequate to fully compensate Plaintiffs for these injuries,

COMPLAINT

EXHIBIT 1
54

1  entitling Plaintiffs to injunctive relief as provided by California Penal Code section
2  502(e)(1).

3  ### FOURTH CAUSE OF ACTION

4  ### Violations of Wisconsin Computer Crimes Act under Wis. Stat. § 943.70
   **(Against both Defendants)**
5

6  164.  Plaintiffs restate and incorporate by reference Paragraphs 1 through
7  120 and 139 through 151 as if fully set forth herein.

8  165.  As an alternative to the Third Cause of Action above, for the violation
9  of California Penal Code section 502(c), should the Court find that Wisconsin
10  statutory law applies to Autel's conduct relating to the handheld diagnostic
11  computers, Defendants are both liable for individually violating the Wisconsin
12  Computer Crimes Act, set forth in Wisconsin Statute section 943.70, and for
13  conspiring with one another to violate the Act.

14  166.  If the Wisconsin Computer Crimes Act applies, Autel US and Autel
15  ITC have each individually violated multiple sections of that statute.

16  167.  Autel US and Autel ITC each violated Wisconsin Statute section
17  943.70(2)(a)(3) because they knowingly and without authorization accessed Snap-
18  on's computer programs or supporting documentation.  As described in detail
19  above, Autel US and Autel ITC knowingly and without authorization accessed
20  computer programs relating to Snap-on's handheld diagnostic computers, the
21  TruckSeries product, and the data servers containing Plaintiffs' proprietary data
22  associated with each of those products.  Further, Autel ITC knowingly and without
23  authorization accessed computer programs relating to the ProDemand product.

24  168.  Autel US and Autel ITC, each knowingly and without permission
25  accessed the proprietary diagnostic and repair information located on Plaintiffs'
26  data servers by spoofing Snap-on's handheld diagnostic computers, disguising the
27  requests as having come from legitimate devices to pass the authentication protocol
28  and gain access to the data servers.  Autel US and Autel ITC were fully aware that

<center>48</center>                                                    COMPLAINT

EXHIBIT 1
55

they had not purchased these spoofed devices and that they had never purchased subscriptions for the devices, and that they had no permission to use the identifying information for the devices to request information.

169.   In addition, Autel US and Autel ITC, each knowingly and without permission, made use of the user name and password issued to Tom Machine to gain access to the TruckSeries product and to Plaintiffs' computer network to access the proprietary diagnostic and repair information relating to medium and heavy trucks on Plaintiffs' data servers.  Again, Autel US and Autel ITC were fully aware that they were not the registered users of the account and had no right to make use of the user name and password to obtain this data.

170.   Further, defendant Autel ITC, knowingly and without permission, made use of the user name and password issued to Autel US to gain access to the ProDemand product and to Plaintiffs' computer network to access the repair information contained on Plaintiffs' data servers associated with that product. Autel ITC was fully aware that it did not possess an account for the ProDemand product, but made use of the Autel US account anyway.

171.   Autel US and Autel ITC each further violated Wisconsin Statute sections 943.70(2)(a)(4) and (a)(5) because they knowingly and without authorization took possession of and copied Plaintiffs' data.  As described above, Autel US and Autel ITC knowingly and without authorization each obtained from Plaintiffs' data servers the proprietary diagnostic and repair information associated with Snap-on's handheld diagnostic computer and the TruckSeries products. Further, Autel ITC knowingly and without authorization accessed ProDemand and obtained from Plaintiffs' data servers the repair information associated with the ProDemand product.  Therefore, Autel US and Autel ITC knowingly possessed, copied, and likely still possess, Snap-on's diagnostic and repair information that they were, and are, not authorized to possess.

1       172.  In addition, Autel US and Autel ITC conspired with one another to
2 breach Wisconsin Statute sections 943.70(2)(a)(3), 943.70(2)(a)(4), and
3 943.70(2)(a)(5) with respect to Snap-on's handheld diagnostic devices and the
4 TruckSeries account through the conduct described above.  Autel US and Autel ITC
5 conspired, agreed, and had a common plan and design, to work together to siphon
6 the proprietary data from the data servers associated with these two products, and
7 gained improper access to these data servers from IP addresses associated with
8 Autel US as well as from Chinese IP addresses associated with Autel ITC.  At least
9 seven different "spoofed" ZEUS devices were observed attempting to improperly
10 access Snap-on's data servers from both an Autel US IP address and various IP
11 addresses from China associated with this scraping activity.  As just one example of
12 this concerted activity, on March 8, 2021, parallel requests for the same PID data
13 from a 2015 Chevy Cruze were made from the main Autel US IP address and a
14 Chinese IP address within one minute of each other.  Autel US and Autel ITC
15 carried out the conspiracy by engaging in the wrongful conduct described above.

16       173.  In addition, Autel US violated Wisconsin Statute § 943.70(2)(a)(6) by
17 disclosing restricted access information to an unauthorized entity, Autel ITC,
18 because it disclosed its user name and password to Autel ITC, enabling Autel ITC
19 to access ProDemand data from Plaintiffs' data servers.  Further, Autel US and
20 Autel ITC conspired and agreed, and had a common plan and design, in violation of
21 Wisconsin Statute section 943.70(2)(a)(6), by agreeing to provide the user name
22 and password of Autel US to Autel ITC to enable Autel ITC to clandestinely obtain
23 access to ProDemand and to take ProDemand data from Plaintiffs' servers without
24 Plaintiffs' knowledge—even though they knew that Autel ITC had no permission to
25 access this data.  This agreement is further evidenced by the parallel taking of
26 ProDemand data from Plaintiffs' servers by Autel US and Autel ITC.  Autel US
27 and Autel ITC carried out the conspiracy by engaging in the wrongful conduct
28 described above.

             COMPLAINT

EXHIBIT 1
57

174.   Autel's violations of the Wisconsin Computer Crimes Act have caused Plaintiffs irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Remedies at law are not adequate to compensate Plaintiffs for these injuries.  Plaintiffs are therefore entitled to injunctive relief under Wisconsin Statute section 943.70(5).

## FIFTH CAUSE OF ACTION

### Breach of Contract under the Snap-on End User License Agreement
**(Against both Defendants)**

175.   Plaintiffs restate and incorporate by reference Paragraphs 1 through 120 as if fully set forth herein.

176.   Users of Snap-on's diagnostic devices and services are subject to an End User License Agreement ("Snap-on EULA").  A true and correct copy of this agreement is attached as Exhibit 6.

177.   Snap-on products are generally sold via a distribution model. Snap-on franchisees or Snap-on employees will sell the ZEUS diagnostic device directly to end user technicians or shops.  Generally, the franchisee selling a diagnostic tool will explain and/or present the EULA to the customer, and will agree to the EULA on their behalf.  Future software updates also require acceptance of the EULA. Because software bundles expire, and the device authentication requires a software bundle version within the current range, users must agree to the EULA to maintain their access to Snap-on's servers.  Additionally, every time a user opens a Snap-on diagnostic device's software, a screen with a URL to the Snap-on EULA is provided.

178.   The Snap-on EULA delineates the following permitted and prohibited uses of Snap-on's diagnostic software:

> **PERMITTED USES** YOU MAY: (i) install the Software on a single automotive diagnostic computer, the diagnostics tool for which it was intended, provided you keep the original solely for backup or archival purposes; (ii) transfer the Software and License to another party if

the other party agrees to accept the terms and conditions of this Agreement, you retain no copies of the Software, and you transfer all of the Software to such other party. Exhibit 6 at 87.

**PROHIBITED USES** YOU MAY NOT: (i) copy the Software into any machine readable or printed form for backup or archival purposes; (ii) modify, merge, translate, decompile, reverse engineer, disassemble, decode, or otherwise alter or attempt to derive the source code of the Software; (iii) use the Software on more than one computer at the same time; (iv) separate the Software's component parts for use on more than one computer; the diagnostics tool for which it was intended (v) transfer, assign, rent, lease, sell, or otherwise dispose of the Software on temporary or permanent basis except as expressly provided herein; (vi) use the Software in any outsourcing, timesharing or service bureau arrangement; and/or (vii) provide, disclose, divulge or make available to, or permit use of the Software by any third party without Snap-on's prior written consent. You will not remove any proprietary notices from the Software and will include such notices on any authorized copies of the Software.  Exhibit 6 at 87.

179.   The Snap-on EULA is a valid contract.

180.   Autel agreed to the terms of the EULA when it made use of Snap-on's diagnostic device software, and when it upgraded the device software.  Autel has made requests for Plaintiffs' proprietary data on at least software versions 20.2, 20.4 and 21.2.

181.   Plaintiff Snap-on has complied with all of the conditions and obligations of the Snap-on EULA.

182.   Upon information and belief, Autel has breached the Snap-on EULA by both exceeding the delineated "permitted uses" and engaging in the "prohibited uses" of Snap-on's diagnostic software.

183.   Autel exceeded the Snap-on EULA's "permitted uses" of Snap-on's software, and engaged in prohibited uses when it made use of the software to spoof multiple devices at the same time to scrape large amounts of proprietary data, when it separated the software's component parts to spoof multiple devices at one time and, on information and belief, when it reverse engineered or otherwise derived

1   source code from the software that allowed it to satisfy the authentication and

2   authorization protocol for the devices and to access the data contained on Plaintiffs'

3   data servers; and when it reverse engineered or otherwise derived source code from

4   the software that allowed it to formulate properly structured and authorized queries

5   requesting data.  This use goes far beyond the Snap-on EULA's permitted use of

6   "install[ing] the Software on a single automotive diagnostic computer, the

7   diagnostics tool for which it was intended."  Exhibit 6 at 87.

8        184.   As a result of Autel's actions, Plaintiff Snap-on has been damaged in

9   an amount to be proven at trial, and is entitled to recover damages to fully

10   compensate for that harm.

11        185.   In addition Autel's violations of this agreement have caused Snap-on

12   irreparable injury.  Unless restrained and enjoined, Defendants will continue to

13   commit such acts.  Remedies at law are not adequate to fully compensate Snap-on

14   for these injuries, entitling Snap-on to injunctive relief.

15                    **SIXTH CAUSE OF ACTION**

16   **(Breach of Contract under the Mitchell 1 End User License Agreement)**
     **(Against Defendant Autel US only)**
17

18        186.   Plaintiffs restate and incorporate by reference Paragraphs 1 through

19   120 as if fully set forth herein.

20        187.   As discussed above, Autel US signed the Mitchell 1 EULA when it

21   opened a ProDemand account on or around January 25, 2016.  A true and correct

22   copy of Autel US's order form and EULA signature page is attached as Exhibit 1.

23   A true and correct copy of Mitchell 1's 2016 EULA (which is more legible and

24   more complete than the EULA signature page) is attached as Exhibit 2.  Autel US

25   has maintained this account to ProDemand.  In December 2020, Autel US signed an

26   order form for ProDemand adding five users to its license, in which it confirmed its

27   earlier agreement to the EULA.  A true and correct copy of the order form that was

28   signed by Autel US in 2020 is attached as Exhibit 3, and a true and correct copy of

1    the Order Terms and Conditions that accompanied that order form is attached as

2    Exhibit 4.

3    188. The 2016 and 2020 Mitchell 1 EULAs are valid agreements. Plaintiff

4    Mitchell 1 has complied with all of the conditions and obligations of the 2016

5    Mitchell 1 EULA and 2020 Mitchell 1 Order Terms and Conditions.

6    189. The 2016 Mitchell 1 EULA and 2020 Mitchell 1 Order Terms and

7    Conditions specify that the licensed use of ProDemand is solely for certain

8    purposes. The permitted uses delineated in the 2016 Mitchell 1 EULA and 2020

9    Mitchell 1 Order Terms and Conditions include:

> "(i) providing vehicle mechanical services; (ii) estimating vehicle mechanical parts and labor cost estimates; and (iii) conducting vehicle shop management. Unless the Order Form specifies otherwise, the license shall be for one location; with location referring to a distinct building or site. If the Order Form authorizes more than one user, then the number of users shall be limited to the number set forth on the Order Form." Exhibit 2 at 75 (¶ 4(a)); Exhibit 4 at 82-83 (¶ 4).

15    190. The prohibited uses described in the 2016 Mitchell 1 EULA provides

16    that:

> Customer may not (i) copy or reproduce the Product except as permitted in this Agreement; (ii) allow the Product or data from the Product to be made available to any person other than Customer; (iii) assign, sell, transfer or pass along the data, the Product or access to the Product; (iv) translate, reverse engineer, decompile, disassemble or otherwise access the source code; and (v) provide services for a fee or otherwise use the Product without prior written agreement from Mitchell 1. Exhibit 2 at 75 (¶ 4(b)).

191. The 2016 Mitchell 1 EULA further provides that:

> Customer acknowledges and agrees that the Services and Product that is comprised of software, equipment and data, together with such other materials, data and information that Customer has access to or receives from Mitchell 1 (all such information and materials collectively called "Proprietary Materials") are the unique, valuable, confidential and proprietary product of Mitchell 1 and contain substantial trade secrets of Mitchell 1 and are entrusted to Customer in confidence to use only as expressly authorized in this Agreement. Customer shall,

and shall cause its employees and any other third party, including its independent contractors, representatives, affiliates and agents, who, with the express consent of Mitchell 1, has access to such Proprietary Materials to keep all Proprietary Materials confidential and shall not disclose or permit access to the Proprietary Materials to any person or entity other than its employees for the purpose of attaining the objects of this Agreement; and to not use the Proprietary Materials for any purpose other than as expressly permitted herein.  Exhibit 2 at 75 (¶ 9).

192.   Autel US has breached the 2016 Mitchell 1 EULA by both exceeding the permitted purposes for access and use granted by the license and engaging in conduct prohibited by the license.  Autel US has breached the 2020 Mitchell 1 Order Terms and Conditions at least by exceeding the permitted purposes for access and use granted by the license.

193.   Autel US exceeded the 2016 Mitchell 1 EULA and 2020 Mitchell 1 Order Terms and Conditions' "permitted uses" and engaged in prohibited uses delineated in the 2016 Mitchell 1 EULA when it used Mitchell 1's ProDemand subscription services to steal large amounts of data from Plaintiffs' database servers instead of using the data for "(i) providing vehicle mechanical services; (ii) estimating vehicle mechanical parts and labor cost estimates; and (iii) conducting vehicle shop management."  Exhibit 2 at 75 (¶ 4(a)); Exhibit 4 at 82 (¶ 4).  Also, the 2016 Mitchell 1 EULA and the 2020 Mitchell 1 Order Terms and Conditions limit the purchased subscription (license) to the number of users on the order form.  Autel US breached this provision by allowing multiple users from Autel ITC to access its ProDemand account.

194.   Autel US also breached the 2016 Mitchell 1 EULA by using Mitchell 1's products ("the Product") in additional manners prohibited by the EULA.  For example, upon information and belief, by providing Autel ITC access to ProDemand, Autel US "allow[ed] the Product or data from the product to be made available to any person other than Customer" and also "assign[ed], s[old],

1   transfer[red] or pass[ed] along the data, Product or access to the Product," which

2   are prohibits uses.  Exhibit 2 at 75 (¶ 4(b)).

3       195.   As a result of Autel US's actions, Plaintiff Mitchell 1 has been harmed

4   and has suffered damages in an amount to be proven at trial.

5       196.   Further, Autel US's violations of these agreement have caused

6   Plaintiffs Mitchell 1 irreparable injury.  Unless restrained and enjoined, Defendants

7   will continue to commit such acts.  Remedies at law are not adequate to fully

8   compensate it for these injuries, entitling Mitchell 1 to injunctive relief.

9   **SEVENTH CAUSE OF ACTION**

10   **Trespass to Chattels**

11   **(Against Both Defendants)**

12       197.   Plaintiffs restate and incorporate by reference Paragraphs 1 through

13   120 as if fully set forth herein.

14       198.   Upon information and belief, Autel US and Autel ITC each committed

15   a trespass to Plaintiffs' chattels under California law for interfering with Plaintiffs'

16   data servers, data, products, and computer system.

17       199.   Plaintiffs had, and have, a possessory interest in their data servers,

18   proprietary diagnostic and repair data, and the computer system and products to

19   which customers subscribe to gain access to that data and system.

20       200.   Autel US and Autel ITC intentionally interfered with Plaintiffs' use or

21   possession of their data servers, data, computer system, and products through their

22   spoofing of Snap-on devices and extensive and repeated wrongful requests for data

23   from the data servers.  Autel US and Autel ITC bombarded Plaintiffs' network and

24   data servers with hundreds of thousands or millions of requests over compressed

25   time periods, at times spoofing dozens of devices from a single IP address to carry

26   out their raid on Plaintiffs' data.

27       201.   As described in more detail above, as a result of Autel US and Autel

28   ITC each knowingly and without permission spoofing multiple handheld diagnostic

1   computers, and extensively attacking Plaintiffs' data servers, service to Plaintiffs'

2   customers was cut off or interrupted, and Plaintiffs were forced to shut down

3   worldwide access to customers on their data servers on multiple occasions.

4      202.   Plaintiffs did not consent to Autel US or Autel ITC requesting this

5   data.

6      203.   In addition, Autel US and Autel ITC conspired with one another to

7   commit trespass to chattels through the conduct described above.  Autel US and

8   Autel ITC conspired, agreed, and had a common plan and design, to work together

9   to carry out mass attacks to siphon the proprietary data from the data servers

10   associated with handheld diagnostic devices, and gained improper access to these

11   data servers from IP addresses associated with Autel US as well as from Chinese IP

12   addresses associated with Autel ITC.  At least seven different "spoofed" ZEUS

13   devices were observed attempting to improperly access Snap-on's data servers from

14   both an Autel US IP address and various IP addresses from China associated with

15   this scraping activity.  As just one example of this concerted activity, on March 8,

16   2021, parallel requests for the same PID data from a 2015 Chevy Cruze were made

17   from the main Autel US IP address and a Chinese IP address within one minute of

18   each other.  Autel US and Autel ITC carried out the conspiracy by engaging in the

19   wrongful conduct described above.

20      204.   Plaintiffs were harmed as a result of Autel's conduct.  Defendants'

21   extensive and repeated wrongful requests for information significantly slowed

22   down Plaintiffs' network, customers were cut off from access to their account, and

23   Plaintiffs were forced to shut down access to their databases for a segment of their

24   customers on multiple occasions.

25      205.    Plaintiffs are entitled to recover damages caused by Autel's conduct.

26   In addition, Autel's trespass to chattels has caused Plaintiffs irreparable injury.

27   Unless restrained and enjoined, Defendants will continue to commit such acts.

28

Remedies at law are not adequate to fully compensate Plaintiffs for these injuries, entitling Plaintiffs to injunctive relief.

## EIGHTH CAUSE OF ACTION

### Misappropriation of Trade Secrets under the DTSA
**(Against Both Defendants)**

206.   Plaintiffs restate and incorporate by reference Paragraphs 1 through 120 as if fully set forth herein.

207.   Plaintiffs' compilation of proprietary diagnostic and repair information—including at least the specific categories of information known as Top Repairs, Top 10 Repairs, Real Fixes, Troubleshooting, Smart Data, Functional Tests, and Component Tests—are trade secrets within the meaning of the DTSA.

208.   Plaintiffs invested substantial time and resources in developing the proprietary diagnostic and repair information described in this Complaint.  As described in detail above, this information is derived from billions of real world repair records that were accumulated over a period of over 25 years, and that have been extensively reviewed and analyzed by Plaintiffs' experts and through artificial intelligence.  Plaintiffs have invested substantial amounts of money, analysis, and product development to incorporate this proprietary data into their products and services in a highly useful form, over many years.

209.   This comprehensive compilation of data derives significant economic value from not being known to others in the industry, and provides Plaintiffs with a substantial competitive advantage in the marketplace.  No competitor has a comparable set of comprehensive data.

210.   Plaintiffs have exercised reasonable efforts to maintain the confidentiality of this compilation of data.  Among other things, the data is maintained on a password-protected network and on password-protected servers, which are accessible only to those with a need to use them.  Plaintiffs limit access to the data internally at the company and employees who do have access to the data

1   are required to maintain it in confidence.  Visitors to the Plaintiffs' facilities are

2   required to sign in and to have an employee escort.  In addition, the full compilation

3   of data is never shared with others and when subsets are shared they are shared

4   pursuant to confidentiality agreements.

5        211.   The compilation of data is also not readily ascertainable by others or

6   made publicly available.  While individual users of Plaintiffs' products are allowed

7   to have access to individual items of data, they are required to sign EULAs that

8   require them to limit their use of the data.  *See* Exhibit 6 at 87; Exhibit 2 at 75 (¶¶

9   4(a)-(b)).  The Mitchell 1 EULA further requires end users to acknowledge and

10  agree to the confidentiality of the data.  Exhibit 2 at 75 (¶ 9).

11       212.   In addition, Plaintiffs' products are designed such that individuals do

12  not gain access to the compilation as a whole.  As described in more detail above,

13  users of Plaintiffs' handheld diagnostic computers only gain access to proprietary

14  diagnostic and repair information when the device is connected to a vehicle's OBD-

15  II port and reading trouble codes.  This means that a user must connect their device

16  to a vehicle or have built a vehicle emulator for the device, which would need to be

17  custom made.  Moreover, even when a device is connected to a vehicle, the

18  diagnostic information presented via the device's software is limited to data that

19  corresponds to the make/model/vintage of the vehicle and the particular repair at

20  issue.  And the devices themselves are protected through the technological

21  measures described above.  Collectively, these technological measures

22  meaningfully control access to Plaintiffs' proprietary compilation of data.

23       213.   While certain aspects of this proprietary data (Top Repairs, Real Fixes,

24  and Troubleshooting) are also available through ProDemand, again, only for the

25  particular trouble codes at issue, access to that product is protected by the security

26  measures described above, including a required user name and password, (or an

27  approved IP address for certain customers only by agreement with Autel), usage is

28  limited by the Mitchell 1 EULA, and Plaintiffs have an anti-piracy team that

1  monitors the accounts to ensure that customers are not exceeding their permitted

2  usage.

3      214.  In addition to the above, the maximum and minimum values of the

4  "known good ranges" for the PID data is never shared with the end user, even at an

5  individual level.  For example, a user connecting a diagnostic device to a 2015

6  Toyota Camry with a particular issue code will only be able to view whether the

7  PIDS associated with that data fall inside or outside the acceptable range.  The

8  range itself is never disclosed.

9      215.  Determining the "known good ranges" for the PID data for all of the

10  vehicles in Plaintiffs' databases was an enormous task that took years of analysis by

11  experts, who were leveraging the billions of real world repair orders that are

12  uniquely in the possession of Plaintiffs.

13      216.  Autel US and Autel ITC improperly gained access to this trade secret

14  information by circumventing the security measures that protected access to the

15  devices and required authorization for individual data queries, then spoofing the

16  devices to gain access to Plaintiffs' data servers, utilizing bots to scrape the data far

17  faster than a human person could, making millions of requests from over 300

18  different IP addresses, and fully bypassing the required procedure of connecting the

19  devices to a vehicle to obtain information that is pertinent only to the active

20  problem codes for that vehicle for a particular repair.  Autel US and Autel ITC were

21  well aware that this was improper and egregious conduct.  It was intended to

22  acquire the compilation of data itself, or a substantial portion of it, rather than to

23  access individual data points for the purpose of conducting repairs.

24      217.  In addition, Autel US and Autel ITC conspired with one another to

25  misappropriate Plaintiffs' trade secrets through the conduct described above.  Autel

26  US and Autel ITC conspired, agreed, and had a common plan and design, to work

27  together to carry out mass attacks to misappropriate Plaintiffs' trade secrets from

28  the data servers associated with handheld diagnostic devices, and gained improper

1    access to these data servers from IP addresses associated with Autel US as well as

2    from Chinese IP addresses associated with Autel ITC.  At least seven different

3    "spoofed" ZEUS devices were observed attempting to improperly access Snap-on's

4    data servers from both an Autel US IP address and various IP addresses from China

5    associated with this scraping activity.  As just one example of this concerted

6    activity, on March 8, 2021, parallel requests for the same PID data from a 2015

7    Chevy Cruze were made from the main Autel US IP address and a Chinese IP

8    address within one minute of each other.  Autel US and Autel ITC carried out the

9    conspiracy by engaging in the wrongful conduct described above.

10       218.   The misappropriation of trade secrets by Autel US and Autel ITC was

11   willful, malicious, and fraudulent—deliberately concealing the true source of the

12   attack on Plaintiffs' data.

13       219.   As a result of Autel's misappropriation, Plaintiffs have been damaged

14   in an amount to be proven at trial.  Further, Autel has been unjustly enriched by

15   having the benefit of Plaintiffs' data that took many years to accumulate, review,

16   and analyze.

17       220.   As a result of Autel's trade secret misappropriation, Plaintiffs are

18   entitled to recover damages both for the actual loss caused by misappropriation and

19   the unjust enrichment caused by misappropriation, or in the alternative to a

20   reasonable royalty.

21       221.   In addition, because Defendants' misappropriation of trade secrets was

22   willful and malicious, Plaintiffs are entitled to exemplary damages in an amount up

23   to two times the amount of the damages awarded, and to recover attorneys' fees and

24   costs pursuant to 18 U.S.C. § 1836(b)(3).

25       222.   Further, Autel's misappropriation of Plaintiffs' trade secrets has

26   caused, and will continue to harm, irreparable harm to Plaintiffs, and Plaintiffs are

27   entitled to injunctive relief.

28

## NINTH CAUSE OF ACTION

## Misappropriation of Trade Secrets under the California Uniform Trade Secrets Act
### (Against both Defendants)

223.   Plaintiffs restate and incorporate by reference Paragraphs 1 through 120 and 206 through 222 as if fully set forth herein.

224.   Plaintiffs' compilation of proprietary diagnostic and repair information—including at least the specific categories of information known as Top Repairs, Top 10 Repairs, Real Fixes, Troubleshooting, Smart Data, Functional Tests, and Component Tests—are trade secrets within the meaning of the California Uniform Trade Secrets Act.

225.   Plaintiffs invested substantial time and resources in developing the proprietary diagnostic and repair information described in this Complaint.  As described in detail above, this information is derived from billions of real world repair records that were accumulated over a period of over 25 years, and that have been extensively reviewed and analyzed by plaintiffs' experts and through artificial intelligence.  Plaintiffs have invested substantial amounts of money, analysis, and product development to incorporate this proprietary data into their products and services in a highly useful form, over many years.

226.   This comprehensive compilation of data derives significant economic value from not being known to others in the industry, and provides Plaintiffs with a substantial competitive advantage in the marketplace.  No competitor has a comparable set of comprehensive data.

227.   Plaintiffs have exercised reasonable efforts to maintain the confidentiality of this compilation of data.  Among other things, the data is maintained on a password-protected network and on password-protected servers, which are accessible only to those with a need to use them.  Plaintiffs limit access to the data internally at the company and employees who do have access to the data are required to maintain it in confidence.  Visitors to the Plaintiffs' facilities are

1   required to sign in and to have an employee escort.  In addition, the full compilation

2   of data is never shared with others and when subsets are shared they are shared

3   pursuant to confidentiality agreements.

4       228.   The compilation of data is also not readily ascertainable by others or

5   made publicly available.  While individual users of Plaintiffs' products are allowed

6   to have access to individual items of data, they are required to sign EULAs that

7   require them to limit their use of the data.  *See* Exhibit 6 at 87; Exhibit 2 at 75 (¶¶

8   4(a)-(b)).  The Mitchell 1 EULA further requires end users to acknowledge and

9   agree to the confidentiality of the data.  Exhibit 2 at 75 (¶ 9).

10      229.   In addition, Plaintiffs' products are designed such that individuals do

11   not gain access to the compilation as a whole.  As described in more detail above,

12   users of Plaintiffs' handheld diagnostic computers only gain access to the

13   proprietary diagnostic and repair information when the device is connected to a

14   vehicle's OBD-II port and reading trouble codes.  This means that a user must

15   connect their device to a vehicle or have built a vehicle emulator for the device,

16   which would need to be custom made.  Moreover, even when a device is connected

17   to a vehicle, the diagnostic information presented via the device's software is

18   limited to data that corresponds to the make/model/vintage of the vehicle and the

19   particular problems at issue.  And the devices themselves are protected through the

20   technological measures described above.  Collectively, these technological

21   measures meaningfully control access to Plaintiffs' proprietary compilation of data.

22      230.   While certain aspects of this proprietary data (Top Repairs, Real Fixes,

23   and Troubleshooting) are also available through ProDemand, again, only for the

24   particular trouble codes at issue, access to that product is protected by the security

25   measures described above, including a required user name and password, (or an

26   approved IP address for certain customers only by agreement with Autel), usage is

27   limited by the Mitchell 1 EULA, and Plaintiffs have an anti-piracy team that

28

1  monitors the accounts to ensure that customers are not exceeding their permitted

2  usage.

3      231.   In addition to the above, the maximum and minimum values of the

4  "known good ranges" for the PID data is never shared with the end user, even at an

5  individual level.  For example, a user connecting a diagnostic device to a 2015

6  Toyota Camry with a particular issue code will only be able to view whether the

7  PIDS associated with that data fall inside or outside the acceptable range.  The

8  range itself is never disclosed.

9      232.   Determining the "known good ranges" for the PID data for all of the

10  vehicles in Plaintiffs' databases was an enormous task that took years of analysis by

11  experts, and it required the billions of real world repair orders that are uniquely in

12  the possession of Plaintiffs.

13      233.   Autel US and Autel ITC improperly gained access to this trade secret

14  information by circumventing the security measures that protected access to the

15  devices and required authorization for individual data queries, and then spoofing

16  the devices to gain access to Plaintiffs' data servers, utilizing bots to scrape the data

17  far faster than a human person could, making millions of requests from dozens of

18  different IP addresses, and fully bypassing the required procedure of connecting the

19  devices to a vehicle to obtain information that is pertinent only to the active

20  problem codes for that vehicle for a particular repair.  Autel US and Autel ITC were

21  well aware that this was improper and egregious conduct.  It was intended to

22  acquire the compilation of data itself, or a substantial portion of it, rather than to

23  access individual data points for the purpose of conducting repairs.

24      234.   In addition, Autel US and Autel ITC conspired with one another to

25  misappropriate Plaintiffs' trade secrets through the conduct described above.  Autel

26  US and Autel ITC conspired, agreed, and had a common plan and design, to work

27  together to carry out mass attacks to misappropriate Plaintiffs' trade secrets from

28  the data servers associated with handheld diagnostic devices, and gained improper

1   access to these data servers from IP addresses associated with Autel US as well as
2   from Chinese IP addresses associated with Autel ITC.  At least seven different
3   "spoofed" ZEUS devices were observed attempting to improperly access Snap-on's
4   data servers from both an Autel US IP address and various IP addresses from China
5   associated with this scraping activity.  As just one example of this concerted
6   activity, on March 8, 2021, parallel requests for the same PID data from a 2015
7   Chevy Cruze were made from the main Autel US IP address and a Chinese IP
8   address within one minute of each other.  Autel US and Autel ITC carried out the
9   conspiracy by engaging in the wrongful conduct described above.

10         235.   The misappropriation of trade secrets by Autel US and Autel ITC was
11   willful, malicious, and fraudulent—deliberately concealing the true source of the
12   attack on Plaintiffs' data.

13         236.   As a result of Autel's misappropriation, Plaintiffs have been damaged
14   in an amount to be proven at trial.  Further, Autel has been unjustly enriched by
15   having the benefit of Plaintiffs' data that took many years to accumulate, review,
16   and analyze.

17         237.   As a result of Autel's trade secret misappropriation, Plaintiffs are
18   entitled to recover damages both for the actual loss caused by misappropriation and
19   the unjust enrichment caused by misappropriation, or in the alternative to a
20   reasonable royalty.

21         238.   In addition, because Defendants' misappropriation of trade secrets was
22   willful and malicious, Plaintiffs are entitled to exemplary damages in an amount up
23   to two times the amount of the damages awarded, and to recover attorneys' fees and
24   costs pursuant to California Civil Code sections 3426.3 and 3426.4.

25         239.   Further, Autel's misappropriation of Plaintiffs' trade secrets has
26   caused, and will continue to harm, irreparable harm to Plaintiffs, and Plaintiffs are
27   entitled to injunctive relief.

28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.  For temporary, preliminary, and permanent injunctive relief, including but not limited to requiring Defendants to cease taking information from Plaintiffs, and prohibiting Defendants from making use of any information obtained from Plaintiffs or any features that incorporate information from Plaintiffs;

b.  For damages sufficient to fully compensate Plaintiffs for all of the harm caused by Defendants' actions and for having to respond to Defendants' actions;

c.  For profits of Defendants pursuant to 17 U.S.C. § 1203(c)(2) or otherwise allowable by law;

d.  For statutory damages pursuant to 17 U.S.C. § 1203(c)(3) or otherwise allowable by law;

e.  For damages sufficient to compensate for the unjust enrichment of Defendants gained through their misappropriation of Plaintiffs' trade secrets;

f.  Alternatively, in lieu of damages for actual loss or for unjust enrichment from Defendants' misappropriation of Plaintiffs' trade secrets, for a reasonable royalty;

g.  For exemplary damages up to two times the amount of damages awarded for Defendants' misappropriation of Plaintiffs' trade secrets pursuant to 18 U.S.C. § 1836(b)(3) and Cal. Civ. Code § 3426.3;

h.  For exemplary and/or punitive damages as otherwise allowable by law;

i.  For attorneys' fees pursuant to 17 U.S.C. § 1203(b), 18 U.S.C. § 1836(b)(3), Cal. Civ. Code § 3426.4, and section 20 of the Mitchell 1 EULA, or as otherwise allowable by law;

j.  For costs of this action;

1    k.     For pre-and post-judgment interest;

2    l.     For such other and further relief as the Court may deem just and

3           proper.

4    Plaintiffs demand a jury trial on all claims that are triable by jury.

5

6    Dated: July 27, 2021                MORRISON & FOERSTER LLP

7

8                                        By:  */s/ Kenneth A. Kuwayti*
9                                             KENNETH A. KUWAYTI
                                              KKuwayti@mofo.com
10
                                              Attorneys for Plaintiffs
11                                            MITCHELL REPAIR
                                              INFORMATION COMPANY, LLC
12                                            and SNAP-ON INCORPORATED

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
MITCHELL REPAIR INFORMATION COMPANY, LLC and SNAP-ON INCORPORATED

**(b)** County of Residence of First Listed Plaintiff   San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached

## DEFENDANTS
AUTEL. US INC. and AUTEL INTELLIGENT TECHNOLOGY CORP., LTD.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**'21 CV1339 CAB BGS**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☒ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 USC § 1201; 18 USC § 1040; 18 USC § 1836
Brief description of cause:
Defendants engaged in circumvention of Plaintiffs' computer security and misappropriation of proprietary vehicle diagnostic and repair information.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.     DEMAND $ TRO, Preliminary and Permanent Injunction; Damages     CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE   Jul 27, 2021     SIGNATURE OF ATTORNEY OF RECORD   /s/ Kenneth A. Kuwayti

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

EXHIBIT 1
75

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)   Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)   County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)   Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.   Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.   Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

EXHIBIT 1
76

# CIVIL COVER SHEET
## ATTACHMENT

## I. (c) Attorneys (*Firm Name, Address and Telephone Number*)

KENNETH A. KUWAYTI (CA SBN 145384)
KKuwayti@mofo.com
BERKELEY G. FIFE (CA SBN 325293)
BFife@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600

JOHN R. LANHAM (CA SBN 289382)
JLanham@mofo.com
JANET S. KIM (CA SBN 313815)
JKim@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100

Attorneys for Plaintiffs
MITCHELL REPAIR INFORMATION
COMPANY, LLC and SNAP-ON
INCORPORATED

EXHIBIT 1
77

# **TABLE OF EXHIBITS**

*(Pursuant to L.R. 5.1(e))*

| Exhibit | Description | Page |
|---------|-------------|------|
| Exhibit 1 | Autel US's order form with EULA signature page, signed January 25, 2016 | 69 |
| Exhibit 2 | Mitchell 1's 2016 order form and EULA | 72 |
| Exhibit 3 | Order form and Order Terms and Conditions signed by Autel US in 2020 | 77 |
| Exhibit 4 | Mitchell 1's 2020 "Order Terms and Conditions" | 80 |
| Exhibit 5 | Screen shot of Snap-on device software's EULA notice | 84 |
| Exhibit 6 | Snap-on's Software License Agreement (Snap-on EULA) | 86 |

68

# EXHIBIT 1

EXHIBIT 1
PAGE 69
EXHIBIT 1
79

**Mitchell1**
Powerful. Intelligent. Simple.
mitchell1.com

18509650

**Remit Payment to:** Make Checks Payable to MITCHELL 1
**From the U.S.:** Mitchell Repair · 28025 Network Place · Chicago, IL  60673-1280
**From Canada:** Mitchell 1 · P.O. Box 15356 · Station A · Toronto, ON M5W1C1 Canada
**Correspondence to:** Mitchell 1 · 14145 Danielson Street · Poway, CA 92064 · (888) 724-6742
**Federal ID No.:** 33-0734307 · GST No. 8842620554RT0001

## INVOICE/ORDER NO.

| NEW ACCOUNT? | ☐YES | HAS INFO CHANGED? (✔ FOR YES) | | | SHIP TO | ☐REP | ☐CUSTOMER | ☐OTHER |
|---|---|---|---|---|---|---|---|---|

ACCOUNT NO. `1033986`    PH # `8 5 5 2 8 8 3 5 8 7`   DATE `1 / 25 / 16`

COMPANY NAME: `A U T E L . U S   I N C`

ATTENTION: `G A R Y   D E L U C A`

STREET ADDRESS: `1 7 5   C E N T R A L   A v e   S U I T E   2 0 0`  REP# `6 2 9 2 8 3`  `660155  50/50`

CITY: `F A R M I N G D A L E`  ST/PROV `N Y`  ZIP `1 1 7 3 5`

E-MAIL: `C H L O E @ A U T E L . U S`

BILL TO NO.    PH.#    MEMBER #

| PRODUCT | QTY | ADDITIONAL USERS | SUBSCRIPTION | PROMO CODE | TERM | PRICE** |
|---|---|---|---|---|---|---|
| PD TMWKS SE Plus | | | | | | $ |
| Manager SE Plus | | | | | | $ |
| Manager Enterprise Pro | | | | | | $ |
| Credit Card Procg | | | | | | $ |
| ProDemand Rep/Est Auto | 1 | 0 | ☑New ☐Ren. | 2 Free | 14 | $ 164.00 |
| ProDemand Rep Only Auto | ☐ | | ☐New ☐Ren | | | $ |
| TechWorks | ☐ | | ☐New ☐Ren | | | $ |
| TruckWorks | ☐ | | ☐New ☐Ren | | | $ |
| Estimator | ☐ | | ☐New ☐Ren | | | $ |
| eCRM | ☐ | | ☐New ☐Ren | | | $ |
| eCRM - Cards | Cards_____ (50-1200) (increments of 100 after 150) | | ☐New ☐Ren | | | $ |
| Social CRM | ☐ | | ☐New ☐Ren | | | $ |
| Social CRM Website Services | ☐ | | ☐New ☐Ren | | | $ |
| TT.net | ☐ | | ☐New ☐Ren | | | $ |
| Medium-Truck.net | ☐ | | ☐New ☐Ren | | | $ |
| Truck Labor | ☐ | | ☐New ☐Ren | | | $ |
| Repair-Connect | ☐ | | ☐New ☐Ren | | | $ |
| Transporter | Single Pay ☐  Monthly Pay ☐ | | | | | $ |
| Pro Pack | | | ☐New ☐Ren | | | $ |
| Message Pro | ☐ | | ☐New ☐Ren | | | $ |
| Lube Pro | ☐ | | ☐New ☐Ren | | | $ |
| Report Pro | ☐ | | ☐New ☐Ren | | | $ |
| QuickBooks | ☐ | | ☐New ☐Ren | | | $ |

*CC Monthly*

| | |
|---|---|
| Subtotal $ | 164 |
| – Tax* $ | |
| TOTAL $ | |

**DIRECT DEBIT**

I authorize Mitchell 1 to enroll me in the Direct Debit or credit card payment plan to enable the automatic payment of my Mitchell 1 monthly bill  **OR**  I agree to change my existing monthly payment by the amount of this order.
I authorize the financial institution named below to debit the charge and finance this monthly bill.

Check one of the payment methods below:
☐ Direct Debit  ☑ Credit Card  Card # ████████ `1016`  Exp. Date @ `9/19`
(attach voided check)

Signature @ _____  Date @ `1/25/16`

*if tax exempt, you must attach exempt certificate
**Pricing good for 30 days

Remit Payment to Mitchell 1.

| FIRST MONTH OR FULL PAYMENT | ☐ Check (Ck.# _____ | Amt. _____ | ☐ P.O. Number _____ |
|---|---|---|---|
| | ☐ Credit Card  Card # _____ | | Exp. _____ |

SPECIAL INSTRUCTIONS/OTHER PRODUCTS: `660155    629283`   PDG: `AI`
`50/50 Split Between Dwayne Cohen & Dan Warner`   CORP. ID:

THE UNDERSIGNED AGREE TO THE TERMS AND CONDITIONS SET FORTH ABOVE AND HAVE RECEIVED AND ACCEPTED THE TERMS OF THE END USER LICENSE AGREEMENT IN WITNESS THEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON THE RESPECTIVE DATE INDICATED ABOVE. CUSTOMER AGREES TO RECEIVE PROMOTIONAL E-MAILS FROM MITCHELL 1 IF CUSTOMER WOULD PREFER NOT TO RECEIVE PROMOTIONAL E-MAILS FROM MITCHELL 1 PLEASE VISIT OUR WEBSITE WWW.MITCHELL1.COM/EMAIL/SOURCE TO UNSUBSCRIBE

End User/Owner Signature @ _____  Print Name @ `GARY DeLUCA`  Title @ `V.P`

Electronic Signatures: Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in the Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile or e-mail electronic signatures.

THANK YOU FOR YOUR ORDER!

EXHIBIT 1
PAGE 70

B

EXHIBIT 1
80

W. Reust
By: W.Reust DAN 01.27.16 6:00

RCVD
01.27.16.
OR

APPLY TO EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT OR TO CUSTOMER'S BREACH OF THE LICENSES AND RESTRICTIONS SET FORTH IN THIS AGREEMENT AND THE APPLICABLE ORDER FORM(S).

(c)  CUSTOMER'S SOLE REMEDY UPON BREACH OF THIS AGREEMENT BY MITCHELL 1 THAT MITCHELL 1 IS UNABLE TO CURE AFTER A REASONABLE NOTICE PERIOD SHALL BE TERMINATION OF THE AGREEMENT AND REFUND OF UNEARNED PORTIONS OF THE FEES STATED ON THE ORDER FORM(S).

**12.  Equitable Relief.** ...

**13.  Indemnification.** ...

**14.  Termination.**

(a)  ...

(b)  ...

(c)  ...

(d)  ...

**15.  Effect of Termination.** ...

**16.  Assignment.** ...

**17.  Choice of Law and Forum.** ...

End User/Owner Signature

**18.  Arbitration.**

(a)  ...

(b)  ...

(c)  ...

**19.  Limitation on Right to Pursue Claims.** ...

**20.  Attorney's Fees.** ...

**21.  Irreparable Harm.** ...

**22.  Notice.** ...

**23.  Waiver.** ...

**24.  Severability.** ...

**25.  Successors and Assigns.** ...

**26.  Force Majeure.** ...

**27.  Counterparts; Facsimile Signatures.** ...

**28.  Entire Agreement.** ...

**29.  Export Laws.** ...

**30.  Complementary Products.** ...

EXHIBIT 1
PAGE 71

EXHIBIT 1
81

# EXHIBIT 2

EXHIBIT 2
PAGE 72
EXHIBIT 1
82

Case 3:21-cv-01339-CAB-BGS   Document 1-4   Filed 07/27/21   PageID.76   Page 2 of 5



**Remit Payment to:** Mitchell 1 • 14145 Danielson Street • Poway, CA 92064 • (888) 724-6742
**From the U.S.:** Mitchell Repair • 25029 Network Place • Chicago, IL  60673-1250
**From Canada:** Mitchell1 • P.O. Box 15358 • Station A • Toronto, ON M5W 1C1 Canada
**Correspondence to:** Mitchell1 • 14145 Danielson Street • Poway, CA 92064 • (888) 724.6742
**Federal ID No.:** 33-0734307 • GST No. 888262094RT0001

**Powerful. Intelligent. Simple.**
**mitchell1.com**

## INVOICE/ORDER NO. _____

NEW ACCOUNT?  ❏ YES  ❏ NO    ❏ HAS INFO CHANGED? (✔ FOR YES)          SHIP TO:  ❏ REP   ❏ CUSTOMER   ❏ OTHER

| ACCOUNT NO. | | PH.# | DATE | |
| COMPANY NAME | | | T# | |
| ATTENTION | | | M# | |
| STREET ADDRESS | | | REP# | |
| CITY | | ST/PROV | ZIP | |

**E-MAIL**

| BILL TO NO. | | PH.# | | MEMBER # |

| PRODUCT | QTY | ADDITIONAL USERS | SUBSCRIPTION | | PROMO CODE | TERM | PRICE** |
|---------|-----|------------------|--------------|---|-----------|------|---------|
| PD TMWKS SE Plus | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Manager SE Plus | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Manager Enterprise Pro | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Credit Card Procg | ❏ | | ❏ New | ❏ Ren. | | | $ |
| ProDemand Rep/Est Auto | ❏ | | ❏ New | ❏ Ren. | | | $ |
| ProDemand Rep Only Auto | ❏ | | ❏ New | ❏ Ren. | | | $ |
| TechWorks | ❏ | | ❏ New | ❏ Ren. | | | $ |
| TruckWorks | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Estimator | ❏ | | ❏ New | ❏ Ren. | | | $ |
| eCRM | ❏ | | ❏ New | ❏ Ren. | | | $ |
| eCRM + Cards | Cards _insert #_ (50-1200) (increments of 100 after 100) | | ❏ New | ❏ Ren. | | | $ |
| Social CRM | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Social CRM Website Services | ❏ | | ❏ New | ❏ Ren. | | | $ |
| TT.net | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Medium-Truck.net | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Truck Labor | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Repair-Connect | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Transporter | Single Pay ❏  Monthly Pay ❏ | | | | | | $ |
| Pro Pack | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Message Pro | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Lube Pro | ❏ | | ❏ New | ❏ Ren. | | | $ |
| Report Pro | ❏ | | ❏ New | ❏ Ren. | | | $ |
| QuickBooks | ❏ | | ❏ New | ❏ Ren. | | | $ |

**DIRECT DEBIT**

I authorize Mitchell 1 to enroll me in the Direct Debit or credit card payment plan to enable the automatic payment of my Mitchell 1 monthly bill  **OR**  I agree to change my existing monthly payment by the amount of this order.

I authorize the financial institution name below to charge my account for payment of my Mitchell 1 bill.

*Check one of the payment methods below:*

☐ Direct Debit   ☐ Credit Card  Card# _____   Exp. Date _____
(attach voided check)

Signature _____   Date _____

| Subtotal | $ |
| + Tax* if applicable | $ |
| **TOTAL** | $ |

*If tax exempt, you must attach exempt certificate.
**Pricing good for 30 days.

**Remit Payment to Mitchell 1.**

**FIRST MONTH OR FULL PAYMENT**
☐ Check (Ck #_____   Amt:_____ )   ☐ P.O. Number:
☐ Credit Card  Card #: _____   Exp:

**SPECIAL INSTRUCTIONS/OTHER PRODUCTS:**

**PDG:**

**CORP. ID:**

THE UNDERSIGNED AGREE TO THE TERMS AND CONDITIONS SET FORTH ABOVE AND HAVE RECEIVED AND ACCEPTED THE TERMS OF THE END USER LICENSE AGREEMENT. IN WITNESS THEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON THE RESPECTIVE DATE INDICATED ABOVE. CUSTOMER AGREES TO RECEIVE PROMOTIONAL E-MAILS FROM MITCHELL 1. IF CUSTOMER WOULD PREFER NOT TO RECEIVE PROMOTIONAL E-MAILS FROM MITCHELL 1, PLEASE VISIT OUR WEBSITE WWW.MITCHELL1.COM/UNSUBSCRIBE TO UNSUBSCRIBE.

End User/Owner Signature _____   Print Name _____   Title _____

Electronic Signatures. Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any voice recorded or electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile, telephone recording or e-mail electronic signatures.

**THANK YOU FOR YOUR ORDER!**

EOPF102014
EXHIBIT 2
PAGE 73

EXHIBIT 1
83

**MITCHELL 1 CUSTOMER LICENSE AGREEMENT**

THIS MITCHELL 1 CUSTOMER LICENSE AGREEMENT (the **"Agreement"**) is by and between MITCHELL REPAIR INFORMATION COMPANY LLC and/or Partners, 14145 Danielson Street, Poway, California 92064 (**"Mitchell 1"**) and the purchaser identified on the Mitchell 1 Order Form (**"Customer"**) attached to this Agreement and incorporated herein.

1. **Term.** This Agreement will commence upon the date an Order Form (defined below) is accepted by Mitchell 1 as stated in Section 2 below (**"Effective Date"**) and unless terminated earlier in accordance with the Agreement, will remain in full force and effect for the period of time selected on the Order Form (**"Initial Term"**) and will be renewed as provided herein (**"Renewal Term"** and collectively with the Initial Term the **"Term"**). The parties acknowledge that the Services and Subscription may have different Terms. The expiration or other termination of a Service(s), and not a Subscription shall not termination the Agreement, and the Agreement shall remain in full force and effect, as it applies to the Subscription or Service(s) not terminated. The termination of a Subscription, and/or a Service(s), and not other Service(s) shall not terminate the Agreement, and the Agreement shall remain in full force and effect, as it applies to the Service(s) not terminated.

2. **Order Forms.** Each Mitchell 1 Product or Service (defined below) shall be ordered pursuant to one or more Mitchell 1 order forms that reference this Agreement and are signed by Customer and Mitchell 1 (**"Order Form"**), which shall become part of this Agreement. Customer acknowledges and agrees that the Order Form and the registration, payment and other information submitted by Customer on the Order Form is complete and accurate. Electronic Signatures. Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any voice recorded or electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile, telephone recording or e-mail electronic signatures. Order Forms for: (a) Products provided electronically, or (z) Services and Products provided electronically, are accepted when Mitchell 1 sends Customer an electronic message confirming the Order Form. All other Order Forms for: (y) Products not provided electronically, or (z) Services and Products not provided electronically, are accepted upon shipment of the Products, licensed FCA shipping point. Order Forms for Services only are accepted when an authorized Mitchell 1 representative signs the Order Form. Any terms and conditions set forth on a purchase order or other written documentation from Customer shall be considered void and of no force and effect. In the event of any conflict between the terms and conditions of this Agreement and those contained on an Order Form, the terms and conditions of this Agreement shall prevail, provided that the Agreement may be supplemented or modified by the Order Form only if the Order Form specifically identifies the provision of this Agreement to be supplemented or modified.

3. **Services.** The only Services offered by Mitchell 1 are listed on the Order Form and if selected by Customer are subject to the terms of this Agreement. The Service(s) unless terminated earlier in accordance with the Agreement, will renew automatically on a month to month basis. 30-day notice is required to cancel during the renewal period. Notwithstanding anything herein to the contrary, if the Order From provides for a promotional term, the "Initial Term" and "Renewal Term" shall be the promotional term defined in the Order Form. The 30 day notice of cancelation stated above shall apply to any promotional term.

   **3.1 M1 Business Performance Services**

   **3.1.1 Overview.** If the Services may include Customer Retention Marketing Service Reminders (**"CRM"**), Target Market Promotions (**"TMP"**), Mitchell 1 ServiceIntelligence (**"MSI"**), Performance Center, Performance Reporting and Data Protection (**"DP"**) and other services that may be offered from time to time as further specified on the Order Form (hereinafter individually or collectively referred to as **"Service(s)"**) **Section 3.1.1** through **Section 3.1.6** apply respectively to the Service(s) selected.

   **3.1.2 Customer Retention Marketing Service Reminders.** If Customer selects CRM as set forth on the Order Form, Mitchell 1 agrees to provide the following services:

   **(a)** Extract customer and vehicle information from the automotive facilities management system for the use of Marketing Services (defined below).

   **(b)** Provide **"Marketing Services"** that include service reminder postcards via mail, e-mail service reminders, and thank you e-mails for new customers. Service reminders via mail and e-mail service reminders are limited to unique vehicle/ customer records defined as eligible for solicitation based on the payment level chosen on the Order Form. E-mail service reminders will always be sent when an e-mail address is captured by Mitchell 1 via the extraction process or may be obtained by Mitchell 1 through third party e-mail providers.

   **(c)** Manage a database of customer and vehicle information for the Customer.

   **(d)** Send customer and vehicle data to print vendor of Mitchell 1's choice for Marketing Services.

   **(e)** Use data hygiene cleansing processes for data integrity and provide a secure environment for customer data storage.

   **(f)** Provide Customer technical and customer support for CRM services during the Term of the Agreement.

   **(g)** If Customer has opted for service recommendations on the Order Form, such recommendations will be added to service reminder postcards and e-mails. Service recommendations will be pulled from the Mitchell 1/ShopKey Manager program.

   **(h)** If Customer has opted for the Target Market Promotions (**"TMP"**) on the Order Form, Mitchell 1 agrees to provide promotional marketing services to the Customer at the listed price. Data for TMP will be provided either from: (i) the Customer's existing customer database and uploaded for use on mailing campaigns, or (ii) for an additional fee and as indicated on the Order Form, Customer may elect to "rent" a customer mailing list through Mitchell 1 from a Third Party Provider (defined below). If Customer elects to rent a mailing list as provided in this Section **3.1.2 (h)**, such rented mailing list shall be used only for one (1) mailing event and Mitchell 1 is not permitted and will not in any event provide a list of customers included in a rented mailing list. Standard promotional artwork templates are provided. At Customer's option, Mitchell 1 will create custom templates for a one-time fee of $150 for each unique template requested. The $150 charge includes one (1) change or revision to the custom template.

   **(i)** Customer opting for eCRM e-mail service can choose from an extensive list of preexisting text coupon templates with the ability to include their own limited text. These preexisting text coupons can be updated at any time. Custom graphic coupons are available to customers subscribing to eCRM e-mail service at $150 per request.

   **(j)** Customers opting for monthly Postcard service can choose coupons from a large list of coupon design templates and make a maximum of 4 revisions in a twelve (12) month period. Additional custom coupon changes can be completed at $150 per request. There is no limit on switching coupons from the existing coupon template library. Customer opting for Postcard service can choose cover artwork from the existing Mitchell 1 library and receive one (1) custom design per year, and a maximum of two (2) revisions to that custom design. Additional cover art change requests can be completed at $150 per request.

   **3.1.3 OwnerAutoSite.com** The Customer acknowledges that Mitchell 1 will be posting consumer service history data on behalf of Customer via a unique Internet login, and Customer accepts full responsibility for doing so.

   **3.1.4 Mitchell 1 DataProtection Services.** If Customer selects DataProtection Services (DataProtection), Mitchell 1 agrees to provide the following: **DataProtection Services.**

   **(a)** Periodic web based electronic copying and storage of files, including, and limited to, Mitchell 1/ShopKey shop management product database files.

   **(b)** Mitchell 1 customer service personnel to provide web based restoration of electronically stored files, including, and limited to, Mitchell 1/ShopKey shop management product database files.

   **3.1.6 Other Rights and Restrictions.**

   **(a)** Mitchell 1 reserves the right to use third parties to provide any of the Services under this Agreement (**"Third Party Provider"**).

   **(b)** Mitchell 1 reserves the right to modify or discontinue, temporarily or permanently, all or a part of the Service(s) to the extent such Service(s) are modified or discontinued for substantially all of its customers.

   **(c)** Mitchell 1 reserves the right to suspend or terminate provision of any Services in a particular jurisdiction if Mitchell 1 determines, in its reasonable discretion that the Services cannot be provided in accordance with applicable laws.

   **(d)** All software deemed outdated by Mitchell 1 must be removed from Customer's computer and returned to Mitchell 1 upon Mitchell 1's request with a certification from Customer that all software has been removed.

   **(e)** Mitchell 1 reserves the right to enforce its legal rights against anyone who uses the Services without its consent or in violation of this Agreement.

   **(f)** Mitchell 1 reserves the right to make changes in rules of operation, security measures, accessibility, procedures, types of terminal equipment, types of system equipment, operating system requirements, programming languages and any other matters relating to the Services and its use, without notice.

   **(g)** Customer, and not Mitchell 1, shall bear sole responsibility to obtain, maintain and operate, or cause to be obtained, maintained and operated at its own expense, any and all equipment and non-Mitchell 1 software that may be used in conjunction with the Services.

   **(h)** Mitchell 1 agrees not to disclose or use any personal data shared with Mitchell 1 except to the extent necessary to carry out its obligations under this Agreement, which may include sharing such data with Third Party Providers. Mitchell 1 reserves the perpetual right to aggregate and market data collected from a Customer for various purposes, including without limitation, benchmarking, research and data analysis, and Customer shall be responsible for providing Customer's customers with any necessary notice of said right.

   **(i)** To the extent any of the Services involve the use of software by Customer, Customer shall not: (i) sell, transfer, rent, lease, sublicense or dispose of the Services, or any part or copies thereof; (ii) modify, change, alter, translate, create derivative works from, reverse engineer, disassemble or decompile the Services in any way for any reason or otherwise attempt to discern the source code to the software; (iii) provide, disclose, divulge or make available to, or permit use of the Services by, any third party; or (iv) copy or reproduce all or any part of the Services except as expressly permitted in this Agreement.

   **(j)** In addition to any restrictions set forth in this Agreement, use of the Services is limited to the restrictions set forth in the Order Form. All rights not expressly granted to Customer in this Agreement or the Order Form are reserved by Mitchell 1.

   **(k)** Customer shall be responsible for giving Customer's customers notice that if an e-mail address is not provided, a third party e-mail provider will be used in an attempt to obtain said customer's e-mail address.

   **(l)** Mitchell 1's Third Party Providers are direct beneficiaries of this Agreement and shall have the right to enforce this Agreement against Customer with respect to any violation by Customer affecting the products of Third Party Providers licensed to Customer under this Agreement.

   **3.2 Subscriptions.** The products offered for licensing are listed on the Order Form and the products selected by the Customer shall be referred to in this Agreement as the "Products". Products are available by subscription and subject to the terms of this Agreement.

   **3.2.1** The Products are licensed, and not sold, on a subscription-basis only. Customer may select on the Order Form the type of subscription to be purchased by Customer (each a **"Subscription"**). Each Subscription may be subject to different terms and conditions as described below. The Term of a Subscription will commence on the Effective Date, and unless terminated earlier in accordance with this Agreement, will continue for the term described in the applicable Subscription below (each a **"Subscription Period"**). Each renewal of a Subscription will be considered a new Subscription Period. During the applicable Subscription Period, Customer will receive any updates to the Product that Mitchell 1 makes available generally to its customers as part of the applicable Subscription (**"Updates"**).

   **3.2.2 The terms below will apply to the Subscription selected by Customer: (i)** Rental. The Subscription Period for this Subscription is effective for an initial term of twelve (12) or twenty-four (24) months following the Commencement Date (**"Initial Rental Subscription Period"**). In addition to the applicable Subscription fees, Customer may be required to pay Mitchell 1 a one-time activation fee to commence the Rental Subscription. The activation fee is non-refundable once the Order Form is submitted to

end user/owner initial _____

EXHIBIT 2
PAGE 74

EXHIBIT 1
84

Case 3:21-cv-01339-CAB-BGS   Document 1-4   Filed 07/29/21   PageID...   Page...

Mitchell 1 unless Customer has entered into an Order form, Mitchell 1 will bill Customer monthly, with payments due within thirty (30) calendar days following receipt of the Mitchell 1 invoice. After the Initial Rental Subscription Period, the Subscription Period for this subscription will renew automatically on a month to month basis. 30-day notice is required to cancel during the renewal period. A Subscription may not be cancelled during the Initial Rental Subscription Period. Mitchell 1 reserves the right to change pricing upon notice to Customer prior to each Rental Renewal Period. At the end of the Initial Rental Subscription Period or any Rental Renewal Period, Customer must return to Mitchell 1 the Product, any Updates, documentation and all copies thereof and discontinue use of the Product, any Updates and all documentation.

**4.  License.**

(a) Subject to the terms and conditions of this Agreement, Mitchell 1 grants to Customer a personal, nonexclusive, nontransferable, limited license to access and use the executable version of the applicable Product during the applicable Subscription Period purchased by Customer solely for the purpose of: (i) providing vehicle mechanical services; (ii) estimating vehicle mechanical parts and labor cost estimates; and (iii) conducting vehicle shop management. Unless the Order Form specifies otherwise, the license shall be for one location; with location referring to a distinct building or site. If the Order Form authorizes more than one user, then the number of users shall be limited to the number set forth on the Order Form. When technically and reasonably feasible, Customer may make one copy of the Product solely for backup purposes.

(b) Regardless of the Subscription Period, Customer may not (i) copy or reproduce the Product except as permitted in this Agreement; (ii) allow the Product or data from the Product to be made available to any person other than Customer; (iii) assign, sell, transfer or pass along the data, the Product or access to the Product; (iv) translate, reverse engineer, decompile, disassemble or otherwise access the source code; and (v) provide services for a fee or other-wise use the Product without prior written agreement from Mitchell 1. Mitchell 1 and its third party licensors shall retain title at all times to the Product, and Customer shall have no rights there-in except to use the Product as permitted by this Agreement.

(c) The Products may be comprised of third party products licensed by a third party to Mitchell 1 and will be subject to all of the terms and conditions of this Agreement. Customer's license to use such third party products will be limited to Customer's applicable Subscription for such third party products and may be used only in connection with the Mitchell 1 Products.

(d) Customer shall not remove, alter or destroy any form of copyright notice, propri etary markings or confidential legends placed upon or contained with the Product.

**5.  Ownership Rights Reserved.** No title or ownership in and to the Services or Products or any part thereof, are transferred to Customer under this Agreement.  Mitchell 1 retains all right, title and interest and all copyright, trade secret rights and other intellectual property and proprietary rights in and to the Services, Products and all Updates, corrections, enhancements, modifications and derivative works thereof. Customer shall not alter, distort or remove any proprietary notices or legends from the Services or Products and shall include such notices on any authorized copies of the Services or Products.

**6.  Publicity.**  Neither party shall use the name or marks of the other party or refer to or identify the other party in advertising or publicity releases, promotional or marketing correspondence to others without first securing the written consent of such other party, except that Mitchell 1 shall have the right to:

(a) use Customer's name in oral sales presentations, client lists, press releases, brochures, marketing materials and financial reports indicating that Customer is a customer of Mitchell 1; and

(b) Disclose the terms of this Agreement, or any part thereof, to potential investors or acquirers of Mitchell 1 or for purposes of complying with the disclo-sure requirements of federal and state securities laws.

**7.  Payments.**

(a) In consideration of the rights granted to Customer herein, Customer shall pay to Mitchell 1: (i) the initial fees as set forth in the Order Form (ii) the then-current renewal fees applicable to a Service or Subscription for a Product ordered by Customer, and (iii) any sales, use, excise and other similar taxes, and shipping costs applicable to an Order (collectively, the "**Customer Fees**"). Unless otherwise specified in this Agreement, Mitchell 1 reserves the right to change Customer Fees at anytime. Payments shall be due within thirty (30) days of the date of Mitchell 1's invoices. Late payments will earn interest charged to Customer at the lesser of: (i) the monthly rate of 1.5 percent; or (ii) the maximum interest amount allowed by local law. In the event a payment is more than ten (10) days late, Mitchell 1 shall have the right to suspend use of the Products, cease providing Services, take possession of the system and all related materials in Customer's possession and cease delivery of any updates or upgrades until the account is made current.  Customer shall be responsible for all costs, including costs, including attorneys' fees, incurred by Mitchell 1 due to Customer's delinquency.

(b) As applicable, Customer hereby authorizes Mitchell 1 to charge the Customer Fees to the payment card or checking account number provided by Customer. By submitting a payment card or checking account number as the form of payment, Customer represents and warrants that Customer's use of the particular card or checking account is authorized and that all information submitted is true and accurate (including, without limitation, payment card number and expiration date). In doing so, Customer also authorizes Mitchell 1 to charge to the payment card or checking account tendered all amounts payable by Customer to Mitchell 1 based on the Subscription plan selected (including all renewals thereof), including, but not limited to, all fees and any applicable taxes Mitchell 1 is required to collect. Customer agrees to update its account registration and payment card or checking account information immediately with any change in the payment card information including, but not limited to, any change in expiration date. If Mitchell 1 is unable to process the payment card or checking account at any time, Customer's account may be immediately suspended or terminated and Customer will remain responsible for all amounts payable by Customer to Mitchell 1. The payment card or checking account issuer agreement governs use of your payment card or checking account

end user/owner initial _____

If a payment card or checking account is used, Customer must refer to the agreement with respect to Customer's rights and liabilities as an account holder. If Mitchell 1 does not receive payment from its pay-ment card or checking account issuer or its agent, Customer agrees to pay Mitchell 1 all amounts due upon demand by Mitchell 1. Mitchell 1 reserves the right to not renew Customer's account at any time for any reason.

**8.  Maintenance of Equipment and Software.**  Customer, and not Mitchell 1, shall bear sole responsibility to obtain, maintain and operate, or cause to be obtained, maintained and operated at Customer's own expense, all equipment and software that may be necessary for Customer to access and use the Services or Product. The minimum requirements may be updated from time to time by Mitchell 1. Customer is responsible solely for ensuring compatibility with the Services and Product and for any new hardware or software required by Customer to maintain compatibility with the Services or Product.

**9.  Confidentiality.**  Customer acknowledges and agrees that the Services and Product that is comprised of software, equipment and data, together with such other materials, data and information that Customer has access to or receives from Mitchell 1 (all such information and materials collectively called **"Proprietary Materials"**) are the unique, valuable, confidential and proprietary product of Mitchell 1 and contain substantial trade secrets of Mitchell 1 and are entrusted to Customer in confidence to use only as expressly authorized in this Agreement. Customer shall, and shall cause its employees and any other third party, including its independent contractors, representatives, affiliates and agents, who, with the express consent of Mitchell 1, has access to such Proprietary Materials to keep all Proprietary Materials confidential and shall not disclose or permit access to the Proprietary Materials to any person or entity other than its employees for the purpose of attaining the objects of this Agreement; and to not use the Proprietary Materials for any purpose other than as expressly permitted herein. Customer shall be required to apply the same standard of care that it uses with respect to its own valuable confidential information and Customer represents that it uses commercially reasonable efforts at all times to protect such information. Customer shall promptly notify Mitchell 1 in writing of any unauthorized knowledge, possession or use of the Proprietary Materials of which it becomes aware. Customer agrees that such software, equipment and data and any portions of the Products not available to the general public may not be disclosed to others, copies, reproduced, disseminated, broadcast, displayed, reverse engineered, disassembled, compiled or used for any purpose other than as specifically permitted under this Agreement. Customer shall use its best efforts to protect the Product and to prevent dissemination or use of the Product or Services to or by unauthorized person. Customer shall not assign, pledge, sublicense or permit any other use of the Product or Services without obtaining the prior written consent of Mitchell 1, which consent may be withheld at the sole discretion of Mitchell 1.  Customer's obligations under this Section 9 shall survive termination or expiration of this Agreement.

**10.  WARRANTY AND DISCLAIMER.**

(a) THE SERVICES AND PRODUCTS ARE DELIVERED "AS IS" AND MITCHELL 1 MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SYSTEM INTEGRATION, INFORMATION CONTENT, DATA ACCURACY, NON-INFRINGEMENT, INTERFERENCE WITH ENJOYMENT OR OTHERWISE. MITCHELL 1 ALSO DOES NOT WARRANT THAT THE OPERATION OF THE SERVICES, PRODUCTS OR ANY SOFTWARE RELATED THERETO WILL BE UNINTERRUPTED OR ERROR FREE.

(b) CUSTOMER ACKNOWLEDGES AND AGREES THAT:

1. MITCHELL 1 IS NOT THE MANUFACTURER OR DISTRIBUTOR OF ANY AUTOMOTIVE REPAIR PARTS REFERENCED IN THE PRODUCT;

2. NEITHER MITCHELL 1 NOR ITS THIRD PARTY LICENSORS MAKE ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE QUALITY OR AVAILABILITY OF SUCH PARTS OR THE ACCURACY OF THE PRICES OF SUCH PARTS;

3. THE DATA MADE AVAILABLE TO CUSTOMER ON OR THROUGH THE PRODUCT OR BY THE SERVICES IS PROVIDED ON AN "AS IS" BASIS WITHOUT WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, ACCURACY, COMPLETENESS, AND INFORMATIONAL CONTENT;

4. CUSTOMER USES SUCH DATA SOLELY AT CUSTOMER'S OWN RISK. CUSTOMER ACCEPTS FULL RESPONSIBILITY FOR ANY AND ALL DECISIONS MADE BY CUSTOMER IN RELIANCE UPON SUCH DATA;

5. CUSTOMER ACCEPTS FULL RESPONSIBILITY FOR ANY AND ALL DECISIONS MADE BY CUSTOMER IN RELIANCE UPON SUCH DATA;

6. IN ENTERING INTO THIS AGREEMENT AND/OR PURCHASING A SUBSCRIPTION, CUSTOMER IS NOT RELYING UPON ANY REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) MADE BY MITCHELL 1, ITS THIRD PARTY LICENSORS, AUTHORIZED RETAILERS OR ANY OTHER PERSON;

7. IF CUSTOMER UTILIZES ANY NON- MITCHELL 1 SUPPLIED INTERFACE PROGRAM TO INTERFACE WITH THE PRODUCT OR SERVICES, CUSTOMER SHALL LOOK SOLELY TO THE VENDOR OF SUCH INTERFACE PROGRAM WITH RESPECT TO ANY LOSSES OR DAMAGES CAUSED BY SUCH INTERFACE PROGRAM; AND

8. NEITHER MITCHELL 1 NOR ITS THIRD PARTY LICENSORS IS RESPONSIBLE FOR OBSOLESCENCE OF THE PRODUCT OR SERVICES, NOR SHALL HAVE RESPONSIBILITY FOR SUSPENDED, OUTDATED OR UNCORRECTED VERSIONS OF THE PRODUCT, SERVICES OR ANY PART THEREOF.

**11.  LIMITATION OF LIABILITY.**

(a) IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, LOSS OF USE, TRADING LOSSES, LOSS OF SAVINGS, BUSINESS INTERRUPTION, OPPORTUNITY, LOSS OF DATA, OR OTHER PECUNIARY LOSS) ARISING OUT OF OR RELATED TO THE SERVICES OR PRODUCTS, THE USE OF OR INABILITY TO USE THE SERVICES OR PRODUCTS, OR THE TERMS OF THIS AGREEMENT, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) NOT WITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND REGARD LESS OF THE CAUSE OR THE FORM OF ACTION (WHETHER BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY, OR OTHERWISE), A PARTY'S LIABILITY TO THE OTHER FOR DAMAGES SHALL BE LIMITED TO ACTUAL DIRECT DAMAGES AND SHALL NOT EXCEED THE FEES PAID BY CUSTOMER FOR THE AFFECTED SERVICES OR PRODUCT DURING THE MONTH IN WHICH THE CLAIM FIRST ACCRUED.  THE LIMITATIONS ON LIABILITY SET FORTH IN THIS SECTION 12 SHALL NOT

EXHIBIT 2
PAGE 75

EXHIBIT 1
85

APPLY TO EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT OR TO CUSTOMER'S BREACH OF THE LICENSES AND RESTRICTIONS SET FORTH IN THIS AGREEMENT AND THE APPLICABLE ORDER FORM(S).

**(c)** CUSTOMER'S SOLE REMEDY UPON BREACH OF THIS AGREEMENT BY MITCHELL 1 THAT MITCHELL 1 IS UNABLE TO CURE AFTER A REASONABLE NOTICE PERIOD, SHALL BE TERMINATION OF THE AGREEMENT AND REFUND OF UNEARNED PORTIONS OF THE FEES STATED ON THE ORDER FORM(S).

**12. Equitable Relief.** Notwithstanding any other provision of this Agreement, Customer acknowledges that any breach of its obligations under this Agreement with respect to the Services or Products and any other proprietary rights and confidential information of Mitchell 1 or its Third Party Providers will cause irreparable injury to Mitchell 1 or its third party providers, as applicable, for which there are inadequate remedies at law and, therefore, Mitchell 1 or its Third Party Providers shall be entitled to equitable relief in addition to all other remedies provided by this Agreement and the applicable Order Form(s) or available at law.

**13. Indemnification.** Customer agrees to defend, indemnify, and hold Mitchell 1 harmless against all claims and damages, including without limitation, reasonable attorney's fees arising out of Customer's use of the Services or Products, including but not limited to, any Update, unless such claims or damages result from, or unless Customer's authorized use of the Services or Products has given rise to, claims or damages based on the infringement of any copyright or other proprietary right of any third party. Mitchell 1 shall not be liable to you for interception of CWS data through the Internet by third parties. Mitchell 1 has no control over, is not responsible for and will not be liable to you for the actions of Internet systems and service providers or natural disasters that create delays or interruptions of services. Customer acknowledges and agrees that if Customer utilizes any non-Mitchell 1 supplied interface program to interface with the system, Customer shall look solely to the vendor of such interface program with respect to any losses or damages caused by such interface program. Mitchell 1 is not responsible for obsolescence of the system and data updates and shall have no responsibility for suspended, outdated or uncorrected versions of the system and data updates.

**14. Termination.**

**(a)** Mitchell 1 shall have the right to terminate this Agreement in the event of any of the following: (1) if Customer defaults in the performance of any of Customer's obligation under this Agreement involving the payment of money and the same shall not be cured within ten (10) business days after written notice to Customer; (2) if Customer defaults in the performance of any of Customer's obligations under this Agreement or breaches any restriction imposed on it by this Agreement, and if such default or breach involves performance or restrictions other than the payment of money and Customer shall not commence curing the same within ten (10) business days after written notice to Customer, and if such default is not thereafter cured within ninety (90) days; or (3) if a receiver is appointed or one or more creditors do take possession of all or substantially all of the assets of Customer, or if Customer shall make a general assignment for the benefit of creditors, or if Customer resolves to go into voluntary liquidation.

**(b)** Notwithstanding the forgoing, Customer acknowledges that certain third party products licensed by Mitchell 1 to Customer under this Agreement may be terminated by Mitchell 1 upon violation of this Agreement by Customer without any opportunity to cure and the following actions by Customer shall constitute a material breach of the Agreement and Mitchell may terminate the Agreement, in part or in whole, upon notice to Customer without the opportunity to cure: (1) any use or dissemination of the Product or Services that is not expressly permitted in this Agreement, (2) any unauthorized access to, or use of, the Product or Services by or through Customer; or (3) failure to make timely payment of any Customer Fee. Immediately upon the effective date of termination of this Agreement, Customer shall cease using the Product and Services.

**(c)** Upon termination of this Agreement by Customer for a material breach by Mitchell 1, Mitchell 1 shall refund to Customer the unearned portion of the Customer Fees (i.e., prorated for the remainder of the Subscription Period for Products or Term for Services following the effective date of termination). Upon termination of this Agreement by Mitchell 1 for a breach by Customer, Customer shall not be entitled to any refund of the Customer Fees.

**(d)** The terms and conditions of Sections 5, 7, 9, 11, 12, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30 shall survive the termination of this Agreement for any reason.

**15. Effect of Termination.** In the event of the expiration or termination of this Agreement for any reason: (a) Customer shall refrain from any and all use of the Services and Products in any manner whatsoever, except as otherwise provided in this Agreement; (b) any CWS Web Site and Mitchell 1 Network Number shall immediately be shut down; (c) Customer shall not be relieved of any of its obligations which have accrued on and prior to the date of expiration or termination of this Agreement; (d) Customer shall return the system, data updates, and all Mitchell 1 documents and information pertaining thereto; (e) except as set forth in Section 11(c), Customer shall not be entitled to any refund of any payments or fees paid to Mitchell 1 by Customer; and (f) Customer must immediately return to Mitchell 1 any and all Proprietary Materials.

**16. Assignment.** Mitchell 1 may freely assign its rights hereunder without securing Customer's permission to do so. Customer may not assign its rights or delegate its duties hereunder without first securing written permission from Mitchell 1, which permission may be withheld at the sole discretion of Mitchell 1. For purposes of this Section 17, Customer shall be deemed to have assigned this Agreement if there is, in the aggregate, a change of ownership of twenty-five percent (25%) or more of Customer or a merger or combination of Customer with another entity of business, whether Customer is the surviving entity or not. Any such attempted assignment shall be void and shall constitute a default entitling Mitchell 1 to terminate this Agreement. Notwithstanding the foregoing, upon payment by Customer of a reasonable transfer fee, this Agreement may be assigned by Customer to a purchaser of all or substantially all of its business upon the prior written consent of Mitchell 1, such consent not to be unreasonably withheld.

**17. Choice of Law and Forum.** This Agreement has been entered into in San Diego, California under the laws of the State of California and Customer and Mitchell 1 agree that it shall be interpreted, and all disputes arising hereunder shall be resolved, in accordance with California law. To the extent recourse to a court is allowed hereunder, both Customer and Mitchell 1 agree that jurisdiction of any claim or suit hereunder shall be exclusively the courts located within the County of San Diego, California. Both parties hereby submit to the personal jurisdiction of such courts and hereby disclaim the applicability of the Uniform Commercial Code, the Uniform Computer Information Transactions Act and the United Nations Convention of Contracts for the International Sale of Goods.

**18. Arbitration.**

**(a)** Any dispute, claim or controversy arising out of or relating to this Agreement or breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in San Diego, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction.

**(b)** The arbitrator shall have no authority to amend or modify the terms of this Agreement or to award punitive consequential, indirect, special or exemplary damages, and the award may be enforced by judgment.

**(c)** Before, during, or after arbitration each party shall have the right, without awaiting the outcome of the arbitration, to seek provisional remedies from an appropriate court including but not limited to temporary restraining orders or preliminary injunctions. Seeking any such remedies shall not be deemed a waiver of either party's right to compel arbitration.

**19. Limitation on Right to Pursue Claims.** ANY CLAIM SHALL BE MADE BY FILING A DEMAND FOR ARBITRATION WITHIN ONE (1) YEAR FOLLOWING THE OCCURRENCE FIRST GIVING RISE TO THE CLAIM.

**20. Attorney's Fees.** If any action or proceeding is brought in connection with this Agreement, the prevailing party shall be entitled to its attorney's fees and other costs and expenses incurred in such action or proceeding, including any appeals or petitions therefore.

**21. Irreparable Harm.** Customer acknowledges and expressly agrees that any breach by of the provisions of the licenses in Section 4 of this Agreement or any of the provisions Section 3 or Section 9 would cause Mitchell 1 irreparable harm for which damages would not be an adequate remedy. Therefore, Customer agrees that in the event of any breach of the licenses in Section 4 of this Agreement or any of the provisions Section 3 or Section 9, Mitchell 1 will have the right to seek injunctive relief against continuing or further breach by Customer, without the necessity of proof of actual damages. This right to seek injunctive relief without necessity of proof of damage will be in addition to any other right that Mitchell 1 may have under this Agreement, or otherwise in law or in equity.

**22. Notice.** Any notice or other communication required or permitted to be given to either party shall be in writing and shall be deemed to have been properly given and to be effective on the date of delivery, if delivered in person, or by facsimile (with electronic confirmation of receipt and mailing a copy) or five (5) days after mailing by registered or certified mail, postage paid, to the other party at the following addresses, or the addresses provided to the other party in writing from time to time: In the case of Mitchell 1: 14145 Danielson Street, Poway, CA 92064, Attention: CRM Department Tel: 888-724-6742 (toll free) Fax: 858-391-5262. In the case of Customer, the address specified in the Order Form.

**23. Waiver.** No delay or omission by either party hereto to exercise any right occurring upon any noncompliance or default by the other party with respect to any of the terms of this Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by either of the parties of any of the covenants, conditions or agreements to be performed by the other shall not be construed to be a waiver of any succeeding breach thereof or of any covenant, condition or agreement herein contained.

**24. Severability.** If any provision of this Agreement or applicable Order Form(s) is found by a court of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable any other part of this Agreement or applicable Order Form(s), but the Agreement or applicable Order Form(s) shall be construed as not containing the particular provision or provisions held to be invalid or unenforceable.

**25. Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Section 26 shall not be construed to alter or modify the prohibitions upon assignments or transfers by Customer expressed elsewhere in this Agreement.

**26. Force Majeure.** Mitchell 1 shall not be liable for, or be considered to be in breach of or default under this Agreement, on account of any delay or failure to perform as required by this Agreement as a result of any cause or condition beyond its reasonable control. Mitchell 1 may suspend or terminate provision of any Services or Product as a result of any such cause or condition.

**27. Counterparts; Facsimile Signatures.** This Agreement and the applicable Order Form(s) may be executed in one or more duplicate originals, all of which together shall be deemed one and the same instrument. This Agreement and the applicable Order Form(s) shall be binding on the parties through facsimile signatures, with originals to follow by regular mail or overnight courier.

**28. Entire Agreement.** This Agreement and the applicable Order Form(s) sets forth the entire, final and exclusive agreement between Customer and Mitchell 1 as to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, between the parties. This Agreement may be modified only pursuant to a writing executed by authorized representatives of Customer and Mitchell 1.

**29. Export Laws.** Customer shall not export, re-export, disclose, or distribute the Services or Product in violation of any applicable laws or regulations, including the export laws and regulations of the United States, and shall comply with all such laws and regulations.

**30. Complimentary Products.** If Customer has received complimentary products, Sections 1, 2, 3, 7 and 11(c) shall not apply to the complimentary products, except the definition of any term in an inapplicable Section shall remain in effect to the extent such term is used in an applicable Section. Customer shall not receive Services with complimentary products. This Agreement will commence upon Customer's receipt of the complimentary products. CUSTOMERS SOLE REMEDY UPON BREACH OF THIS AGREEMENT BY MITCHELL 1 SHALL BE TERMINATION OF THIS AGREEMENT, AND DAMAGES NOT TO EXCEED $1. This Agreement, as to the complimentary products, may be terminated by either party at any time upon written notice. Mitchell 1 shall further have the right to terminate this Agreement, as to the complimentary products, by denying Customer access to the complimentary products at its sole discretion.

End User/Owner Signature _____

EXHIBIT 2
PAGE 76

EXHIBIT 1
86

EOPF102014

# EXHIBIT 3

EXHIBIT 3
PAGE 77
EXHIBIT 1
87

25393759

Make Checks Payable to MITCHELL 1

From the U.S.: MITCHELL 1  29029 Network Place, Chicago, IL 60673-1250
Federal ID No.: 33-0734307

From Canada: MITCHELL 1  P.O. Box 15358  Station A Toronto, ON  M5W 1C1 Canada
GST No: 888262094RT0001

Correspondence to: MITCHELL 1  16067 Babcock Street, San Diego, CA 92127-3696  Ph# (888) 724-6742

12.22.20.
OR

## US/CN ORDER FORM with Order Terms

ORDER #

NEW ACCOUNT?  Yes  [✓] No   Has Info Changed?   SHIP TO  Rep  [✓] Customer   Other

| SHIP TO #: 1033986 | CRP ID: | ASSOC MEMBER #: | PDG or Lead #: | DATE: 12/22/20 |

CO NAME: AUTEL US INC.

OUT OF TERRITORY?  Y  N [✓]
(If yes, needs RSM approval)

ATTENTION: Shuk Hung

FIELD REP # (6 digit account) 669155

ST ADDRESS: 175 CENTRAL AVE STE200

FIELD REP NAME: HOWARD J

CITY, ST, ZIP: FARMINGDALE, N.Y..11735

TM #     TM Rep Name

PH#: 855-288-3587   FAX#:     EMAIL: maurice@autel.com

[✓] Bill to address is the same? If not, complete the following section.

BILL TO #:   CO NAME:

ATTENTION: Sh

# CC Monthly

ST ADDRESS: 17

CITY, ST, ZIP: FARMINGDALE, NY, 11735

| PRODUCT | | QTY | NEW / REN | Subscription | Code | Term | Price** |
|---|---|---|---|---|---|---|---|
| Select Product | | | | | | | |
| 5 EXTRA USERS FOR PRODEMAND | | 5 | ✓ | | $15 EACH  XUSER | 12M | 75 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Type Other | | | | | | | |

**PAYMENT OPTIONS:** Terms & Conditions (see End User License Agreement):
Customer is responsible for all applicable state or local taxes.

| | | Subtotal | 75 |
| | | + TAX* if applicable | 6.47 |
| | | TOTAL | 81.47 |

**DIRECT DEBIT**   I authorize Mitchell 1 to enroll me in the Direct Debit or credit card payment plan to enable the automatic payment of my Mitchell 1 monthly bill  OR  I agree to change my existing monthly automatic payment by the amount of this order. I authorize the financial institution name below to charge my account for payment of my Mitchell 1 bill.

Check one of the payment methods below:

Direct Debit (attach voided check)   [✓] Credit Card  Card #  ___ ___  Exp: 11/24

Name on Card: Shuk Hung

Signature: X Shuk Hung     Date: 12/22/20

*If tax exempt, you must attach exempt certificate.
**Pricing good for 30 days excluding promotional pricing which expires at the end of the stated promotional period. Promotional pricing returns to list pricing in renewal term.

Remit Payment to Mitchell 1.

| FIRST MONTH OR FULL PAYMENT | Check (Ck #   | Amt   ) | P.O. # |
| | Credit Card  Card #   | Name on Card: | Exp: |

SPECIAL INSTRUCTIONS:

THE UNDERSIGNED AGREE TO THE TERMS AND CONDITIONS SET FORTH ABOVE AND HAVE RECEIVED AND ACCEPTED THE MITCHELL 1 ORDER TERMS AND CONDITIONS, IN WITNESS THEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON THE RESPECTIVE DATE INDICATED ABOVE. CUSTOMER AGREES TO RECEIVE PROMOTIONAL E-MAILS FROM MITCHELL 1, IF CUSTOMER WOULD PREFER NOT TO RECEIVE PROMOTIONAL E-MAILS FROM MITCHELL 1, PLEASE VISIT OUR WEBSITE www.mitchell1.com/unsubscribe TO UNSUBSCRIBE.

End User/Owner Signature X _____  Print Name MAURICE MILLER  Title Director Tech Support

This agreement may be cancelled within 30 days without penalty by calling 888-724-6742.

Electronic Signatures. Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any voice, electronic sound, symbol or process attached to or logically associated with a record and executed and adopted and adopted by a party with the intent to sign such record, including a telephone recording or e-mail electronic signatures.



EXHIBIT 3
PAGE 78

EXHIBIT 1
88

Unless the Order Form specifies otherwise, the license shall be for one location, with location referring to a distinct building or site. If the Order Term authorizes more than one user, then the number of users shall be limited to the number set forth on the Order Form. As it pertains to the shop management software, an additional license is required for each additional computer the application is installed on beyond the host machine. The Mitchell 1 Services and Products are not sold or transferred and Mitchell 1 retains ownership of all right, title, and interest in and to the Services and Products and all copies thereof, including, any software applications or content. Except for the rights expressly granted in the Agreement, Mitchell 1 grants no right, title, or interest to Customer in any of the Products or Services or any part thereof.

5.  **Export Control.** Mitchell 1's products may be subject to U.S. export and re-export control laws and regulations or similar laws applicable in other jurisdictions, including the Export Administration Regulations ("EAR") maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control ("OFAC"), and the International Traffic in Arms Regulations ("ITAR") maintained by the Department of State. Customer hereby represents and warrants that: (i) Customer is not located in any country to which the United States has embargoed goods or has otherwise applied any economic sanctions; and (ii) neither Customer nor any end-user is a denied party as specified in any applicable export or re-export laws or regulations or similar laws applicable in other jurisdictions. Customer agrees to comply with all applicable export and reexport control laws and regulations, including the EAR, trade and economic sanctions maintained by OFAC, and the ITAR. Specifically, Customer shall not, directly or indirectly, sell, export, reexport, transfer, divert, or otherwise dispose of any products, software, or technology (including products derived from or based on such technology) received from Mitchell 1 to any destination, entity, or person prohibited by any applicable laws or regulations of the United States or any other jurisdiction without obtaining prior authorization from the competent government authorities as required by those laws and regulations.

6.  **Third Party Rights.** Customer hereby acknowledges and agrees that certain portions of the content or materials contained in the Products or Services may be licensed by Mitchell 1 from certain third parties (the "**Third Party Beneficiaries**"). The Third Party Beneficiaries are intended beneficiaries of the Agreement and may have the right to enforce the Agreement directly. Other than as expressly set forth above, the Agreement is not intended to, and affirmatively does not, grant rights to any other party or create any other third party beneficiary rights.

7.  **Indemnification by Customer.** Customer hereby agrees to indemnify and hold Mitchell 1 and the Third Party Beneficiaries harmless from and against all damages, losses, and expenses of any kind or nature (including reasonable attorney fees and costs) arising out of or related to: (i) Customer breach of the Agreement or any part thereof; (ii) any activity performed by Customer that makes use of the Services or Products; (iii) Customer's wrongful or improper use of the Products or Services; and (iv) Customer's violation, actual or alleged, of any law, regulation, order, or the infringement or violation of any rights of a third party.

8.  **Entire Agreement.** The Agreement constitutes the entire agreement between the parties regarding the subject matter hereof. This Agreement supersedes all prior agreements and understanding between the parties regarding its subject matter. A waiver of any right hereunder does not imply a waiver of any other rights and no waiver alteration modification or amendment shall be effective unless made in writing and signed by authorized representatives of the parties.

9.  **Counterparts; Electronic Signatures.** This Agreement and the applicable Order Form(s) may be executed in one or more duplicate originals, all of which together shall be deemed one and the same instrument. Each party agrees that electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any electronic signature, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile, e-mail, or electronic click-to-accept signatures. Order Forms for Services and Products provided electronically are accepted when Mitchell 1 sends Customer an electronic message confirming the Order Form. All other Order Forms for Services and Products not provided electronically are accepted upon shipment of the Products, licensed FOA shipping point. Order Forms for Services only are accepted when an authorized Mitchell 1 representative signs the Order Form.

10. **Disclaimer of Warranties.** OTHER THAN AS EXPRESSLY SET FORTH IN THE AGREEMENT, NEITHER MITCHELL 1 NOR ANY OF ITS AFFILIATES, SUPPLIERS, LICENSORS, OR THIRD PARTY BENEFICIARIES MAKE ANY SPECIFIC PROMISES, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ABOUT THE PRODUCTS OR SERVICES. THE PRODUCTS AND SERVICES ARE PROVIDED "AS IS". EXCEPT AS MAY BE PROHIBITED BY LAW, ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, ARE HEREBY DISCLAIMED AND EXCLUDED.

11. Privacy. Mitchell 1's privacy policy explains how Mitchell 1 treats your personal data and protect your privacy when you use the Products or Services. By using the Products you agree that Mitchell 1 may use such data in accordance with the Mitchell 1 privacy policy.

End User Owner Signature

EXHIBIT 3
PAGE 79

Page 2 of 2

M1TERMS082020

EXHIBIT 1
89

# EXHIBIT 4

EXHIBIT 4
PAGE 80
EXHIBIT 1
90

**Mitchell 1**
*The First Choice of Automotive Professionals*

Remit Payment To: Make Checks Payable To Mitchell 1
From The US: Mitchell Repair • 25029 Network Place • Chicago, IL 60673-1250
From Canada: Mitchell 1 • P.O. Box 15358 • Station A • Toronto, ON M5W1C1 Canada
Correspondence To: 16067 Babcock St • San Diego, CA 92127-3690 • (888) 724 6742
Federal ID No.: 33-0734307 • GST No. 888262094RT0001

| Account Number | | Ship To | Date | | | 6/4/2021 |
|---|---|---|---|---|---|---|
| New Account | | Has Info Changed | Order # | | | |
| **SHIPTO INFO:** | | | | | | |
| Company Name | | | Attention | | | |
| Street Address | | City | | ST/PROV | | ZIP |
| Street Address2 | | Phone No. | | | | |
| **BILLTO INFO:** | **Same as SHIPTO** | | EMAIL | | | |
| Account Number | | | Phone | | Email | |
| Company Name | | | | | | |
| Street Address | | City | | ST/Prov | | Zip |
| **USCORP** | NONE | | Level | None | CODE: | 0 | LEAD# | |
| **CANCORP** | NONE | | SECONDARY PDG | | | |
| Sales Rep Number | | Inside Sales Rep | | BPS Sales Rep | | C # | |

| PRODUCTS | Description | QTY | Promo Code | Term | Add'l Users | | Price** |
|---|---|---|---|---|---|---|---|
| ProDemand | | | | 12 | | | |
| Manager SE | | | | 12 | | | |
| ManagerSE Addons | | | | 12 | | | |
| Pro Pack | | | | 12 | | | |
| Mobile Manager Pro (must have ProPack) | | | | 12 | | | |
| Transporter to SE | | | | 12 | | | |
| Enterprise_Pro | | | | 12 | | | |
| Enterprise Training | | | | | | | |
| Conversion to Enterprise | | | | | | | |
| ENT Optional Charges | | | | | | | |
| RepairConnect Plus | | | | 12 | | | |
| TeamWorks | | | | 12 | | | |
| TruckWorks Plus | | | | 12 | | | |
| TechWorks Plus | | | | 12 | | | |
| TruckLabor Plus | | | | 12 | | | |
| **Marketing Services - US ONLY** | | | | | | | |
| SocialCRM | | | | 12 | | | |
| ADDONS (Must have SocialCRM) | | | | 12 | | | |
| Postcards (must have SocialCRM) | | | | 12 | | | |

| Rental Pricing | | |
|---|---|---|
| Initial Monthly Payment (s) | | I authorize Mitchell 1 to enroll me in the Direct Debit or credit card payment plan to enable the automatic payment of my Mitchell 1 |
| Subsequent Payments (pre-tax) | | monthly bill OR I agree to change my existing monthly automatic payment by the amount of this order. I authorize the financial institution name below to charge my account for payment of my Mitchell 1 bill. |
| Additonal Users | | Direct Debit (Attach Voided Check)   Credit Card |
| Set Up /Activation/Training | Signature | |
| Tax* (Customer responsible for all applicable state/local taxes.) | Name on Credit Card | |
| | Credit Card | EXP |
| Government Full Pay Price | * If Tax exempt, you must attach exempt certificate. | |
| Total Due | **Quote good for 30 days. Promotional price returns to list price in renewal term. | |
| **Payment Type** | | |
| Check Number | | |
| Purchase Order Number | | |
| Credit Card Number | EXP | Name on Card |
| **Special Instructions** | **Special Promo Code** | |

THE UNDERSIGNED AGREE TO THE TERMS AND CONDITIONS SET FORTH ABOVE AND HAVE RECEIVED AND ACCEPTED THE MITCHELL 1 ORDER TERMS AND CONDITIONS. IN WITNESS THEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON THE RESPECTIVE DATE INDICATED ABOVE. CUSTOMER AGREES TO RECEIVE PROMOTIONAL EMAILS FROM MITCHELL 1. IF CUSTOMER WOULD PREFER NOT TO RECEIVE PROMOTIONAL EMAILS FROM MITCHELL 1, PLEASE VISIT OUR WEBSITE www.mitchell1.com/unsubscribe TO UNSUBSCRIBE. Promotion pricing returns to list pricing in renewal term.

| End User/Owner Signature | | Print | |
|---|---|---|---|
| | | Title | |

**This agreement may be cancelled within 30 days without penalty by calling 888-724-6742.**

Electronic Signatures. Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means your voice recorded or electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile, telephone recording or e-mail electronic signatures.

EXHIBIT 4
PAGE 81
EXHIBIT 1
91

Mitchell 1 Order Terms and Conditions

**1. Agreement; Order Forms.** The agreement between you ("**Customer**") and Mitchell Repair Information Company LLC ("Mitchell 1") includes: (i) these Mitchell 1 Order Terms and Conditions; (ii) the Order Form; and (iii) the End User License Agreement, as may be updated from time to time ("**EULA**") (collectively, the "**Agreement**"). Customer acknowledges and agrees that the Order Form and the registration, payment and other information submitted by Customer on the Order Form is complete and accurate. Any additional terms and conditions set forth on any customer quote, purchase order, or other written documentation from Customer shall be considered void and of no force and effect and are hereby expressly rejected.

**2. Services.** The Service(s), unless terminated earlier in accordance with the Agreement, will renew automatically on a month to month basis. 30-day notice is required to cancel during any renewal period. Notwithstanding anything herein to the contrary, if the Order Form provides for a promotional term, the "**Initial Term**" and "**Renewal Term**" shall be the promotional term defined in the Order Form. The 30 day notice of cancelation stated above shall apply to any promotional term.

**2.1 M1 Business Performance Services**

2.1.1. **Overview.** If the Services include Customer Retention Marketing Service Reminders ("**CRM**"), Target Market Promotions ("**TMP**"), Website or other services offered by Mitchell 1 from time
to time as further specified on the Order Form (hereinafter individually or collectively referred to as "Service(s)") **Section 2.1.1** through **Section 2.1.4** apply respectively to the Service(s) selected.

2.1.2. **Customer Retention Marketing Service Reminders.** If Customer selects CRM as set forth on the Order Form, Mitchell 1 agrees to provide the following services:

(a) Extract customer and vehicle information from the customer facilities management system for the use of Marketing Services (defined below).
(b) Provide "**Marketing Services**" that include service reminder postcards via mail, e-mail service reminders, and thank you e-mails for new customers. Service reminders via mail and e-mail service reminders are limited to unique vehicle/customer records defined as eligible for solicitation based on the payment level chosen on the Order Form. E-mail service reminders will always be sent when an e-mail address is captured by Mitchell 1 via the extraction process or may be obtained by Mitchell 1 through third party e-mail providers.
(c) Manage a database of customer and vehicle information for the Customer.
(d) Send customer and vehicle data to print vendor of Mitchell 1's choice for Marketing Services.
(e) Use data hygiene cleansing processes for data integrity and provide a secure environment for customer data storage.
(f) Provide Customer technical and customer support for CRM services.
(g) If Customer has opted for service recommendations on the Order Form, such recommendations will be added to service reminder postcards and e-mails. Service recommendations will be pulled from the Mitchell 1 Manager program.
(h) If Customer has opted for the Target Market Promotions ("**TMP**") the data for TMP will be provided either from: (i) the Customer's existing customer database and uploaded for use on mailing campaigns, or (ii) for an additional fee and as indicated on the Order Form, Customer may elect to "rent" a customer mailing list through Mitchell 1 from a third party provider. If Customer elects to rent a mailing list as provided in this Section 2.1.2 (h), such rented mailing list shall be used only for one (1) mailing event and Mitchell 1 is not permitted and will not in any event provide a list of customers included in a rented mailing list. Standard promotional artwork templates are provided. At Customer's option, Mitchell 1 will create custom templates for a one-time fee of $150 for each unique template requested. The $150 charge includes one (1) change or revision to the custom template.
(i) Customer opting for eCRM e-mail service can choose from an extensive list of pre-existing text coupon templates with the ability to include their own limited text. These pre-existing text coupons can be updated at any time. Custom graphic coupons are available to Customers subscribing to eCRM e-mail service at $150 per request.
(j) Customers opting for monthly postcard service can choose coupons from a large list of coupon design templates and make a maximum of 4 revisions in a twelve (12) month period. Additional custom coupon changes can be completed at $150 per request. There is no limit on switching coupons from the existing coupon template library. Customer opting for Postcard service can choose cover artwork from the existing Mitchell 1 library and receive one (1) custom design per year, and a maximum of two (2) revisions to that custom design. Additional cover art change requests can be completed at $150 per request
(k) The Customer acknowledges that any content pushed to the Customer's Facebook page by Mitchell 1 is at Facebook's sole discretion to present.
(l) A Website and/or any CRM service provided by Mitchell 1 does not include a guarantee of prominent or "first page" search engine results

positioning.

(m) If Customer has opted for Marketing services, the Customer hereby agrees to pay and be fully responsible for the Google AdWords monthly budget of $200.00, to Google pursuant to its policies. In the event the Customer fails to pay such monthly budget, Customer understands and agrees that it will still be required to pay the CRM monthly Service fee.

2.1.3. **OwnerAutoSite.com** The Customer acknowledges that Mitchell 1 will be posting consumer service history data on behalf of Customer via a unique Internet login, and Customer accepts full responsibility for any and all content posted to such site, including, without limitation, the completeness and accuracy of any service history or other information included in the consumer's service records.

2.1.4. **Manager SE Connection Service (MSEC).** Installation of Mitchell1 shop management software also includes the installation of the MSEC application which is required for all product features and add-on products and services to function. As part of this service, Mitchell 1 provides the following:

(a) Real-time database replication and electronic storage of Customer database files on Mitchell 1 servers.
(b) Data updates and additions from Mitchell 1 licensed products and features into the Customer MSEC database, which will be synchronized with the Customer locally-hosted database.
(c) Mitchell 1 customer service personnel to provide web based restoration of the electronically stored Mitchell 1 shop management product database files (to the extent such files are backed up on Mitchell 1 servers).

2.1.5. **Mitchell 1 Manager Shop Management Texting Service.** Customer acknowledges the following regarding texting service usage:

(a) Mitchell 1 provides the Customer with the ability to send and receive short message service (SMS) text messages. Mitchell 1 texting service includes an unsubscribe mechanism for message recipients.
(b) The Customer located in the United States is responsible for appropriate usage and adherence to all local, state and federal laws as they pertain to sending and receiving text messages.
(c) The Customer located in Canada is responsible for adherence to all local, provincial and federal legislation including but not limited to Canada's Anti-Spam Legislation (CASL).

**2.2 Subscriptions.** The terms below will apply to the Subscription selected by Customer: The subscription period for any subscription, as set forth in the Order Form ("Subscription"), is effective for an initial term of either twelve (12) or twenty four (24) months (as selected on the Order Form) following the commencement date ("Initial Subscription Period"). In addition to the applicable Subscription fees, Customer may be required to pay Mitchell 1 a one-time activation fee to commence the Subscription. The activation fee is non-refundable once the Order Form is accepted by Mitchell 1. Mitchell 1 will bill Customer monthly, with payments due within thirty (30) calendar days following the date of the Mitchell 1 invoice. After the Initial Subscription Period, the Subscription Period for this Subscription will renew automatically on a month to month basis (each, a "**Renewal Period**", together with the Initial Subscription Period, the "**Subscription Period**"). 30-day notice is required to cancel during any Renewal Period. A Subscription may not be cancelled by Customer during the Initial Subscription Period. Mitchell 1 reserves the right to change pricing upon notice to Customer prior to each Rental Renewal Period. At the end of the Initial Subscription Period or any Renewal Period, Customer must discontinue use of the Product, any Updates and all documentation.

**3. Payments.** As applicable, Customer hereby authorizes Mitchell 1 to charge the Customer the fees set forth in the Order Form to the payment card or checking account number provided by Customer. By submitting a payment card or checking account number as the form of payment, Customer represents and warrants that Customer's use of the particular card or checking account is authorized and that all information submitted is true, complete and accurate (including, without limitation, payment card number and expiration date). In doing so, Customer also authorizes Mitchell 1 to charge to the payment card or checking account tendered all amounts payable by Customer to Mitchell 1 based on the Subscription plan selected (including all renewals thereof), including, but not limited to, all fees and any applicable taxes. Customer agrees to update and keep current its account registration and payment card or checking account information. If Mitchell 1 is unable to process the payment card or checking account at any time, Customer's account may be immediately suspended or terminated and Customer will remain responsible for all amounts payable by Customer to Mitchell 1. Mitchell 1 reserves the right to not renew Customer's account at any time for any reason.

**4. License.** Subject to the terms and conditions of this Agreement, Mitchell 1 grants to Customer a personal, nonexclusive, nontransferable, limited license to access and use the executable version of the applicable Service or Product during the applicable Subscription Period solely for the purpose of: (i) providing vehicle mechanical services; (ii) estimating vehicle mechanical parts and labor cost estimates; and (iii) conducting vehicle shop management. Unless the Order Form specifies otherwise, the license shall be for one

EXHIBIT 4
PAGE 82
EXHIBIT 1
92

location, with location referring to a distinct building or site. If the Order Form authorizes more than one user, then the number of users shall be limited to the number set forth on the Order Form. As it pertains to the shop management software, an additional license is required for each additional computer the application is installed on beyond the host machine. The Mitchell 1 Services and Products are not sold or transferred and Mitchell 1 retains ownership of all right, title, and interest in and to the Services and Products and all copies thereof, including, any software applications or content. Except for the rights expressly granted in the Agreement, Mitchell 1 grants no right, title, or interest to Customer in any of the Products or Services or any part thereof.

5. **Export Control.** Mitchell 1's products may be subject to U.S. export and re-export control laws and regulations or similar laws applicable in other jurisdictions, including the Export Administration Regulations ("**EAR**") maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control ("**OFAC**"), and the International Traffic in Arms Regulations ("**ITAR**") maintained by the Department of State. Customer hereby represents and warrants that: (i) Customer is not located in any country to which the United States has embargoed goods or has otherwise applied any economic sanctions; and (ii) neither Customer nor any end-user is a denied party as specified in any applicable export or re-export laws or regulations or similar laws applicable in other jurisdictions. Customer agrees to comply with all applicable export and reexport control laws and regulations, including the EAR, trade and economic sanctions maintained by OFAC, and the ITAR. Specifically, Customer shall not, directly or indirectly, sell, export, reexport, transfer, divert, or otherwise dispose of any products, software, or technology (including products derived from or based on such technology) received from Mitchell 1 to any destination, entity, or person prohibited by any applicable laws or regulations of the United States or any other jurisdiction without obtaining prior authorization from the competent government authorities as required by those laws and regulations.

6. **Third Party Rights.** Customer hereby acknowledges and agrees that certain portions of the content or materials contained in the Products or Services may be licensed by Mitchell 1 from certain third parties (the "**Third Party Beneficiaries**"). The Third Party Beneficiaries are intended beneficiaries of the Agreement and may have the right to enforce the Agreement directly. Other than as expressly set forth above, the Agreement is not intended to, and affirmatively does not, grant rights to any other party or create any other third party beneficiary rights.

7. **Indemnification by Customer.** Customer hereby agrees to indemnify and hold Mitchell 1 and the Third Party Beneficiaries harmless from and against all damages, losses, and expenses of any kind or nature (including reasonable attorney fees and costs) arising out of or related to: (i) Customer breach of the Agreement or any part thereof; (ii) any activity performed by Customer that makes use of the Services or Products; (iii) Customer's wrongful or improper use of the Products or Services; and (iv) Customer's violation, actual or alleged, of any law, regulation, order, or the infringement or violation of any rights of a third party.

8. **Entire Agreement.** The Agreement constitutes the entire agreement between the parties regarding the subject matter hereof. This Agreement supersedes all prior agreements and understanding between the parties regarding its subject matter. A waiver of any right hereunder does not imply a waiver of any other rights and no waiver alteration modification or amendment shall be effective unless made in writing and signed by authorized representatives of the parties.

9. **Counterparts; Electronic Signatures.** This Agreement and the applicable Order Form(s) may be executed in one or more duplicate originals, all of which together shall be deemed one and the same instrument. Each party agrees that electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Electronic signature means any electronic signature, symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including facsimile, e-mail, or electronic click-to-accept signatures. Order Forms for Services and Products provided electronically are accepted when Mitchell 1 sends Customer an electronic message confirming the Order Form. All other Order Forms for Services and Products not provided electronically are accepted upon shipment of the Products, licensed FCA shipping point. Order Forms for Services only are accepted when an authorized Mitchell 1 representative signs the Order Form.

10. **Disclaimer of Warranties.** OTHER THAN AS EXPRESSLY SET FORTH IN THE AGREEMENT, NEITHER MITCHELL 1 NOR ANY OF ITS AFFILIATES, SUPPLIERS, LICENSORS, OR THIRD PARTY BENEFICIARIES MAKE ANY SPECIFIC PROMISES, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ABOUT THE PRODUCTS OR SERVICES. THE PRODUCTS AND SERVICES ARE PROVIDED "AS IS". EXCEPT AS MAY BE PROHIBITED BY LAW, ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, ARE HEREBY DISCLAIMED AND EXCLUDED.

11. **Privacy.** Mitchell 1's privacy policy explains how Mitchell 1 treats your personal data and protect your privacy when you use the Products or Services. By using the Products or Services, you agree that Mitchell 1 may use such data in accordance with the Mitchell 1 privacy policy.

End User/Owner Signature _____

M1TERMS082020

EXHIBIT 4
PAGE 83
EXHIBIT 1
93

# EXHIBIT 5

EXHIBIT 5
PAGE 84
EXHIBIT 1
94



EXHIBIT 5
PAGE 85
EXHIBIT 1
95

# EXHIBIT 6

EXHIBIT 6
PAGE 86
EXHIBIT 1
96

### SNAP-ON INCORPORATED SOFTWARE LICENSE AGREEMENT

**YOU SHOULD CAREFULLY READ THE FOLLOWING TERMS AND CONDITIONS BEFORE INSTALLING THIS SOFTWARE PACKAGE.  WHOEVER INSTALLS THIS SOFTWARE PACKAGE MUST EITHER BE THE PERSON WHO ACQUIRED THE SOFTWARE OR A PERSON AUTHORIZED BY THE PERSON OR ENTITY WHO ACQUIRED THE SOFTWARE TO ACCEPT THE FOLLOWING TERMS ON SUCH PERSON'S OR ENTITY'S BEHALF.  "YOU" AND "YOUR" SHALL REFER TO THE PERSON OR ENTITY WHO ACQUIRED THIS PRODUCT.  INSTALLING THIS SOFTWARE PACKAGE INDICATES YOUR ACCEPTANCE OF THESE TERMS AND CONDITIONS.  IF YOU DO NOT AGREE WITH THEM, YOU SHOULD PROMPTLY RETURN THE SOFTWARE PACKAGE, UNINSTALLED, TO THE PLACE OF PURCHASE.**

**LICENSE**   Upon your acceptance of this License Agreement (the "Agreement"), Snap-on Incorporated ("Snap-on") grants, subject to the terms and conditions of this Agreement, to the person or business entity who originally acquired the Software Products ("Software") a non-exclusive, non-transferable (except as permitted below), personal license to use the Software ("License").  The Software in this package is a proprietary product of Snap-on and is protected by copyright law, as well as other intellectual property laws.  Snap-on retains title and ownership of the Software, and it is being licensed to you and not sold.  All rights, not expressly granted to you, are reserved by Snap-on.

**CONSENT**  Each time you use this Software, you consent to the collection, use, disclosure, and processing of Personal Information in accordance with the Privacy Policy attached as <u>Exhibit A</u>.  In particular, if you are located in a jurisdiction outside the United States, you consent to the transfer of this information to our servers and computer systems in the United States, a country that may not provide an "adequate" level of data protection within the meaning of the laws in your country.  You may withdraw your consent at any time, subject to any applicable legal or contractual restrictions and prior written notice to Snap-on.  **If you wish to withdraw your consent, please contact Snap-on using our information below.**

> **You may contact us at:**
>
>> **Snap-on Incorporated**
>> **2801 80th Street**
>> **P.O. Box 1410**
>> **Kenosha, WI  53141-1410**

**PERMITTED USES**  YOU MAY:  (i) install the Software on a single automotive diagnostic computer, the diagnostics tool for which it was intended, provided you keep the original solely for backup or archival purposes; (ii) transfer the Software and License to another party if the other party agrees to accept the terms and conditions of this Agreement, you retain no copies of the Software, and you transfer all of the Software to such other party.

**PROHIBITED USES**  YOU MAY NOT:  (i) copy the Software into any machine readable or printed form for backup or archival purposes; (ii) modify, merge, translate, decompile, reverse engineer, disassemble, decode, or otherwise alter or attempt to derive the source code of the Software; (iii) use the Software on more than one computer at the same time; (iv) separate the Software's component parts for use on more than one computer; the diagnostics tool for which it was intended (v) transfer, assign, rent, lease, sell, or otherwise dispose of the Software on temporary or permanent basis except as expressly provided herein; (vi) use the Software in any outsourcing, timesharing or service bureau arrangement; and/or (vii) provide, disclose, divulge or make available to, or permit use of the Software by any third party without Snap-on's prior written consent.  You will not remove any proprietary notices from the Software and will include such notices on any authorized copies of the Software.

**OEM SPECIFIC DATA**.  The Software utilizes certain data, technology, and other information that it receives from original equipment manufacturers ("OEM Data"). This OEM Data may be necessary for the proper functionality of the Software as it relates to the respective original equipment manufacturer's vehicles. In certain instances, these original equipment manufacturers may require you to register your use of the OEM Data or accept separate terms of use or other agreements or conditions in order to access and use the OEM Data in conjunction with the Software. Snap-on's obligations set forth in this Agreement do not extend to any such agreements or licenses.

**TERM**  The License is effective until terminated.  You may terminate it at any time by destroying the Software.  The License will also terminate automatically without notice from Snap-on if you fail to comply with any provision of this Agreement.  You agree upon such termination to destroy the Software and upon Snap-on's request to certify in writing that you have so destroyed the Software.

**LIMITED WARRANTY**  Snap-on warrants, for a period of sixty (60) days from the date of delivery to you as evidenced by a copy of your sales receipt, that the Software will perform substantially in accordance with the accompanying technical specifications in the documentation, under normal use.  THIS LIMITED WARRANTY IS PROVIDED IN LIEU OF ANY OTHER EXPRESS WARRANTIES (IF ANY), ALL OF WHICH ARE DISCLAIMED BELOW. THIS LIMITED WARRANTY IS THE ONLY EXPRESS WARRANTY THAT IS PROVIDED TO YOU AND IS NOT TRANSFERABLE OR ASSIGNABLE.

**WARRANTY DISCLAIMER**  EXCEPT AS SET FORTH IN THE ABOVE LIMITED WARRANTY AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE SOFTWARE IS PROVIDED "AS IS", WITH ALL FAULTS AND WITHOUT WARRANTY, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OF LACK OF VIRUSES, AND OF LACK OF NEGLIGENCE OR LACK OF WORKMANLIKE EFFORT AND ALL SUCH WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

SNAP-ON AND ITS AFFILIATED COMPANIES DO NOT WARRANT, GUARANTEE, OR MAKE ANY REPRESENTATIONS REGARDING THE USE, OR THE RESULTS OF THE USE, OF THE SOFTWARE OR WRITTEN MATERIALS IN TERMS OF CORRECTNESS, ACCURACY, RELIABILITY, CURRENTNESS, OR IN TERMS OF YOUR REQUIREMENTS.  ALSO, THERE IS NO WARRANTY OF TITLE OR NONINFRINGEMENT IN THE SOFTWARE.  NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY SNAP-ON OR ITS AFFILIATED COMPANIES, OR THEIR RESPECTIVE AGENTS, DISTRIBUTORS, DEALERS AND EMPLOYEES, SHALL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THIS WARRANTY, AND YOU MAY NOT RELY ON ANY SUCH INFORMATION OR ADVICE.  SNAP-ON DOES NOT WARRANT THE OPERATION OF THE SOFTWARE TO BE UNINTERRUPTED OR ERROR-FREE, NOR DOES SNAP-ON MAKE ANY WARRANTY OR REPRESENTATION REGARDING THE USE OR OUTPUT OF THE SOFTWARE IN TERMS OF CORRECTNESS, ACCURACY, COMPLETENESS, TIMELINESS, SEQUENCE, RELIABILITY OR OTHERWISE OR THAT THE SOFTWARE WILL MEET YOUR REQUIREMENTS.  SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSIONS MAY NOT APPLY TO YOU TO THE EXTENT SUCH EXCLUSION IS NOT ALLOWED BY APPLICABLE LAW.  THE LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU ALSO MAY HAVE OTHER RIGHTS THAT VARY BY JURISDICTION.

**YOUR EXCLUSIVE REMEDY**  If, during the sixty (60) day warranty period, the Software fails to comply with the limited warranty set forth above, provided you notify Snap-on within such sixty (60) day warranty period, Snap-on shall, at Snap-on's sole option, either:  (i) the return the price paid (if any) for the Software; or (ii) repair or replace at no charge, the Software not meeting the Limited Warranty, and which is returned to Snap-on at your expense with a copy of the sales receipt.  THE FOREGOING IS SNAP-ON'S ENTIRE LIABILITY AND YOUR SOLE AND EXCLUSIVE REMEDY RELATING TO BREACH OF THE LIMITED WARRANTY.  If failure of the Software has resulted from accident, abuse, misuse or misapplication, Snap-on shall have no responsibility whatsoever.  Any replacement Software will be warranted for the remainder of the original warranty period of sixty (60) days.

**EXCLUSION OF CONSEQUENTIAL, INCIDENTAL AND CERTAIN OTHER DAMAGES**  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER SNAP-ON NOR ANY ONE ELSE WHO HAS BEEN INVOLVED IN THE CREATION, PRODUCTION, OR DELIVERY OF THE SOFTWARE, INCLUDING BUT NOT LIMITED TO SNAP-ON'S AFFILIATED COMPANIES, DISTRIBUTORS OR DEALERS SHALL BE LIABLE TO YOU FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES WHATSOEVER (INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF BUSINESS OR PERSONAL PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS OR PERSONAL OR CONFIDENTIAL INFORMATION, OR ANY OTHER PECUNIARY LOSS, DAMAGES FOR LOSS OF PRIVACY, OR FOR FAILURE TO MEET ANY DUTY, INCLUDING ANY DUTY OF GOOD FAITH OR TO EXERCISE COMMERICALLY REASONABLE CARE OR FOR NEGLIGENCE) ARISING OUT OF OR IN ANY WAY RELATED TO THE USE OR INABILITY TO USE SUCH SOFTWARE, EVEN IF SNAP-ON  HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  **IN NO EVENT WILL SNAP-ON'S OR ITS AFFILIATED COMPANIES' TOTAL LIABILITY FOR ANY AND ALL DAMAGES, LOSSES AND CAUSES OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, EXCEED THE AMOUNT PAID BY YOU FOR THE SOFTWARE.**  SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO CERTAIN OF THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

**TAXES AND CHARGES**  You will be responsible for all applicable federal, state or local taxes, tariffs or duties, now or hereafter imposed except for those taxes related to the income of Snap-on.

**EXPORT ADMINISTRATION COMPLIANCE**  This Agreement is made subject to any restrictions concerning the export of the Software from the United States of America or the country in which you are located.  You will comply fully with all

relevant export laws and regulations of the United States and any local country, and you will not export, directly or indirectly, the Software nor any other technical data received from Snap-on, nor any part thereof, in violation of such laws.

**RESTRICTED RIGHTS**  The Software is provided with RESTRICTED RIGHTS.  Use, duplication, or disclosure by or on behalf of any unit or agency of the United States Government (the "Government") is subject to restrictions as set forth in subparagraph (c)(1) of the Rights in Technical Data and Computer Licensed Software clause at DFARS 252.227-7013 or subparagraphs (c)(1) and (2) of the Commercial Computer Licensed Software---Restricted Rights at 48 CFR 52.227-19, as applicable.  Manufacturer is Snap-on Incorporated or one of its affiliates, 2801 80th Street, Kenosha, WI 53143.

**GOVERNING LAW; EXCLUSIVE JURISDICTION**   This Agreement will be governed by the laws of the State of Wisconsin (excluding its choice of laws principles).  **YOU CONSENT TO EXCLUSIVE JURISDICTION AND VENUE IN THE FEDERAL COURTS SITTING IN MILWAUKEE COUNTY, WISCONSIN, UNLESS NO FEDERAL JURISDICTION EXISTS, IN WHICH CASE YOU CONSENT TO EXCLUSIVE JURISDICTION AND VENUE IN ANY STATE COURT LOCATED IN MILWAUKEE COUNTY, WISCONSIN.  YOU WAIVE ALL DEFENSES OF LACK OF PERSONAL JURISDICTION AND FORUM NON CONVENIENS.  THE PARTIES HEREBY EXPRESSLY AGREE THAT THIS AGREEMENT SHALL NOT BE GOVERNED BY THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS.**

**GENERAL**  You agree that this Agreement is the complete and exclusive statement of the Agreement between you and Snap-on which supersedes any proposal or prior agreement, oral or written, and any other communications between you and Snap-on relating to the subject of this Agreement.  If for any reason a court of competent jurisdiction finds any provision of this Agreement to be unenforceable, that provision will be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement will continue in full force and effect.  Any failure by either party to require strict performance by the other of any provision of this Agreement will not constitute a waiver of such provision or thereafter affect the party's full rights to require strict performance.  This Agreement may only be amended by specific written amendment signed by authorized representatives of both parties.

**YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.**

8-13963A03 Rev E

### SNAP-ON INCORPORATED PRIVACY POLICY

The privacy of your personally identifiable information is important to us. As part of our commitment to the privacy of your personally identifiable information ("Personal Information") that we collect through the Software Product ("Software") or other means such as registration cards, telecommunications or other means, we provide this notice explaining our information practices and the choices you can make about the way your Personal Information is collected and used with the Software. To make this notice easy to find, we make it available with the Software. This revised Privacy Policy is effective as of June 1, 2019.

The privacy practices set forth in this Privacy Policy are for this Software only. Other Snap-on Incorporated ("Snap-on") affiliate Software may have different practices. If you use other Snap-on Software, please review the privacy policies, if any, provided with that Software. Also, if you are an employee of Snap-on or its affiliates, please note that other internal company policies apply to you related to employee use of company computer systems and networks.

**CONSENT**  Please read this policy carefully. Your use of this Software constitutes your consent to the collection, use, disclosure and processing of Personal Information in the United States as described below.

**FOREIGN VISITORS**  The Software maybe used by persons located in jurisdictions worldwide.  Please review the Foreign Users Notices section near the end of this Privacy Policy, where we may provide additional notices regarding the collection, use, disclosure, and processing of your Personal Information in accordance with the laws in your country.

**ACTIVE COLLECTION OF PERSONAL INFORMATION**  When you use the Software you provide Personal Information to register, order products or services, contact Snap-on, and conduct other activities or transactions via the Software. The types of Personal Information actively collected in the Software may include any or all of the following, depending on your activities using the Software:

Date of sale, franchisee name, franchisee address, e-mail, invoice number, product number, quantity, device serial number, customer name, customer address, customer phone number, Snap-on customer number (if applicable), Software training requested and received, diagnostic session information (including, without limitation, identification of the registered shop and registered user (name), tool identification/serial number, and information related to vehicles serviced during the diagnostic session and the corresponding services performed on such vehicle during the respective session) ("Session Information"), and other Personal Information that you actively provide to us via the Software or other means. Additional information may be collected, such as vehicle specific information including vehicle identification number (VIN) and vehicle engine control unit serial number, Public Key Infrastructure Reference Identification (PKI RefID), year, make, model, engine and other vehicle data via the Software.

Snap-on agrees not to disclose or use any Customer's specific company or end customer data shared with Snap-on except to the extent necessary to carry out its obligations under this Agreement or other data access or license agreements with original equipment manufacturers or other parties whose data, technology, or information are necessary for the proper functionality of the Software, which may include sharing such Customer's specific company or end customer data with original equipment manufacturers and other third party content or service providers ("Third Party Providers"). Snap-on reserves the right to aggregate and market general data collected from a Customer for the purposes of benchmarking, research and data analysis. Customer hereby declares that it has collected any consents that are legally required to process Personal Information through use of the Software as described herein.

**PURPOSE FOR WHICH WE USE AND DISCLOSE PERSONAL INFORMATION**  We use and disclose Personal Information obtained when you purchase the product/software and agree to provide this information to the Snap-on Franchise.

We also use Personal Information to communicate with you, for example, to answer the e-mail and correspondence we receive, to confirm your order, to send more information about becoming a dealer, to send renewal notices, and to notify you of important changes in the functionality of the Software or other notices related to the handling of your Personal Information.

We may use Personal Information to make recommendations for additional products or special offers, and to provide you with updates on new products that we believe may be of interest to you, in situations where you expressly request such communications.

From time to time, we may share certain Personal Information with select third parties including other Snap-on affiliates and independent Snap-on dealers in your area to enable them to offer products or services that may be of interest to you. If you do not want us to share such Personal Information in the future, please contact us by using our information below and we will take reasonable measures to avoid sharing such information in the future. Please note that such third parties are usually independent from Snap-on, and if you wish to stop all communications from such parties, you will need to address such issues with the third parties directly.

We may disclose Personal Information in response to legal process or when we believe in good faith that the law requires it, for example, in response to a court order, subpoena or a law enforcement agency's request. We also reserve the right to disclose Personal Information to protect the security of the Software, to protect ourselves and our affiliated companies against liability, and/or in connection with any sale, assignment, or other transfer of all or a part of our business.

We may share Personal Information with our consultants or service providers to help us serve you better. We also contract other companies and individuals (collectively "Suppliers") to perform functions on our behalf, including without limitation, fulfilling and processing orders, handling shipping and returns, sending communications to you, and providing customer services. We require the Suppliers to agree to abide by Snap-on's privacy policy and only use your Personal Information, only until payment for your order is processed, and only to the extent necessary to perform their functions, and may not use it for any other purpose.

In certain limited instances, we may share Personal Information and Session Information with certain Third Party Providers. We will share the Personal Information and Session Information with those Third Party Providers only when we are required to share such information pursuant to the terms of a data access agreement, data license agreement, or other similar agreement with any Third Party Provider in order to obtain the data, technology, or information that is required for the full and proper functionality of the Software. The Personal Information and Session Information will only be supplied to those Third Party Providers who specifically request it pursuant to a valid contractual right to receive such information, and then only to those Third Party Providers to whose products the information relates (i.e. information about Brand X vehicles will only be shared with Brand X).

We will not use or share the Personal Information provided to us in the Software in ways unrelated to the ones described above without first providing you an opportunity to opt out or otherwise prohibit such unrelated uses.

**CUSTOMIZATION AND AGGREGATE DATA**  We use non-identifying and aggregate information to better design our Software and gather information for product management and development at Snap-on. For example, we may tell our sales and marketing staff that X number of individuals using the Software, or that Y number of software licenses were ordered during a particular time period, but we would not disclose anything that could be used to identify those individuals. This aggregate information may also be shared with Snap-on's affiliates and independent dealers.

**CHILDREN'S PRIVACY**  Snap-on has no intention of collecting personal information from children in this Software.

**HOW YOU CAN ACCESS OR CORRECT YOUR INFORMATION**  If you are a registered user of the Software, you can access and correct certain Personal Data that we collect through the Software and maintain by using the contact information below. You may also contact us using the information below to ask us to remove your Personal Information from our records, electronic or otherwise. However, we will need to maintain certain Personal Information about your product purchases in our records for purposes such as warranty and product information.  We will usually be glad to update your information, but we reserve the right to use Personal Information obtained previously to verify your identity, administer our warranty program, or to take other actions that we believe are appropriate.

**COLLECTION OF PERSONAL INFORMATION BY THIRD PARTIES**  Sometimes we may offer promotions or specials that are sponsored by or co-sponsored with identified third parties. By virtue of their sponsorship, these third parties may obtain Personal Information that you submit to participate in the promotion or special. Snap-on has no control over the third-party sponsors' use of this information. We will notify you at the time of requesting Personal Information if third-party sponsors will obtain such information, and obtain your express consent for such disclosures.

**CHANGES TO THE POLICY**  Our privacy practices are subject to change. We reserve the right to change this policy from time to time in our sole discretion. Please review this policy before you submit additional Personal Information via the Software. All revisions to this Privacy Policy will be communicated to you through updates to the License Agreement. Your continued use of the Software constitutes acceptance of such changes in the Privacy Policy, except where further steps are required by applicable law.

**FOREIGN USERS NOTICES**   Please contact us at the address below to obtain Privacy Policy information for your country.

**HOW TO CONTACT US**   Please feel free to contact us with any comments, questions, or suggestions you may have regarding the information practices described in this Privacy Policy.  Please also contact us to report any known or suspected privacy or security breaches.

　　　　　**You may contact us at:**

　　　　　　　**Snap-on Incorporated**
　　　　　　　**2801 80th Street**
　　　　　　　**P.O. Box 1410**
　　　　　　　**Kenosha, WI  53141-1410**

**From:** efile_information@casd.uscourts.gov <efile_information@casd.uscourts.gov>
**Sent:** Tuesday, July 27, 2021 11:32 AM
**To:** efile_information@casd.uscourts.gov
**Subject:** Activity in Case 3:21-cv-01339-CAB-BGS Snap-On Incorporated v. Mitchell Repair Information Company, LLC et al Complaint

<mark>External Email</mark>

---

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Southern District of California

## Notice of Electronic Filing

The following transaction was entered on 7/27/2021 at 11:31 AM PDT and filed on 7/27/2021

| | |
|---|---|
| **Case Name:** | Snap-On Incorporated v. Mitchell Repair Information Company, LLC et al |
| **Case Number:** | 3:21-cv-01339-CAB-BGS |
| **Filer:** | Mitchell Repair Information Company, LLC |
| | Snap-On Incorporated |

**Document Number:** 1

**Docket Text:**
**COMPLAINT with Jury Demand against Autel. US Inc., Autel Intelligent Technology Corp., LTD ( Filing fee $ 402 receipt number ACASDC-15967028.), filed by Mitchell Repair Information Company, LLC, Snap-On Incorporated. (Attachments: # (1) Civil Cover Sheet, # (2) Table of Exhibits, # (3) Exhibit 1, # (4) Exhibit 2, # (5) Exhibit 3, # (6) Exhibit 4, # (7) Exhibit 5, # (8) Exhibit 6)**

1

EXHIBIT 1
103

**The new case number is 3:21-cv-1339-CAB-BGS. Judge Cathy Ann Bencivengo and Magistrate Judge Bernard G. Skomal are assigned to the case. (Kuwayti, Kenneth) (fth)**

**3:21-cv-01339-CAB-BGS Notice has been electronically mailed to:**

Kenneth A. Kuwayti    Kkuwayti@mofo.com

**3:21-cv-01339-CAB-BGS Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-0] [ab4d9582349207c636030ce2833984ddaf8084078bf2320a57bab372032538b3d6 f32bcd7066438756cbe628d920c846d84a4382779faf47205555596bc442a5]]
**Document description:** Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-1] [a56458efd4f1014c671560f6c0ef92bfbd60a9577a8a414ffb3fc0aec644a8832f 6ceaa7cca7c0d2facda87bf23134a40f4b08f2cef28121acf976bd3fc92aeb]]
**Document description:** Table of Exhibits
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-2] [a6977cacd242b53a47beea184862df87fe818db71539615238566a825692714f54 7f8c9b4b00edfbbdf7ebe56d36ecff698e7d3e8745d36d70f3c172cc3575c9]]
**Document description:**Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-3] [a61b42f504710a262a600e3ec5c574b576daf6453b6ffa0ee4d6e0a9358804f07d c4e18bf90ba4db98ee35fc5a7a973926a85ca0154fb2b47d39f26bcc9f221f]]
**Document description:**Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-4] [acdaef7869031d2474e59f6e8e037f419d4e0913ccd3b04da2292aa8db22b96759 b3478fd8e765acdcd1cbc74fd5c3364cf02d017798ab45fed864628527e490]]
**Document description:**Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-5] [80df20af0af23a06df017a1a960b266250a68ebfff113dbf487d25dbd4350b40b2 55bee3b9d2e1a57ab2298397c6d2010163d07ea397009ae402513ba078355b]]
**Document description:**Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-6] [6b0199104fd329735d290bf844cca82099d956e532425e58329df58883952d8e92607dab8a5d7f87f6ff972ac21c0801abc8958f11c4e711e01adc3325a40951]]

**Document description:**Exhibit 5

**Original filename:**n/a

**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-7] [753f8cfa7df29a5dcba9f4608d2ca66ea3c43f041176d6bc27cde2f3b22cd5034ea8b89422fbbab61690a73dfb02139d592c1da3bf8bcb52dd54c47eb2a3516e]]

**Document description:**Exhibit 6

**Original filename:**n/a

**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1106146653 [Date=7/27/2021] [FileNumber=15724186-8] [46b587b11c2449fa9fe67a8fcdd2cbce5588f927b017d56be5daa5c248c593605ae494a128e72e039d7b6c21d78ed5c174514851c4d1bfea9875c4665a96cb32]]

AO 441   Summons in a Civil Action

# United States District Court
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mitchell Repair Information Company, LLC, a Delaware limited liability company; Snap-On Incorporated, a Delaware corporation | |
| *Plaintiff* | Civil Action No. 21-cv-1339-CAB-BGS |
| **V.** | |
| Autel. US Inc., a New York corporation; Autel Intelligent Technology Corp., LTD, a Chinese corporation | |
| *Defendant* | |

### SUMMONS IN A CIVIL ACTION

To:  *(Defendant's name and address)*

> Autel Intelligent Technology Corp., Ltd.
> 7th, 8th and 10th Floor, Building B1,
> Zhiyuan, Xueyuan Road, Xili, Nanshan,
> Shenzhen, 518055, China

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) **-** or 60 days if you are the United States or a United States agency, or an office or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) **-** You must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Kenneth A. Kuwayti
> 755 Page Mill Road
> Palo Alto, CA 94304
> (650) 813-5600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Date:  _____7/27/21_____



John Morrill
*CLERK OF COURT*
S/            T. Hernandez
_____
*Signature of Clerk or Deputy Clerk*

EXHIBIT 1
106

AO 441    Summons in a Civil Action                                                                                              (Page 2)

**Civil Action No.** 21-cv-1339-CAB-BGS                    Date Issued:        7/27/21

<div align="center">

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(1))*

</div>

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

  ☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____; or

  ☐ I left the summons at the individual's residence or place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

  ☐ I served the summons on *(name of the individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____; or

  ☐ I returned the summons unexecuted because _____; or

  ☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

I declare under penalty of perjury that this information is true.

Date: _____    _____

                     *Server's Signature*

             _____

                     *Printed name and title*

             _____

                     *Server's address*

---

<div align="center">

NOTICE OF RIGHT TO CONSENT TO TRIAL BY A UNITED STATES MAGISTRATE JUDGE

</div>

IN ACCORDANCE WITH THE PROVISION OF 28 USC 636(C) YOU ARE HEREBY NOTIFIED THAT A U.S. MAGISTRATE JUDGE OF THIS DISTRICT MAY, UPON CONSENT OF ALL PARTIES, CONDUCT ANY OR ALL PROCEEDINGS, INCLUDING A JURY OR NON-JURY TRIAL, AND ORDER THE ENTRY OF A FINAL JUDGMENT.

YOU SHOULD BE AWARE THAT YOUR DECISION TO CONSENT OR NOT CONSENT IS ENTIRELY VOLUNTARY AND SHOULD BE COMMUNICATED SOLELY TO THE CLERK OF COURT.  ONLY IF ALL PARTIES CONSENT WILL THE JUDGE OR MAGISTRATE JUDGE WHOM THE CASE HAS BEEN ASSIGNED BE INFORMED OF YOUR DECISION.

JUDGMENTS OF THE U.S. MAGISTRATE JUDGES ARE APPEALABLE TO THE U.S. COURT OF APPEALS IN ACCORDANCE WITH THIS STATUTE AND THE FEDERAL RULES OF APPELLATE PROCEDURE.

<div align="center">

EXHIBIT 1
107

</div>

AO 441    Summons in a Civil Action

# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

Mitchell Repair Information Company, LLC, a
Delaware limited liability company; Snap-On
Incorporated, a Delaware corporation

*Plaintiff*

**V.**

Autel. US Inc., a New York corporation; Autel
Intelligent Technology Corp., LTD, a Chinese
corporation

*Defendant*

Civil Action No. 21-cv-1339-CAB-BGS

### SUMMONS IN A CIVIL ACTION

To:  *(Defendant's name and address)*

    Autel. US, Inc.
    175 Central Ave, Ste. 200
    Farmingdale, NY 11735

    A lawsuit has been filed against you.

    Within 21 days after service of this summons on you (not counting the day you received it) **-** or 60 days
if you are the United States or a United States agency, or an office or employee of the United States described
in Fed. R. Civ. P. 12(a)(2) or (3) **-** You must serve on the plaintiff an answer to the attached complaint or a
motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the
plaintiff or plaintiff's attorney, whose name and address are:

    Kenneth A. Kuwayti
    755 Page Mill Road
    Palo Alto, CA 94304
    (650) 813-5600

    If you fail to respond, judgment by default will be entered against you for the relief demanded in the
complaint.  You also must file your answer or motion with the court.

Date: _____7/27/21_____



John Morrill
*CLERK OF COURT*
S/ _____
           T. Hernandez
      *Signature of Clerk or Deputy Clerk*

EXHIBIT 1
108

AO 441    Summons in a Civil Action                                                                                                    (Page 2)

**Civil Action No.** 21-cv-1339-CAB-BGS                          Date Issued:        7/27/21

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____; or

I left the summons at the individual's residence or place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

I served the summons on *(name of the individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____; or

I returned the summons unexecuted because _____; or

Other *(specify)*:


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                                          *Server's Signature*

                                                         _____
                                                                          *Printed name and title*

                                                         _____
                                                                          *Server's address*

<div style="border:1px solid">

### NOTICE OF RIGHT TO CONSENT TO TRIAL BY A UNITED STATES MAGISTRATE JUDGE

IN ACCORDANCE WITH THE PROVISION OF 28 USC 636(C) YOU ARE HEREBY NOTIFIED THAT A U.S. MAGISTRATE JUDGE OF THIS DISTRICT MAY, UPON CONSENT OF ALL PARTIES, CONDUCT ANY OR ALL PROCEEDINGS, INCLUDING A JURY OR NON-JURY TRIAL, AND ORDER THE ENTRY OF A FINAL JUDGMENT.

YOU SHOULD BE AWARE THAT YOUR DECISION TO CONSENT OR NOT CONSENT IS ENTIRELY VOLUNTARY AND SHOULD BE COMMUNICATED SOLELY TO THE CLERK OF COURT.  ONLY IF ALL PARTIES CONSENT WILL THE JUDGE OR MAGISTRATE JUDGE WHOM THE CASE HAS BEEN ASSIGNED BE INFORMED OF YOUR DECISION.

JUDGMENTS OF THE U.S. MAGISTRATE JUDGES ARE APPEALABLE TO THE U.S. COURT OF APPEALS IN ACCORDANCE WITH THIS STATUTE AND THE FEDERAL RULES OF APPELLATE PROCEDURE.

</div>

EXHIBIT 1
109